## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EVANGELINE TURNER,

     Plaintiff,

v.                                  Case No.:  1:07-cv-00569 JDB

FEDERAL EXPRESS CORPORATION

     Defendant.

---

## DEFENDANT FEDERAL EXPRESS CORPORATION'S
## MOTION TO DISMISS COMPLAINT AND SUPPORTING MEMORANDUM

---

Defendant, Federal Express Corporation (hereinafter "Defendant"), pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby moves the Court to dismiss all claims raised in the Plaintiff's Complaint.  In support of its Motion to Dismiss, Defendant states the following:

### <u>INTRODUCTION</u>

Plaintiff filed her Complaint in the Superior Court of the District of Columbia on February 22, 2007, alleging breach of contract, defamation and wrongful termination. Defendant subsequently removed the action to this Court pursuant to 28 U.S.C. §1332.

In her Complaint, Plaintiff alleges that she was wrongfully terminated in violation of alleged contractual provisions contained in the employee handbook, that her termination was a breach of that alleged contract, and that Defendant made defamatory statements that caused damage to her reputation.  Plaintiff's claims should be dismissed in their entirety for failure to state a claim pursuant to Fed. R. Civ. P 12(b)(6) because:

(1) Plaintiff's defamation claims are untimely; (2) even if  some or all of Plaintiff's defamation claims were timely, Defendant's claims were absolutely privileged; (3) Plaintiff was employed at-will and did not have an employment contract; and (4) the law of the District of Columbia bars claims of wrongful discharge by at-will employees.

## <u>LEGAL STANDARD</u>

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), will be successful if the defendant shows that the plaintiff can prove no facts in support of their claims that would entitle them to relief. See, e.g., *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997).  All of the plaintiff's factual allegations are accepted as true and all inferences are drawn in the plaintiff's favor. *Mortensen v. First Federal Sav. & Loan Asso.*, 549 F.2d 884, 891 (3d Cir. 1977). "If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure." *Id.* (citing 5 C. *Wright and A. Miller, Federal Practice and Procedure* § 1350 (1969) (emphasis added)).  *But see, GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (contract attached to motion and response considered "not outside the pleading.")

## <u>ARGUMENT</u>

**I.     <u>This Court Should Dismiss Plaintiff's Defamation Claim Because it is Untimely and Because it Fails to State a Claim Upon Which Relief May be Granted.</u>**

Plaintiff alleges in Count I of the Complaint that Defendant defamed her through "statements" it allegedly made in its response to the District of Columbia Department of

Employment Services ("DOES") and through its suspension of Plaintiff's employment.[1]
*See* Complaint, ¶¶ 31-40. Specifically, Plaintiff alleges that "[t]he statements of
Defendant that Plaintiff had engaged in willful misconduct constituted a malicious
publication." *See* Id. ¶ 32.[2] Plaintiff further alleges that "[t]he suspension of Plaintiff by
Defendant communicated to her co-workers and all other employees of Defendant that
Plaintiff had performed a disgraceful and/or dishonest act." *See* Id., ¶ 34. This claim
should be dismissed because it is untimely and because it does not state a claim upon
which relief may be granted.

### A. Plaintiff's Defamation Claim is Untimely.

D.C. Code § 12-301(4) provides that claims of defamation must be filed within
one year of the alleged publication. D.C. Code § 12-301 (2007). *See also, Jin v. Ministry
of State Sec.*, 254 F. Supp. 2d 61 (D.D.C. 2003) (where defamation suit was filed more
than one year after the alleged defamatory broadcast, the defamation claim was time-
barred). Plaintiff's allegations of defamation consist of two alleged publications: (1)
Plaintiff's suspension with pay on or about January 20, 2006 (see Complaint §§ 13-14,
34; and (2) Defendant's statement to DOES that Plaintiff had engaged in "willful
misconduct" and/or been terminated "for cause" (see Complaint §§ 25, 32).

---

[1] Because no other "statements" named in Plaintiff's Complaint are attributable to Defendant,
Defendant assumes that Count I refers to statements allegedly made to the District of Columbia
Department of Employment Services in its response to Plaintiff's application for employment
benefits. *See* Complaint, ¶¶ 25, 32. In any case, as explained *infra*, any other alleged
"statements" or publications would have occurred prior to this date and be outside the statute of
limitations and, accordingly, should be dismissed as untimely.

[2] Defendant denies that it made this statement. Indeed, Plaintiff's own complaint contradicts
itself by stating that Defendant informed the DOES that Plaintiff had been terminated "for cause."
*See* Id., ¶ 25. However, for the purpose of its Motion, Defendant's denial of this allegation is
immaterial.

First, Plaintiff alleges that her suspension with pay was a "statement" which "communicated to her co-workers and all other employees of Defendant that Plaintiff had performed a disgraceful and/or dishonest act."  Although Defendant disputes that a mere suspension with pay constitutes a "statement" which may rise to the level of defamation, it is not necessary for this Court to decide that issue because the claim is clearly untimely. Plaintiff asserts that her suspension occurred on or about January 20, 2006; therefore, her Complaint must have been filed prior to January 20, 2007 to fall within the one-year statute of limitations.  Plaintiff filed her Complaint on February 22, 2007, clearly beyond the statute of limitations.

Moreover, <u>any</u> statements or events which allegedly occurred prior to February 22, 2006 would be outside the statute of limitations for defamation claims.  *See, Dove v. Wash. Metro. Area Transit Auth.*, 402 F. Supp. 2d 91 (D.D.C. 2005) (Employee's defamation/libel claim was time-barred under the one year statute of limitations of D.C. Code § 12-301(4) where the latest date that the statute of limitations could have started running was the last day of the plaintiff's employment.)  Therefore, to the extent Plaintiff alleges other defamatory statements were made prior to her termination on February 5, 2006, those claims would also be untimely.[3]

The second alleged defamatory statement occurred in Defendant's response to Plaintiff's application for benefits with the District of Columbia Department of

---

[3] Defendant denies that Plaintiff has correctly stated the dates of her employment in the Complaint.  Indeed, Defendant's records show that Plaintiff was terminated on 1/19/06. However, for the sole purpose of its Motion to Dismiss, Defendant will accept Plaintiff's dates as true.

Employment Services.[4]  *See* Complaint ¶¶ 25, 32.  Although Defendant asserts that these

alleged statements are also untimely, establishing this fact would require the Court to

examine documents outside the pleadings, which is not contemplated in a motion brought

pursuant to F.R.C.P. 12(b)(6).  Moreover, because statements to DOES cannot, as a

matter of law, support a claim of defamation, it is not necessary for this Court to go

outside the pleadings and rule upon the issue of timeliness as to these statements.

### B.  Statements by Defendant to DOES are Absolutely Privileged and, As a Matter of Law, Cannot Support a Claim for Defamation

It is well-settled under District of Columbia law that "[r]eports to the

unemployment compensation board (a.k.a. Department of Employment Services)

concerning the termination of an employee ***are absolutely privileged and cannot support***

***a claim for libel***."  *Alexander v. Evans-Afflick*, 1993 U.S. Dist. LEXIS 16425, 20-21

(D.D.C. 1993) (emphasis supplied) (copy attached).  *See also, Goggins v. Hoddes*, 265

A.2d 302, 303 (D.C. 1970) (communication by employer to D.C. Unemployment

Compensation Board concerning termination of employee held to be absolutely

privileged); *Holland v. Marriott Corp.*, 34 Fair Empl. Prac. Cas. (BNA) 1763 (D.D.C.

1984) ("Under the defamation law of the District of Columbia, defendant's written

communications to the Department were absolutely privileged and, therefore, could not

support a claim for libel."); *Rice v. Hilton Hotel Corp*, 1987 U.S. Dist. LEXIS 16893

(D.D.C. 1987) (copy attached) (dismissing plaintiff's amended complaint for defamation

because "[a]ssuming that [the] statement was made, and that it is defamatory, it is

nevertheless absolutely privileged under District of Columbia law"); *Coleman v. ABC,*

---

[4] Defendant assumes for the purpose of this Motion that Paragraph 32 of the Complaint refers to its written response submitted to DOES. However, because any statements to DOES would be absolutely privileged, this distinction is immaterial.

19855 U.S. Dist. LEXIS 18787, 20-21 (D.D.C. 1985) (copy attached) ("[N]o representations made during the course of the hearing [before DOES] may become the subject of a lawsuit.").

In Count I of her Complaint, Plaintiff alleges that Defendant made statements that Plaintiff had engaged in "willful misconduct" and that this statement constituted a "malicious publication." *See* Complaint, ¶ 32. As explained above, to the extent this allegation refers to any communications allegedly made prior to February 22, 2006, Plaintiff's claims are untimely. Additionally, however, any statements allegedly made by Defendant to the Department of Employment Services – whether timely or not – cannot support a claim of defamation because such statements are absolutely privileged as a matter of law.

Plaintiff's Complaint does not allege that Defendant made any defamatory statements other than her suspension with pay and Defendant's communications with DOES. Because these statements are either untimely or absolutely privileged as a matter of law, [5] Count I of Plaintiff's Complaint should be dismissed with prejudice.

## II.    Plaintiff's Breach of Contract Claim Fails to State a Claim Upon Which Relief May be Granted Because Plaintiff Was an At-Will Employee.

In Count II of her Complaint, Plaintiff alleges that she had an express or implied contract of employment with Defendant and that her termination was in breach of the terms of the alleged contract. *See* Complaint ¶¶ 41-49. Plaintiff further alleges that the

---

[5] Defendant additionally denies that any of the alleged statements, if made, are defamatory.

contract" was created by the Defendant's employee handbook.  Id. ¶¶ 43-48.   Count II of

Plaintiff's Complaint should be dismissed because Plaintiff was an at-will employee.[6]

There is a "longstanding presumption in the District of Columbia that, unless a

contrary contractual intent is clearly expressed, all employment is at-will." *Green v.

Bowne of N.Y. LLC*, 2002 U.S. Dist. LEXIS 16872, 1-2 (D.D.C. 2002) (granting

defendant's motion to dismiss plaintiff's breach of contract claim based upon employee

handbook) *citing Sullivan v. Heritage Found.*, 399 A.2d 856, 860 (D.C. 1978).  *See also,*

*Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 (D.C. 1997) (employment

is presumed to be at will and can be terminated "at any time and for any reason, or for no

reason at all.") (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C.

1991)).

It is equally well-established that this presumption can be rebutted only if the

parties "state clearly their intention to limit the employer's right to terminate." *Perkins v.*

*District Gov't Employees Fed. Credit Union*, 653 A.2d 842, 842 (D.C. 1995), citations

omitted.  Although, in very limited circumstances, certain employee handbooks and

manuals have been found to contain the requisite expression of intent, an employee

handbook is "unenforceable at law" where it "contains language clearly reserving the

employer's right to terminate at will." *Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689

A.2d 52, 55 (D.C. 1997).

For example, in *Futrell v. Department of Labor Federal Credit Union*, 816 A.2d

793 (D.C. 2003), the District of Columbia Court of Appeals analyzed an employee

handbook to determine whether it created an implied employment contract. In concluding

---

[6] Although Defendant additionally denies that any of its actions were contrary to it own policies,
this denial is immaterial for the purpose of the present Motion.

that no such contract had been created, the Court of Appeals relied, in part, on the fact that the handbook stated in boldface print that it "'does not constitute an expressed or implied employee contract,' and it also provided that 'employees may terminate their employment with the [employer] any time, for any reason, and may be terminated by the [employer] any time, for any reason, with or without notice." *Id.* at 806. The court concluded that "the inclusion of such unambiguous language and the lack of any specific preconditions in the Guidebook that must be met before employment will be terminated supports the conclusion that [the plaintiff's] arguments [are] without merit . . . ." *Id.*

Additionally, in *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97 (D.D.C. 2001), the District Court reviewed an employee handbook and found that, as a matter of law, its terms did not support the plaintiff's assertion that an express or implied contractual relationship existed. The handbook at issue in *Carter* included a disclaimer stating that "the personnel policies . . . do not constitute or reflect terms of a contract between the University and any employee" and further stated that "employment at the University is not for a definite time and may be terminated at the will of the employee or the University at any time." *Id.* at 109-110. *See also*, *Green* 2002 U.S. Dist. LEXIS 16872, 1-2 (granting defendant's motion to dismiss breach of contract claim where employee handbook stated: "this booklet ... is not intended to be, nor is it a contract or guarantee of employment or working conditions.")

In the present case, Plaintiff alleges that the FedEx Express Employee Handbook created an express or implied contract. This assertion is absolutely contradicted by the clear language of the documents and the vast weight of authority in District of Columbia

caselaw.  The employee handbook contains a disclaimer on page 2 which states in

pertinent part:

> The FedEx Express Employee Handbook **is not a contract
> of employment**, nor should its provisions be read or implied
> to provide for one.  Your specific rights as an employee are
> governed by the Employment Agreement you signed in
> your employment application.

*See* Declaration of Lisa Monahan, Exh.2 (attached hereto as Exhibit A) (emphasis

added).  This same language is repeated verbatim on the signed acknowledgement of

receipt which all employees, including Plaintiff, sign upon receipt of a handbook.  *Id.*

Moreover, the Employment Agreement referenced in this provision provides:

> (11) . . during the term of my employment, which I
> understand is INDEFINITE IN DURATION, I will comply
> with the guidelines established in the Company's policies,
> rules, regulations, and procedures.  I acknowledge and
> agree that Federal Express has the absolute, unfettered right
> to change its policies, rules, regulations, and procedures
> unilaterally, at any time, without prior notice.  I ALSO
> AGREE THAT MY EMPLOYMENT AND
> COMPENSATION CAN BE TERMINATED WITH OR
> WITHOUT CAUSE AND WITHOUT NOTICE OR
> LIABILITY WHATSOEVER, AT ANY TIME, AT
> EITHER MY OR THE COMPANY'S OPTION.  I
> FURTHER UNDERSTAND THAT NO MANAGER OR
> REPRESENTATIVE OF THE COMPANY, OTHER
> THAN THE CEO, OR ANY SENIOR VICE-PRESIDENT
> DESIGNATED BY THE CEO, HAS ANY AUTHORITY
> TO ENTER INTO ANY AGREEMENT FOR
> EMPLOYMENT WITH ME FOR ANY SPECIFIED
> PERIOD OF TIME OR TO AMEND THIS AGREEMENT
> IN ANY MANNER.  MOREOVER, ANY SUCH
> AMENDMENTS SHALL BE IN WRITING.  NOTHING
> IN THIS AGREEMENT, NOR IN ANY
> DOCUMENTATION OR OTHER COMMUNICATION
> FROM THE COMPANY, SHALL AFFECT MY
> EMPLOYMENT AT WILL STATUS.

*Id.*. at Exh. 1, p. 2-49 (emphasis in original).

9

The clear language expressed in the Employee Handbook and Employment Application leaves no room for doubt as to whether a contractual relationship was intended or implied. [7]  Plaintiff was employed at will and was plainly informed of her at-will status.  Accordingly, no contract for employment existed and Plaintiff cannot state a claim for breach of contract.  Count II of Plaintiff's Complaint should, therefore, be dismissed with prejudice.

### III.    Plaintiff's Wrongful Discharge Claim Fails to State a Claim Upon Which Relief May be Granted Because Plaintiff Was an At-Will Employee.

Plaintiff alleges in Count III of her Complaint that Defendant is liable for wrongful discharge because it allegedly terminated her in a manner not provided for in her "contract for employment."  *See* Complaint ¶¶ 50-58.  As explained above, Plaintiff did not have a contract for employment.  Plaintiff was employed at-will and, therefore, "[could] be terminated 'at any time and for any reason, or for no reason at all.'" *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 (D.C. 1997) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)).  "District of Columbia law presumptively bars wrongful termination claims brought by at-will employees." *Spychalski v. The Univ. Club*, 2004 U.S. Dist. LEXIS 29541, 8-9 (D.D.C. 2004) citing *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991).  Although the District

---

[7]  Other courts have already held that FedEx employees are employed at will and that FedEx's employee manuals do not provide contractual rights.  *See, e.g.*, Foster v. Federal Express Corp., 2006 U.S. Dist. LEXIS 53779 (E.D. Mich. August 3, 2006); Warner v. Federal Express Corp., 174 F.Supp.2d 215 (D.N.J. 2001); Calhoun v. Federal Express Corp., 2000 U.S. Dist. LEXIS 10869 (N.D. Cal. July 31, 2000); Bowen v. Federal Express Corp., 2000 U.S. Dist. LEXIS 1697 (N.D. Tex. February 9, 2000); Cowen v. Federal Express Corp., 25 F.Supp.2d 33 (D.Conn. 1998); Aquinas v. Federal Express Corp., 940 F.Supp. 73 (S.D.N.Y. 1996); Leahy v. Federal Express Corp., 609 F.Supp. 668 (E.D.N.Y. 1995); Montalvo v. Federal Express Corp., 1995 U.S. Dist. LEXIS 18335 (S.D.N.Y. December 11, 1995); White v. Federal Express Corp., 729 F.Supp. 1536 (E.D. Va. 1990); Federal Express Corp. v. Dutschmann, 846 S.W.2d 282 (Texas 1993).

of Columbia has recognized a narrow policy exception to this general rule (e.g. where the

sole reason for discharge is the employee's refusal to violate the law), Plaintiff has made

no such allegation in her Complaint.

As an at-will employee, Plaintiff cannot state a claim of common law wrongful

discharge and, accordingly, Count III of the Complaint should be dismissed with

prejudice.

## **CONCLUSION**

Based upon the foregoing, Defendant moves this Court to dismiss Plaintiff's

Complaint with prejudice in its entirety and to award it such other and further relief to

which it may be entitled.

Respectfully submitted,

By:    /s/ M. Kimberly Hodges
       M. Kimberly Hodges
       (admitted *pro hac vice*)
       TN Bar No. 020809
       Senior Attorney
       FEDERAL EXPRESS CORPORATION
       3620 Hacks Cross Road
       Building B – 3rd Floor
       Memphis, Tennessee  38125
       Telephone: (901) 434-8217
       Facsimile: (901) 434-9278

       Edward J. Efkeman
       (DC Bar No. 479545)
       Senior Counsel
       FEDERAL EXPRESS CORPORATION
       3620 Hacks Cross Road
       Building B – 3rd Floor
       Memphis, Tennessee  38125
       Telephone: (901) 434-8555
       Facsimile: (901) 434-9271

       *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed via ECF and served electronically this 5th day of April, 2007, on the following:

Michael L. Avery
AVERY & ASSOCIATES
1331 H Street, NW, Suite 902
Washington, DC 20005
Telephone: (202) 393-4600
Fax: (202) 393-3633

<u>/s/ M. Kimberly Hodges</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EVANGELINE TURNER,

    Plaintiff,

v.                          Case No.:  1:07-cv-00569

FEDERAL EXPRESS CORPORATION

    Defendant.

---

## DECLARATION OF LISA MONAHAN

---

I, Lisa Monahan, under penalty of perjury, state as follows:

1.    I am over the age of twenty-one and am qualified to testify as to the matters set forth herein.

2.    I am a Paralegal employed in the legal department at the Corporate Headquarters of Federal Express Corporation ("FedEx"), located at 3620 Hacks Cross Road, Building B-Third Floor, Memphis, Tennessee 38125.

3.    In my capacity as Paralegal for Federal Express Corporation ("FedEx"), I have knowledge of the facts stated herein and am authorized to make this certification on behalf of FedEx.

4.    Exhibit 1 contains a true and accurate copy of Plaintiff's Application for Employment Form. This document is kept in the regular course of business of FedEx, and it is the regular and routine practice of FedEx to make and keep this document.

5.      Exhibit 2 is a true and accurate copy of the FedEx Express Employee Handbook in effect on the date of Plaintiff's termination together with Plaintiff's signed acknowledgement of receipt of this Handbook.  These documents are kept in the regular course of business of FedEx, and it is the regular and routine practice of FedEx to make and keep these documents.

Pursuant to 28 U.S.C. Sec. 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 5th day of April, 2007 at Memphis, Tennessee.

Lisa Monahan

# EXHIBIT 1



AN EQUAL OPPORTUNITY EMPLOYER

# APPLICATION FOR EMPLOYMENT

Complete the "bubble" sections, neatly darkening in the circles.

| Employee Number | First Letter of Last Name | Second Letter of Last Name | Date of Hire |  |  |
|---|---|---|---|---|---|
|  |  |  | Month | Day | Year |
| 3 0 0 4 8 8 | T | U | 09 | 03 | 97 |

DATE 8-6-97

MI M

FIRST NAME EVANGELINE

LAST NAME TURNER

SHIFT PREFERENCE ANY

---

**IMPORTANT!        IMPORTANT!        IMPORTANT!        IMPORTANT!**

**APPLICANT:**
1. MUST COMPLETE ALL PAGES RELATED TO POSITION APPLIED FOR, MAKING CERTAIN TO SIGN AND DATE PAGE 9.
2. MUST INDICATE POSITION DESIRED ON PAGE 2.
3. MUST ATTACH COPIES OF ALL JOB-RELATED OR JOB-REQUIRED LICENSES.

## EEO Policy Statement

Dear prospective employee:

It is the policy of FedEx to afford equal employment opportunity to all individuals, regardless of race, color, religion, sex, national origin, citizenship, disability, status as a Vietnam Era or special disabled veteran, or age. In addition, FedEx adheres to the equal employment opportunity requirements of the federal government, and all states and localities in which it does business. We are strongly bound to this policy because adherence to equal employment opportunity principles is the only acceptable American way of life. FedEx is committed to ensure that we: (1) recruit, hire, train, and promote persons into all jobs in accordance with principles of equal employment opportunity; (2) base decisions on employment so as to further the principle of equal employment opportunity; (3) make promotional decisions in accordance with principles of imposing only valid job requirements; and (4) administer personnel actions such as compensation, benefits, transfers, Company-sponsored training, education, tuition assistance, social and recreation programs, in accordance with principles of equal employment opportunity.

Frederick W. Smith
Chairman and Chief Executive Officer

APP            9512   10





FedEx    2-43
M-0265X 6/96

INSTRUCTIONS: COMPLETE ALL BLANKS, INDICATE "NONE" OR "NA" WHEN APPROPRIATE, USE ADDITIONAL SHEETS IF NECESSARY FOR COMPLETE INFORMATION.

## GENERAL INFORMATION

### PERSONAL DATA

NAME (LAST) *Turner*  (FIRST) *Evangeline*  (MI) *M*  | SOCIAL SECURITY NUMBER

PRESENT ADDRESS (NO., STREET, AND APARTMENT NO.) *2436 Elvans Road, SE #T-2*

CITY *Washington, DC*  STATE  |  ZIP CODE *20020*  *9-1-94*

TELEPHONE (AREA CODE AND NUMBER) *(202) 889-5774*  ALTERNATE TELEPHONE (AREA CODE AND NUMBER) *(202) 563-5941*

IS ANY ADDITIONAL INFORMATION RELATIVE TO A CHANGE IN YOUR NAME NECESSARY TO ENABLE FEDEX CORPORATION TO VERIFY THE INFORMATION IN THIS APPLICATION OR OBTAINED IN CONNECTION WITH IT?  ☐ YES ☒ NO

IF YES, OTHER NAME(S) _____

### TYPE OF WORK

POSITIONS APPLIED FOR
1 *CKR*   2 *HND*   3 *CSA*

AVAILABILITY  ☒ FULL-TIME ☒ PART-TIME ☐ CASUAL ☐ TEMPORARY ☒ ANY    MINIMUM SALARY REQUIRED                    PER HOUR/PER MON

SHIFT  ☒ ANY  ☐ DAYS  ☐ AFTERNOONS  ☐ NIGHTS    SHIFT PREFERENCE

☐ WEEKENDS ONLY

ARE YOU WILLING TO WORK OVERTIME? ☒ YES ☐ NO    WEEKENDS? ☒ YES ☐ NO
(As a condition of employment, overtime and/or weekend work may be required for certain positions. This information will be used for job-related reasons only.)

1. HAVE YOU EVER BEEN EMPLOYED AT FEDEX? ☐ YES ☒ NO  ☐ IN USA  OR ANOTHER COUNTRY _____

IF YES, GIVE EMPLOYEE NO. _____ DATES _____ TO _____

WHY DO YOU WANT TO WORK FOR FEDEX? *To develope a career with Fed-Fx.*

2. HAVE YOU EVER APPLIED FOR A POSITION AT FEDEX?
☐ YES ☒ NO  IF YES, WHERE? _____ DATES _____

3. IN THE LAST 7 YEARS, HAVE YOU BEEN CONVICTED OF OR PLEADED GUILTY TO A CRIME OR OTHER OFFENSE? ☐ YES ☒ NO
Include military service convictions, guilty pleas, and traffic violations (traffic violations are applicable to driving positions only). Driving positions require MVR checks. Do not include parking tickets or convictions or guilty pleas for which a record has been sealed or expunged. NOTE: A conviction is NOT an automatic bar to employment. All circumstances will be considered.
IF YES, STATE THE CRIME OR OTHER OFFENSE FOR WHICH YOU HAVE PLEADED GUILTY TO OR HAVE BEEN CONVICTED.

DATE OF THE CONVICTION OR GUILTY PLEA _____

PLACE OF THE CONVICTION OR GUILTY PLEA _____

4. ARE YOU PRESENTLY UNDER INDICTMENT OR ARE YOU CURRENTLY A DEFENDANT IN ANY CRIMINAL PROCEEDING? ☐ YES ☒ N

IF YES, STATE THE CHARGE _____

DATE OF THE INDICTMENT OR PENDING CHARGE _____

PLACE OF THE INDICTMENT OR PENDING CHARGE _____
NOTE: A Yes answer to this question is NOT an automatic bar to employment.

5. NOTE: THE INFORMATION THAT I HAVE PROVIDED ON THIS APPLICATION IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDG ANY MISREPRESENTATION OR OMISSION OF ANY FACT IN MY APPLICATION, RESUME, OR ANY OTHER MATERIALS SUBMITTED T THE COMPANY OR DURING MY INTERVIEWS MAY RESULT IN DENIAL OF EMPLOYMENT OR DISCHARGE.

SIGNATURE *Evangeline M. Turner*

2-44

## WORK HISTORY

CORPORATE POLICY REQUIRES A 5-YEAR BACKGROUND CHECK ON ALL APPLICANTS.
LIST BELOW IN ORDER ALL PRESENT AND PAST EMPLOYMENT BEGINNING WITH YOUR MOST RECENT EMPLOYMENT FOR THE LAST 5 YEARS
YEARS WORKED IF LESS THAN 10 YEARS. (INCLUDE MILITARY JOB EXPERIENCE AND OTHER ACTIVITY TO INCLUDE EDUCATION, HOMEWORKE
ETC.) USE ADDITIONAL SHEET IF NECESSARY. (ACCOUNT FOR ALL PERIODS OF UNEMPLOYMENT FOR PERIODS OF 30 DAYS OR MORE.)
CAN WE CONTACT YOUR PRESENT EMPLOYER?  ☐ YES   ☐ NO    YOUR ANSWER TO THIS QUESTION WILL NOT AUTOMATICALL
PRECLUDE YOU FROM THE SELECTION PROCESS. HOWEVER, WE WANT YOU TO KNOW THAT WE WILL CONTACT YOUR PRESENT EMPLOYE
BEFORE A JOB OFFER IS EXTENDED.

| FROM MM/DD/YY | TO MM/DD/YY | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| 8-19-94 | Present | Cosmetologist | Hair - N - Effect | START $ 200.00  END $ 500.00 + |

**SUPERVISOR'S FULL NAME AND TITLE** Roland Hilton Owner — **PHONE** (202) 588-8780
**ADDRESS** 1915 ½ 7th St., NW **CITY** Wash. DC **STATE** **ZIP CODE** 20020
**DESCRIPTION OF DUTIES** Greet Clients; shampoo, condition and style hair.
**REASON FOR LEAVING** Presently Employed

| FROM MM/DD/YY | TO MM/DD/YY | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| 2-8-94 | 8-11-94 | Clerk-Typist (Intership) | Department of Housing | START $ END $ |

**SUPERVISOR'S FULL NAME AND TITLE** Junita Walker Manager — **PHONE** (202) 767-1498
**ADDRESS** Ringer Place SE **CITY** Wash. DC **STATE** **ZIP CODE** 20020
**DESCRIPTION OF DUTIES** General Clerical duties.
**REASON FOR LEAVING** End of internship

| FROM MM/DD/YY | TO MM/DD/YY | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| 6-29-93 | 9-3-93 | Clerk | Department of Interior | START $ 4.25  END $ 4.25 |

**SUPERVISOR'S FULL NAME AND TITLE** Jane Normandy — **PHONE** (202) 208-1860
**ADDRESS** 18th & C St., NW **CITY** Wash. DC **STATE** [20018] **ZIP CODE** 20018
**DESCRIPTION OF DUTIES** Sort large quanity of mail for Secretary of Interior; general clerical d
**REASON FOR LEAVING** End of Summer Youth Program

| FROM MM/DD/YY | TO MM/DD/YY | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| 10-3-91 | 6-28-93 | Unemployed | | START $ END $ |

**SUPERVISOR'S FULL NAME AND TITLE** — **PHONE**
**ADDRESS** **CITY** **STATE** **ZIP CODE**
**DESCRIPTION OF DUTIES**
**REASON FOR LEAVING**

| FROM MM/DD/YY | TO MM/DD/YY | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| 10-1-90 | 10-2-91 | Assistant Secretary | Library of Congress | START $ 5.00  END $ 5.42 |

**SUPERVISOR'S FULL NAME AND TITLE** Gieean Brower Chief Secretary — **PHONE** (202) 707-1759
**ADDRESS** Independence Ave., SE **CITY** Wash., DC **STATE** **ZIP CODE** 20011
**DESCRIPTION OF DUTIES** General Clerical duties
**REASON FOR LEAVING** Stay - In - School Program

APP          9512   10



FedEx          2-45

| FROM | TO | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| "MM/DD/YY" 1987" | MM/DD/YY 10-1-90 | SCHOOL | | START $ ___ END $ |
| SUPERVISOR'S FULL NAME AND TITLE | | | | PHONE |
| ADDRESS | | CITY | STATE | ZIP CODE |
| DESCRIPTION OF DUTIES | | | | |
| REASON FOR LEAVING | | | | |

| FROM | TO | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| MM/DD/YY | MM/DD/YY | | | START $ ___ END $ |
| SUPERVISOR'S FULL NAME AND TITLE | | | | PHONE |
| ADDRESS | | CITY | STATE | ZIP CODE |
| DESCRIPTION OF DUTIES | | | | |
| REASON FOR LEAVING | | | | |

| FROM | TO | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| MM/DD/YY | MM/DD/YY | | | START $ ___ END $ |
| SUPERVISOR'S FULL NAME AND TITLE | | | | PHONE |
| ADDRESS | | CITY | STATE | ZIP CODE |
| DESCRIPTION OF DUTIES | | | | |
| REASON FOR LEAVING | | | | |

| FROM | TO | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| MM/DD/YY | MM/DD/YY | | | START $ ___ END $ |
| SUPERVISOR'S FULL NAME AND TITLE | | | | PHONE |
| ADDRESS | | CITY | STATE | ZIP CODE |
| DESCRIPTION OF DUTIES | | | | |
| REASON FOR LEAVING | | | | |

| FROM | TO | JOB TITLE | COMPANY NAME | SALARY |
|---|---|---|---|---|
| MM/DD/YY | MM/DD/YY | | | START $ ___ END $ |
| SUPERVISOR'S FULL NAME AND TITLE | | | | PHONE |
| ADDRESS | | CITY | STATE | ZIP CODE |
| DESCRIPTION OF DUTIES | | | | |
| REASON FOR LEAVING | | | | |

PRIOR

APP          9512  10



2-46

FedEx

**EDUCATION** (Please (x) degrees/diplomas you hold and provide requested information for each.)

| RECEIVED H.S. DIPLOMA OR SECONDARY EDUCATION [x]YES [ ]GED [ ]NO | MAJOR *English, Math* | | CITY *Forestville* | STATE *MD* |
|---|---|---|---|---|
| | SCHOOL *Suitland High* | | | |

| ASSOCIATE DEGREE COMPLETED [ ]YES [ ]NO | MAJOR | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM | TO |
|---|---|---|---|---|
| | SCHOOL | | CITY | STATE |

| BACHELOR DEGREE COMPLETED [ ]YES [ ]NO | MAJOR | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM | TO |
|---|---|---|---|---|
| | SCHOOL | | CITY | STATE |

| MASTERS DEGREE COMPLETED [ ]YES [ ]NO | MAJOR | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM | TO |
|---|---|---|---|---|
| | SCHOOL | | CITY | STATE |

| DOCTORATE DEGREE COMPLETED [ ]YES [ ]NO | MAJOR | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM | TO |
|---|---|---|---|---|
| | SCHOOL | | CITY | STATE |

| CERTIFICATE OF COMPLETION [ ]YES [ ]NO | MAJOR | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM | TO |
|---|---|---|---|---|
| | SCHOOL | | CITY | STATE |

| CERTIFICATE OF COMPLETION [x]YES [ ]NO | MAJOR *Computer Training* | Credit Hours Completed [ ]SEMESTER [ ]QUARTER | FROM *8-93* | TO *3-94* |
|---|---|---|---|---|
| | SCHOOL *New Heights Clerical* | | CITY *Wash.,* | STATE *DC* |

**LANGUAGE** (Please list which foreign languages you speak, read, or write. (Information will be used for job-related purposes only.)

| FOREIGN LANGUAGE *English* | SPEAK [x] / [ ] | READ [x] / [ ] | WRITE [x] / [ ] |
|---|---|---|---|

**AIRCRAFT MAINTENANCE AND AVIONICS INFORMATION**

Please (x) the current licenses you hold and provide requested information for each.

| TYPE LICENSE | LICENSE NUMBER | DATE OF ISSUE | TYPE LICENSE | LICENSE NUMBER | DATE OF ISSU |
|---|---|---|---|---|---|
| [ ] FAA Repairman Certificate | | | [ ] FCC General Radio Telephone Operators | | |
| [ ] Airframe and Powerplant | | | [ ] FAA Inspector Authorization | | |
| [ ] Airframe Only | | | [ ] | | |
| [ ] Powerplant Only | | | [ ] | | |

| AIRFRAMES | POWERPLANTS | AVIONICS EQUIPMENT (Specify) |
|---|---|---|
| [ ] Boeing 727 | [ ] JT-8D | |
| [ ] DC-10  [ ] A-300 [ ] 747  [ ] A-310 [ ] MD-11 | [ ] JT-9 | |
| [ ] Other (Specify) | [ ] CF-6 | |
| | [ ] Other (Specify) | |

2–47

**CLERICAL INFORMATION** (Please (x) office skills/equipment operated.)

☑ Typing

WPM _60_

☑ 10-Key
Adding Machine
By Touch ☑ YES
☐ NO

☐ Telecopier
☐ CRT
☐ Microfilm
☑ Word Processor
☐ PBX System

→ Types of Word Processors
_5.1 , 5.0_

List any other office skills you
possess that may be pertinent
to this application:

_____
_____
_____

**DRIVER INFORMATION** (Complete for driving positions ONLY.)

Enclose current copy of State Motor Vehicle Record (MRV) Check.
Please (x) driver licenses you currently hold and provide requested information for each.

| LICENSE TYPE | STATE | LICENSE NUMBER | EXPIRATION (MO, DAY, YR) |
|---|---|---|---|
| ☐ Chauffeur | | | |
| ☐ Commercial Operator | | | |
| ☐ Commercial Driver's License | | | |
| List any associated endorsements: | | | |
| ☑ Operator | Wash., DC | 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 | 4 \| 4 \| 98 |
| ☐ Other (Please specify) | | | |

Are you 21 years of age or older? ☑ YES ☐ NO

Have you ever been denied a license or permit to operate a vehicle? ☐ YES ☑ NO

Have you ever had a license, permit, or privilege to drive suspended or revoked? ☐ YES ☑ NO

Please (X) types of equipment you have operated and provide requested information for each.

| TYPE | FROM (MO, DAY, YR) | | TO | APPROXIMATE MILES DRIVEN |
|---|---|---|---|---|
| ☑ Automobile | 6 | 88 | Present | 400,000 + |
| ☑ Van or Step Van | 6 | 88 | Present | 400,000 + |
| ☐ Straight Truck | | | | |
| ☐ Tractor – Semitrailer | | | | |
| ☐ Tractor – Two Trailers | | | | |
| ☐ Other | | | | |

States operated in for past 10 years _Wash., DC , VA , MD._

What safe driving awards have you received? _None_

List any accidents you have had within the last 3 years. Attach another sheet if more space is needed.

| | DATE (MO, DAY, YR) | CITY | STATE | NATURE OF ACCIDENT | FATALITY/INJURY | AMT DAMAGE |
|---|---|---|---|---|---|---|
| Last Accident | NONE | | | | | |
| Next Previous | | | | | | |
| Next Previous | | | | | | |

List any citation or conviction you have had in the past 3 years. Attach sheet if more space is needed.
Please include information concerning every traffic ticket paid with or without appearance.

| | DATE (MO, DAY, YR) | CITY | STATE | NATURE OF OFFENSE | FINE OR OTHER PENALTY |
|---|---|---|---|---|---|
| Last Citation | NONE | | | | |
| Next Previous | | | | | |
| Next Previous | | | | | |

**Please remember to date and sign this application on page 9 after reading the Agreement.**

APP                9512  10

# EMPLOYMENT AGREEMENT

## IMPORTANT - PLEASE READ AND SIGN

If employed, in consideration thereof, the continuance thereof, the compensation paid therefore, and without further consideration, I do hereby agree:

(1) That by execution of this application, I acknowledge that Federal Express Corporation (hereinafter referred to as "Company") has disclosed to me that an Investigative Consumer Report including information as to my character, general reputation, personal characteristics, and mode of living may be made; and that I, upon written request to the Company, made within a reasonable time after the date of this application, may obtain a complete and accurate disclosure of the nature and scope of the investigation requested, if any.

(NOTE: When required by state law, applicants, upon written request, will also be provided with the name and address of the consumer reporting agency to whom the Company's request to procure a report was made, and may also inspect and receive a copy of this report by contacting this agency. Applicants in California will be informed by the Company if an investigative consumer report is requested, which will include the name of the agency preparing the report and summary of their rights under California law.)

(2)(a) That any and all intellectual property, including without limitation, all inventions, discoveries, works of authorship, patentable works, copyrightable works, trade secrets, ideas, and software and all materials related to any of them, and all improvements thereto, in any way relating to the business of the character now or hereafter carried on or contemplated by the Company or to the processes of the Company, or to apparatus adapted to the business or processes of the Company, discovered, conceived, created, prepared, or made by me, individually, or jointly with others, in the line of work assigned to me at any time during my employment and any other line of work or investigations which the Company is or may become engaged or may contemplate, during my employment, regardless of whether I am involved in such line of work or investigation, shall immediately be disclosed to the Company, shall be considered prepared for and on behalf of the Company, considered a work for hire, and immediately become absolute property of the Company. I hereby assign all my right, title and interest in and to all such intellectual property, including without limitation, letters patent, copyrights, shopright and all other common law and statutory evidences of possession or ownership of such intellectual property in and by the Company, its successors, and assigns, including the right to apply for and obtain such letters patent, copyrights and other common law and statutory protections in all countries as Company may select. I further agree to assist the Company in making application for such letters patent, copyrights and all other common law and statutory protections for such intellectual property as the Company may consider desirable to perfect the Company's title to and interest in such intellectual property and to sign and execute any and all further papers necessary and incident to the perfection of Company's ownership of the intellectual property and the filing and protection of such protections, the Company to bear the costs and expense incident thereto. I will at any and all times cooperate with the Company in the prosecution and defense of any litigation which may arise in connection with any of the foregoing, and agree that termination of my employment will not relieve me of any of the above stated obligations.

(b) I agree that should I, in the course of my employment, acquire any information which is confidential or proprietary to the Company, I will (i) hold such information in confidence at all times during and after my employment with the Company; (ii) not disclose nor communicate confidential information to any third party; and (iii) not make use of such information on my behalf or on behalf of any third party. I acknowledge that an unauthorized disclosure of confidential information would cause irreparable harm to the Company and the Company shall be entitled to obtain appropriate relief should I violate this provision.

(3) That the Company may request, and I also authorize and request each former employer and each person, firm, or corporation given above as reference to furnish any information that may be sought by the Company concerning me and my work habits, character and skill, and I hereby waive any privileges involved and I hereby release my former employers from any and all liability of any type as a result of providing such information to the Company.

(4) That I may be subjected to searches of my person or property as a condition of employment. I further agree to permit employment searches as outlined in the Company's security policies and acknowledge that should I refuse to permit an employment search, I may be terminated.

(5) That at any time in the future, whether during or after termination of my employment, the Company has my consent to furnish any and all (i) reports (ii) information gathered and (iii) information relative to my record and services with and termination from the Company. I hereby release the Company from any and all liability of any type as a result of disclosing such information to another company or any third party.

(6) As a part of the preemployment process, drug testing may be required. In certain positions and post job offer medical examination, including drug testing, will be required. I understand that for such positions, any job offer is contingent upon successfully passing the medical examination. I agree to provide access to previous medical records if required.

(7) That I will submit myself to medical examinations, and/or health monitors, which may, under appropriate circumstances, include testing for drugs and/or alcohol, by physicians of the Company's selection as often as requested during my employment, and understand that failing to pass any such examination may prevent me from being in the Company's service; and I further understand and agree that failure of the Company to request physical examination shall not be construed as an admission by the Company that I am physically qualified to perform any specific type of service.

(8) Any offer of employment will be contingent upon the applicant's qualification for bond if required for the specific position.

(9) That Company, its successors, subsidiaries, employees, servants, agents, independent contractors, customers and purchasers at any time may copyright, sell, use and publish all photographic negatives and other likenesses made of me at any time, whether before, during, or after termination of my employment, together with all photographic prints or other reproductions from all or any parts thereof, including making, altering, or adding to the same by publication, advertising, testimonial, or otherwise, and including any and all commercial use thereof whatsoever, with or without the use of my name, all without compensation to me.

(10) The Company is subject to and is operating under various state workers' compensation laws and that in case of injury, I will accept compensation as provided by said laws.

(11) That during the term of my employment, which I understand is INDEFINITE IN DURATION, I will comply with the guidelines established in the Company's policies, rules, regulations, and procedures. I acknowledge and agree that Federal Express has the absolute, unfettered right to change its policies, rules, regulations, and procedures unilaterally, at any time, without prior notice. I ALSO AGREE THAT MY EMPLOYMENT AND COMPENSATION CAN BE TERMINATED WITH OR WITHOUT CAUSE AND WITHOUT NOTICE OR LIABILITY WHATSOEVER, AT ANY TIME, AT EITHER MY OR THE COMPANY'S OPTION. I FURTHER UNDERSTAND THAT NO MANAGER OR REPRESENTATIVE OF THE COMPANY, OTHER THAN THE CEO, OR ANY SENIOR VICE-PRESIDENT DESIGNATED BY THE CEO, HAS ANY AUTHORITY TO ENTER INTO ANY AGREEMENT FOR EMPLOYMENT WITH ME FOR ANY SPECIFIED PERIOD OF TIME OR TO AMEND THIS AGREEMENT IN ANY MANNER. MOREOVER, ANY SUCH AMENDMENTS SHALL BE IN WRITING. NOTHING IN THIS AGREEMENT, NOR ANY DOCUMENTATION OR OTHER COMMUNICATION FROM THE COMPANY, SHALL AFFECT MY EMPLOYMENT AT WILL STATUS.

(12) DISPUTE RESOLUTION PROCEDURE: I FULLY UNDERSTAND MY EMPLOYMENT STATUS, AND I AGREE AND UNDERSTAND THAT I MUST USE THE APPROPRIATE FEDERAL EXPRESS POLICIES TO RESOLVE MY WORK-RELATED COMPLAINTS AND ANY OTHER CONTROVERSY ARISING OUT OF MY EMPLOYMENT OR THE TERMINATION OF MY EMPLOYMENT. I UNDERSTAND THAT THE COMPANY CANNOT GUARANTEE FAIR OR PARTICULAR RESULTS SINCE EVERYONE'S CONCEPT OF FAIRNESS DIFFERS. HOWEVER, THE COMPANY DOES GUARANTEE ME AN OPPORTUNITY TO ACCESS FEDEX POLICIES AND PROCEDURES FOR ALL DISCRIMINATION ISSUES. THE EXCLUSIVE REMEDY AS TO ALL DISPUTES AND THE DECISIONS RESULTING FROM USE OF THESE POLICIES WILL BE FINAL AND BINDING ON THE COMPANY AND ME.

(13) I FURTHER UNDERSTAND THAT AS A RESULT OF MAKING THIS APPLICATION FOR EMPLOYMENT, MY CRIMINAL RECORDS MAY BE EXAMINED BY FEDERAL EXPRESS OR ITS AGENTS. I HEREBY AUTHORIZE FEDERAL EXPRESS OR ITS DESIGNATED AGENTS TO MAKE ANY LAWFUL EXAMINATION OF MY CRIMINAL RECORD.

(14) THE INFORMATION THAT I HAVE PROVIDED ON THIS APPLICATION IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. ANY MISREPRESE TATION OR OMISSION OF ANY FACT IN MY APPLICATION, RESUME, OR ANY OTHER MATERIALS SUBMITTED TO THE COMPANY OR DURING MY INTERVIEWS, M RESULT IN DENIAL OF EMPLOYMENT OR DISCHARGE.

(15) This agreement constitutes the entire and final agreement between the parties and all other prior agreements, arrangements, or understandings, oral or written, : merged into and superseded by the terms of this agreement. I understand that should any part of this agreement be held unenforceable, the enforceability of the remain provisions shall not be impaired. To the extent the law allows an employee to bring legal action against Federal Express Corporation, I agree to bring that complaint within time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first.

I have read this entire Agreement, which consists of 2 pages, and I thoroughly understand its content.

*Evangeline M. Turner*

8    6    97

8    6    97

*Evangeline M. Turner*
*Evangeline M. Turner*
*Mary Balk Hawell*

## NOTICE TO APPLICANTS

Federal Express Corporation is required to comply with the provisions of the Immigration Reform and Control Act of 1986. When an applicant is offered employment by Federal Express Corporation, he/she must provide Federal Express Corporation with the papers and documents necessary to prove identity and authorization to work in the United States. This requirement applies to all hires and includes U.S. citizens or nationals, resident aliens, and aliens authorized by federal law or the U.S. Attorney General to be employed in the U.S. Any employment offered by Federal Express Corporation is contingent upon the ability of the candidate to provide the documents required by federal law and to successfully complete all other components of Federal Express Corporation's preemployment screening process. Failure on the part of the person selected for hire to provide the necessary documentation will result in the automatic withdrawal of the offer of employment.

APP          9512   10





FedEx          2-50

This information will be used solely for purposes of conducting the required background checks.

**INSTRUCTIONS: Answer all questions on this form. Type or print legibly.**

**APPLICANT'S INFORMATION**

| NAME (LAST) Turner | (FIRST) Evangeline | (MIDDLE) Michelle | DATE OF BIRTH 4-17-73 |
|---|---|---|---|
| SOCIAL SECURITY NUMBER 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 | | DRIVER'S LICENSE NUMBER 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 | STATE Wash., DC |

**APPLICANT'S ADDRESSES (PAST 10 YEARS)**

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 6920 Walker Mill Rd. #202 | Capital Heights | Md. |
| **COUNTRY** USA | **COUNTY** Prince Georges | **ZIP CODE** 20743 | **FROM (m/yr)** 2-87 **TO (m/yr)** 3-89 |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 2109 Tiber Dr. | District Heights | Md. |
| **COUNTRY** USA | **COUNTY** Prince Georges | **ZIP CODE** 20747 | **FROM (m/yr)** 3-89 **TO (m/yr)** 6-91 |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 1318 Southview Dr. | Oxon Hill | Md. |
| **COUNTRY** USA | **COUNTY** Prince Georges | **ZIP CODE** 20742 | **FROM (m/yr)** 6-91 **TO (m/yr)** 1-92 |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 921 9th St. NE | Wash., DC | |
| **COUNTRY** USA | **COUNTY** | **ZIP CODE** 20002 | **FROM (m/yr)** 1-92 **TO (m/yr)** 8-93 |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 2311 Green St., SE | Wash., DC | |
| **COUNTRY** USA | **COUNTY** | **ZIP CODE** 20020 | **FROM (m/yr)** 8-93 **TO (m/yr)** 9-94 |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| 2436 Elvans Rd., SE | Wash., DC | |
| **COUNTRY** USA | **COUNTY** | **ZIP CODE** 20020 | **FROM (m/yr)** 9-94 **TO (m/yr)** Present |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| | | |
| **COUNTRY** | **COUNTY** | **ZIP CODE** | **FROM (m/yr)** **TO (m/yr)** |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| | | |
| **COUNTRY** | **COUNTY** | **ZIP CODE** | **FROM (m/yr)** **TO (m/yr)** |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| | | |
| **COUNTRY** | **COUNTY** | **ZIP CODE** | **FROM (m/yr)** **TO (m/yr)** |

| NUMBER AND STREET | CITY | STATE |
|---|---|---|
| | | |
| **COUNTRY** | **COUNTY** | **ZIP CODE** | **FROM (m/yr)** **TO (m/yr)** |

2-51

# EXHIBIT 2

Complete the "bubble" sections, neatly darkening in the circles.

| Employee Number | First Letter of Last Name | Second Letter of Last Name |
|---|---|---|
| 3 0 0 4 8 8 | T | U |

**Employee:** Read carefully, complete the requested information, sign, and return this page to your manager so that he may review it and forward it to the Human Resources Information Systems Center (HRIS).

*The FedEx Express Employee Handbook* is not a contract of employment, nor should its provisions be read or implied to provide for one. Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application. For more specific guidelines, refer to the *PEOPLE Manual and Your Employee Benefits book (YEB)*.

Official personnel policies, as found in the *PEOPLE Manual* are referenced throughout the Employee Handbook and in the index. Your manager will make the *PEOPLE Manual* available to you upon request and answer any questions you may have about policies and procedures. You may also access the PEOPLE Manual from the FedEx Intranet as discussed in the Resources Section of this handbook. The Company provides the Guaranteed Fair Treatment Procedures (GFTP/EEO Process) to resolve employment disputes and problems quickly. Employees are therefore expected to use the GFTP to resolve all eligible work-related disputes. The Open Door Process may be used to address other concerns.

*The FedEx Express Employee Handbook* contains guidelines only and the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time. The information in the 2002 *FedEx Express Employee Handbook* supersedes all information in previous editions to the extent it is inconsistent with this edition. All information in previous editions inconsistent with this edition is expressly revoked. No manager or representative of the Company, other than the CEO or Senior Vice President designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with you for any specified period of time. Any amendment or agreement if made shall not be enforceable unless it is in writing and signed by you and the CEO or designated Senior Vice President. This publication applies to all employees except those employees whose terms and conditions of employment are governed by a collective bargaining agreement.

I have read and fully understand the statement on this page and have received a copy of *The FedEx Express Employee Handbook* on    9/10/02



Evangeline Turner          Evangeline Turner
300488                     9-10-02

HBR02                            020101001

FedEx

2041730705 WCS



*Employee Handbook*

**FedEx** Express

LOGOS
2041730735

CONFIDENTIAL

Another product of **HR** Web design & development

in partnership with HR Policies Programs and Relocation



**This handbook belongs to**

Name _____

E-mail _____

Business Telephone _____

Home Telephone _____

Note: This handbook supersedes all previous issues of the FedEx Express Employee Handbook. The effective date of this handbook is January 2002. The male gender is used in this handbook for ease of writing style. Whenever the male gender is used, it applies to both male and female employees.

This handbook is a product of the Human Resources Policies, Programs and Relocation Department.

_____

# Equal Employment Commitment

It is the policy of FedEx Express to afford equal employment opportunity to all individuals, regardless of age, race, color, religion, sex, national origin, citizenship, disability/handicap, status as a Vietnam era, special disabled or other eligible veteran. In addition, FedEx Express adheres to the equal employment opportunity requirements of all states and localities in which it does business. We are completely committed to these principles not only because of the various laws that address these subjects, but because it is the right thing to do and it supports our people-first philosophy.

The Corporate commitment to equal employment opportunity is applied through every aspect of the employment relationship, including recruitment, selection, placement, training, compensation, promotion, transfer, termination, and all other employment matters.

To ensure the success of our commitment, we have implemented an Affirmative Action Program (AAP). Non-confidential portions of our written plan may be reviewed upon request. Employees who have questions or complaints about this program should contact their manager, their Human Resources office, or the Company's Affirmative Action staff at the corporate headquarters. Additionally, employees who feel they have been subjected to harassment or discrimination on the basis of race, color, religion, sex, national origin, citizenship, disability, handicap, age or their veteran's status can utilize the Company's GFTP/EEO process to file a complaint. Employees and applicants are not subjected to coercion, intimidation, interference or discrimination for filing a complaint or assisting in a complaint investigation.

While the Affirmative Action staff has responsibility for ensuring that reporting and monitoring procedures meet the needs of the program, all management and other employees are responsible for ensuring compliance with our equal employment opportunity policy and philosophy.

A team effort is required to ensure success in this important endeavor. Your cooperation and support are needed and appreciated.

# Disclaimer

The FedEx Express Employee Handbook is not a contract of employment, nor should its provisions be read or implied to provide for one. Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application. For more specific guidelines, refer to the PEOPLE Manual and Your Employee Benefits book (YEB).

Official personnel policies, as found in the PEOPLE Manual are referenced throughout the FedEx Express Employee Handbook. Your manager will make the PEOPLE Manual available to you upon request and answer any questions you may have about policies and procedures. You may also access the PEOPLE Manual from the FedEx Intranet as discussed in the Resources Section of this handbook.

The Company provides the Guaranteed Fair Treatment Procedure (GFTP/EEO Process) to resolve employment disputes and problems quickly. Employees are therefore expected to use the GFTP to resolve all eligible work-related disputes. The Open Door Process may be used to address other concerns.

The FedEx Employee Handbook contains guidelines only and the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time. Information in the 2002 FedEx Express Employee Handbook supersedes all information in previous editions to the extent it is inconsistent with this edition. All information in previous editions inconsistent with this edition is expressly revoked. No manager or representative of the Company, other than the CEO or Senior Vice President designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with you for any specified period of time. Any amendment or agreement if made shall not be enforceable unless it is in writing and signed by you and the CEO or designated Senior Vice President. This publication applies to all employees except those employees whose terms and conditions of employment are governed by a collective bargaining agreement.

## FedEx Express and You

The *FedEx Express Employee Handbook* is provided by the Human Resources Division and contains information on human resources policies, benefits, and other aspects of your employment. The PEOPLE policies are referenced throughout the handbook. You may review these policies in the *PEOPLE Manual* for more detailed information.

The policies and programs described in this handbook have been shaped by powerful external factors, such as intense competition and exacting legal requirements. They have also been shaped by strong internal values developed over many years—the values embodied in our People-Service-Profit philosophy (P-S-P).

To succeed, we must continually balance the interest of the three groups central to P-S-P, our employees, customers, and shareholders. That premise guides the policies and programs described in this handbook.

Competition demands that we perform at an extremely high level day in and day out for our customers. For that reason, our policies and programs also reflect the strong belief that our better performers should receive a greater share of the rewards available. This belief is reflected in both our compensation programs and our personnel policies.

Please take the time to read the contents of this handbook. Your manager can assist you with questions you may have after reviewing the contents.

## The FedEx Express Corporate Philosophy



## The FedEx Express Corporate Mission





4

5

# Contents

Welcome ......................................................... 9
    Your Contacts ............................................. 9
    Your Personnel Record .................................... 10
    Your Resources ........................................... 11
    Orientation Notes ........................................ 12

FedEx Express Corporate Philosophy,
History, Quality Process ..................................... 13
    FedEx Express Philosophy ................................. 15
    History .................................................. 16
    Community Relations ...................................... 20
    Quality Improvement Process .............................. 21

Workplace Practices .......................................... 23
    Identification Badges .................................... 25
    Personal Appearance and Uniforms ........................ 25
    Safety ................................................... 26
    Telephone Courtesy ....................................... 27
    Housekeeping ............................................. 28
    Attendance ............................................... 28
    Work Schedules ........................................... 28
    Work Assignments ......................................... 29
    Time Cards ............................................... 29
    Meals .................................................... 29
    Smoking .................................................. 30
    Voting ................................................... 30
    Moonlighting ............................................. 30
    Workplace Violence ....................................... 31
    Firearms and Weapons ..................................... 31
    Security ................................................. 32
    Solicitation and Distribution ........................... 33
    Bulletin Boards .......................................... 33
    Verification of Employment ............................... 34

Conduct and Performance ...................................... 35
    Performance Review ....................................... 37
    Performance Improvement .................................. 38
    Acceptable Conduct ....................................... 40
    Discharge Offenses ....................................... 42

    Investigative Suspensions ................................ 42
    Discipline for Conduct Violations ....................... 42
    Criminal Charges ......................................... 43
    Sexual Harassment ........................................ 43
    Code of Business Conduct ................................. 44
    Gifts/Gratuities ......................................... 44
    Computer Resource Policy ................................. 45
    Confidentiality .......................................... 46
    Personal Financial Responsibility/Garnishments .......... 46
    Alcohol and Drug Free Workplace .......................... 47
    Termination .............................................. 48

Career Opportunities ......................................... 49
    Career Opportunities Policy .............................. 51
    Job Change Applications .................................. 51
    Candidate Selection ...................................... 52
    Personnel Classifications ................................ 53
    Employment of Relatives .................................. 54

Compensation and Benefits .................................... 55
    Compensation – A Package Deal ............................ 57
    Your Pay ................................................. 57
    How You are Paid ......................................... 58
    Overtime ................................................. 58
    Pay Premiums ............................................. 59
    Recall/Call-In Pay ....................................... 59
    Report-In Pay ............................................ 59
    Special Recognition Programs ............................. 59
    Your Benefits-Introduction ............................... 60
    Health ................................................... 60
    Disability Benefits for full-time Employees –
      Short-Term/Long Term Disability ........................ 61
    Temporary Return to Work Program ......................... 61
    Life Insurance ........................................... 62
    Retirement ............................................... 63
    Health and Wellness programs ............................. 64
    Quality of Life Programs ................................. 65
    Service Awards Programs .................................. 65
    Voluntary Programs ....................................... 66
    Other Benefits ........................................... 66
    Tuition Assistance Program ............................... 66

## Welcome

## YOUR CONTACTS

**Your Manager** is your contact for all questions about FedEx Express and matters pertaining to your job. If you have questions regarding what is comfortable in your job. If you have questions regarding what is expected of you or how to do something, ask your manager. Do not feel shy. Everyone has questions, especially during the first few months on the job.

Manager's Name _____

Phone number _____

**Your Human Resources Representative or Human Resources Consulting Team** is provided by the Human Resources Division to help you with all matters pertaining to your employment. Your Representative/Consulting Team Member is an objective person whose role is to provide advice and counsel to you and your manager on all human resources related issues. The Human Resources Representative's/ Consulting Team Member's objective is to maintain one aspect of the corporate philosophy—the very important PEOPLE philosophy.

HR Representative's Name _____

Contact Number _____

E-Mail _____

Discount Shipping . . . . . . . . . . . . . . . . . . . 66
Discount Travel . . . . . . . . . . . . . . . . . . . 67
Jumpseat . . . . . . . . . . . . . . . . . . . 68
Employee Stock Purchase . . . . . . . . . . . . . . . . . . . 69
Toolbox Coverage . . . . . . . . . . . . . . . . . . . 70
Workers' Compensation . . . . . . . . . . . . . . . . . . . 70
Federal Express Credit Association . . . . . . . . . . . . . . . . . . . 70
Unemployment Insurance . . . . . . . . . . . . . . . . . . . 70

Vacations, Holidays, and Other Paid Absences . . . . . . 71
Introduction-Paid Time Off . . . . . . . . . . . . . . . . . . . 73
Holidays . . . . . . . . . . . . . . . . . . . 73
Floating Holidays . . . . . . . . . . . . . . . . . . . 73
Personal Days . . . . . . . . . . . . . . . . . . . 74
Vacation . . . . . . . . . . . . . . . . . . . 75
Jury Duty . . . . . . . . . . . . . . . . . . . 76
Funeral (Bereavement) Pay . . . . . . . . . . . . . . . . . . . 76
Leave of Absence (Medical) . . . . . . . . . . . . . . . . . . . 76
Authorized Non-Paid Time Off . . . . . . . . . . . . . . . . . . . 77
Leave of Absence (Personal) . . . . . . . . . . . . . . . . . . . 77
Leave of Absence (Military) . . . . . . . . . . . . . . . . . . . 78
Leave of Absence (Family) . . . . . . . . . . . . . . . . . . . 78

Communications and Employee Relations . . . . . . 81
Communications . . . . . . . . . . . . . . . . . . . 83
Employee Relations . . . . . . . . . . . . . . . . . . . 83
Open Door . . . . . . . . . . . . . . . . . . . 84
Guaranteed Fair Treatment Procedure . . . . . . . . . . . . . . . . . . . 84
EEO Complaint Process . . . . . . . . . . . . . . . . . . . 88
SFA . . . . . . . . . . . . . . . . . . . 89

Index . . . . . . . . . . . . . . . . . . . 91

## YOUR PERSONNEL RECORD

The Human Resources Information Systems (HRIS) maintains the permanent personnel file and electronic records on all FedEx Express employees in the PRISM system. PRISM is the Company's computer system used to maintain information pertaining to personnel management and individual personnel data. These records contain important confidential information about you, your job, and your job performance. HRIS needs your help to keep your file current. Notify your manager immediately of any changes in your name, home address, marital status, dependent status, telephone number and your emergency contact person. This critical information is stored electronically and is available for your review. Your manager is responsible for ensuring that you have the opportunity to view your file on a computer terminal at any mutually convenient time. During your performance evaluation, you are required to review your personnel file in PRISM, and to use the VALIDATE screen to verify the accuracy of your personnel information.



## YOUR RESOURCES

- The *PEOPLE Manual*, a guide for managers and employees, includes all human resources policies and procedures relating to attendance, performance and conduct, pay administration, employment/selection systems, communications/employee relations, employee recognition, employee services and discounts, safety, security, training, and general administration/workplace practices.

- The *PEOPLE Manual* applies to all employees whose work group may maintain a departmental handbook. Information in these workgroup handbooks must be consistent with guidelines provided in the *PEOPLE Manual 5-50*. A copy of the *PEOPLE Manual* is available in your work area. Ask your manager for its location. Also, you may access the manual on the FedEx Express Intranet by typing in *people* in the keyword field from the FedEx home page. Note that applicable policy numbers from the *PEOPLE Manual* are referenced throughout this handbook.

- *Departmental and Divisional Manuals* – Examples: GO Express, SOP, etc. These manuals contain procedures relevant to your particular department or division. Contact your manager to view a copy

- *Your Employee Benefits Book (YEB)* – provides more detailed information regarding FedEx Express benefits for permanent employees. Your manager issues your YEB when you are eligible for benefits (immediately if you are a permanent full-time or after your 91st day of employment if you are permanent part-time). Also, you may also view employee benefits information on the FedEx Express Intranet by typing in *benefit* in the keyword field from the home page

- The *Profit Manual* contains financial policies and procedures, and offers information about financial issues

- *FedEx Intranet*

- *TAO E-mail Bulletin Boards* (benefits, tuition, corptrav, funstuff, discount corner)

Contact your manager if you have questions that are not answered in this handbook.

Philosophy History Quality Process

**P-S-P Philosophy**

Take care of our people; they, in turn, will deliver the impeccable service demanded by our customers who will reward us with the profitability necessary to secure our future. People-Service-Profit; these three words are the very foundation of Federal Express....

—*Manager's Guide, USA*

**History**

The Company literally changed the way businesses operated by creating a world with time-definite delivery....

**Quality**

Doing Right things Right the first time... ...100 Percent customer satisfaction at the end of every transaction....

**Orientation Notes** (Record your special notes here)

12

# FedEx Express Corporate Philosophy, History, Quality Process

FedEx Express Philosophy . . . . . . . . . . . . . . . . . 15

History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Community Relations . . . . . . . . . . . . . . . . . . . 20

Quality Improvement Process . . . . . . . . . . . . . 21

14

## FedEx Express Philosophy

### People

FedEx Express is dedicated to the principle that our people are our most important asset. As a Federal Express employee you are a part of the finest team in the transportation industry.

A comprehensive wage and benefit package, open management-employee communications, progressive employee relations policies, and opportunities for career advancement are all key components to our people philosophy. Your ideas and suggestions for improving programs that affect you and others are welcomed.

### Service

Customer satisfaction is the key to our success. Our most important corporate objective is to provide a totally dependable service to our customers. We must ensure customer satisfaction by meeting all service minimums, and by treating customers with the utmost personal courtesy and respect at all times.

Each package, document or shipment entrusted to us is a priority item to the customer. Our livelihood depends upon our quality of service. It is our policy to create a satisfied customer at the end of every transaction. Our ability is performing to the standards of the customer.

To provide professional service and improve our excellence, keep this thought in mind: Do not promise more than we can deliver, but always strive to deliver more than we promise.

### Profit

Profit is attainable when dedicated employees provide the highest level of professional service possible. Any business exists only so long as it makes an adequate return on its shareholders investment. Federal Express is no exception to this iron law of economics. Our continued ability to provide the profits that ensure our corporate future must remain one of our highest priorities.

15

# History

## FedEx Express—the Company that Invented a Whole New Industry

Since it began delivering customer shipments— "absolutely, positively overnight"— more than a quarter-century ago, FedEx Express has remained the clear leader of the air express industry it invented. Today, FedEx Express—the world's largest express transportation company—employs more than 140,000 employees, who work together each business day to deliver more than 5 million packages to customers in more than 200 countries.

It's a remarkable story. One with a proud history that begins back in April 1973, when on the first night of operations, 389 employees delivered a total of 186 packages to 25 U.S. cities.



Prior to FedEx Express, businesses could not send shipments with any guarantee that they would arrive at the appointed destination—on a particular day and time. The Company took on this challenge and in doing so, literally changed the way businesses operated by creating a world with time-definite delivery. In this world, service excellence, backed by a money-back guarantee, became the "rule" and not the exception. It was a world where customers could send something "FedEx" and know, with absolute confidence, that the shipment would not only get there—it would get there on time.

But there was more. In this brave new world, not only would shipments arrive on time, they could actually be tracked in route

16

to their destination. This ability to track shipments became a major factor in helping customers to manage their shipping activities and daily operations more precisely, making their businesses more competitive.

FedEx Express is comprised of a highly sophisticated and technical transportation network, and operations are based on a hub-and-spokes package distribution system that it created. FedEx Express, operating the largest all-cargo fleet worldwide, collects and transports shipments to sorting hubs in the United States, as well as Europe and Asia. There, they are quickly unloaded and sorted, then reloaded on outgoing planes and sent off for morning delivery as early as 8 a.m. the next business day. International shipments go through special hubs in Anchorage, the Philippines, Osaka, Paris, London and Dubai.

Today, FedEx Express is part of a family of companies of FedEx Corporation—the premier global provider of transportation, e-commerce, and supply-chain management services. FedEx Corp. offers integrated business solutions through its network of subsidiaries that operate independently—yet collectively.

A competitive alternative to a "one-size-fits-all approach," our independent operating companies deliver smart choices and business solutions—globally—for customers of all sizes. Other sister companies included in the FedEx Corporation network are:

FedEx Ground: North America's second largest provider of small-package ground delivery service;

FedEx Freight: a leading provider of regional, less-than-truckload freight services;

FedEx Custom Critical: the world's largest provider of expedited, time-critical shipments; and

FedEx Trade Networks: a provider of customs brokerage, consulting, information technology and trade facilitation solutions.



17

## A Land of Opportunity in a Global Marketplace

In part, the Company's success lies in its continued innovation and the ability to maintain flexibility in adapting to changes as needed to meet customer demands. FedEx Express, always committed to being on the cutting edge, has ably prepared itself to reinvent the company and the industry for the 21st century.

At the foundation of the Company's success is the powerful FedEx brand—one of the strongest and most trusted names in the global marketplace. Impeccable customer service is another driving force behind the Company's success. In fact, our customers expect every one of their transactions to be handled not only with reliability but also with friendliness, responsiveness and meticulous attention to detail.

Customers also expect FedEx Express to be an operation that delivers very simple, convenient and flexible business solutions. To this end, the razor-sharp edge of FedEx technology is one of the most advanced available to customers. For example, for all the books and sweaters we buy from today's Internet retailers, someone has to



deliver the goods. The Company's role in the huge e-commerce revolution has been impressive. A high percentage of shipment orders already are generated over the Internet and many companies are comfortable using the Company as a shipper, since they can plug into the Company's website and download up-to-date information on where their shipments are.

In addition to its global network, FedEx Express' fast-cycle procurement and distribution network also is key to its success. In fact, the Company has become a logistical backbone, helping customers to assemble and make products using parts and supplies obtained from different sources around the world. The end result is that the Company helps customers manage their inventory, warehousing, distribution and customs clearance to be more competitive in the ongoing globalization of trade.

## FedEx Express—Its People

Behind any successful Company are its employees. At FedEx Express, employees are the Company's most important asset. Fundamental to its highly dedicated and motivated workforce is a philosophy called People-Service-Profit. Put simply, P-S-P maintains that when a company establishes a culture that respects and rewards its employees, they, in turn, will deliver exceptional service to customers. This creates a profitable enterprise that's based on a continuing cycle of job satisfaction and job security for its people.

FedEx Express is dedicated to providing all employees—our most important asset—with a safe and healthy work environment, where Corporate "Safely Above All" goals mean that a successful day occurs when everyone who comes to work for FedEx Express goes home safely.

Other examples of P-S-P run throughout FedEx Express, including the Company's Career Opportunity Policy, an annual Survey-Feedback-Action process that gives employees an opportunity to fill out a report card on their management, and a Guaranteed Fair Treatment Procedure/EEO process for hearing employee grievances.

FedEx Express is consistently ranked high in lists of the "Best Companies to Work for in America." Contributing to this ranking is the fact that the Company also provides training as a vital part of corporate expenditures, and ensures that managers keep employees informed. In fact, communication is considered such a key part of operations that the Company operates its own satellite TV network, that includes Company news segments broadcast daily to employee locations.

# The Quality Improvement Process

## Continuous Improvement of Processes

FedEx Express' service policy is to create a completely satisfied customer at the end of each transaction. We achieve 100 percent customer satisfaction by performing 100 percent to our standards, as perceived by the customer. To realize this goal, we strive relentlessly to enhance quality in order to improve productivity, delight our customers and reduce costs. Our commitment is to achieve 100 percent customer satisfaction and 100 percent service level, while remaining dedicated to the principles of our People-Service-Profit philosophy.

The Quality Improvement Process is not a complicated formula. It is a simple process of asking yourself how you can do your job more effectively and then finding ways to continually improve your performance. You must encourage others to work with you, as a team, to improve processes in your workgroup.

Your primary focus must always be your customer. One of your first questions must be "who is my customer?" Many of us on the FedEx Express team rarely see the external customer who either ships or receives a package, but our internal customers are just as real. Every organization is made up of departments that can be compared to links in a chain. Each link provides work as a supplier to the next link in the chain, the customer. Whoever your customer is, you want to be a strong link in the chain. You want to deliver quality work as the work moves through the chain to our ultimate customers who pay for FedEx Express service.



Our task is to do the right things right the first time. As we identify our customers and our problems and seek continual improvement, we'll be able to implement the solutions that will not only generate 100 % customer satisfaction, but enable us to deliver our services at lower costs as well.

Because FedEx Express cares about its employees, it also is dedicated to issues that affect the communities where its employees and customers live around the world, whether it's contributing to United Way or supporting the National Safe Kids Campaign. For example, following the tragic events of Sept. 11, 2001, FedEx Express used its delivery expertise to aid the Red Cross. There are many other examples of times when the Company has used its global presence and its air transportation and logistics support to help communities in times of natural disaster.

The bottom line is that while it takes big wide-body planes, lots of them, and it takes trucks and vans and large operating hubs, both across America and abroad, coupled with lots of information and a highly-technical network, it takes people to run a business. FedEx Express is a great place to work because of its people.

## Community Relations and Corporate Contributions

FedEx Express, with our financial and human resources, accepts the obligation to support activities in the public interest. This Corporate responsibility is pursued in the belief that our Company and our people realize their fullest potential in a healthy, vital society.

Two programs coordinated by the Public Relations Department comprise our community service activities. The Corporate Contributions Program distributes designated corporate funds to non-profit organizations dedicated to community welfare. The Community Relations Program encourages individuals to volunteer for various community activities.

The Community Relations workgroup administers the Corporate Volunteer Program. This program consists of employee-managed teams who meet regularly to plan volunteer assistance services in the areas of art, technology, education, emergency, the handicapped/disabled, health, senior citizens, and youth. The Corporate Volunteer Program allows individuals to donate their time to volunteer efforts, thereby enhancing and developing new skills.



## The Service Quality Indicator—SQI

Measurement is an important concept of quality. If you cannot measure the quality of your current work, how will you know when it has improved? Federal Express established the Service Quality Indicator (SQI) as a measurement of how well we are meeting our customers' perception of quality service.

The SQI is calculated based on 12 types of service failures as SQI components. These include elements such as late deliveries, late pickups and damaged packages. Each component is assigned a weight factor reflecting its importance to the customer's perception of our service quality. SQI is measured in Average Daily Failure Points, which are calculated by multiplying the daily occurrences by the weight factor.

The SQI is the sum of the Average Daily Failure Points for the 12 elements. The success of our quality improvement efforts is tracked by comparing current SQI scores to previous scores and to monthly SQI goals.

Many departments use the SQI concept to establish their own measurement system based on their specific function. These departments conduct surveys among their internal customers to ensure they are delivering quality service. This commitment to quality and ownership is the goal that enhances our service to the external customers.

FedEx Express meets its quality goal through its commitment to customer satisfaction and its commitment to creating an environment in which employees can do excellent work. You will be empowered to do your best through the concepts of continual improvement, customer supplier alignment, and process measurement.

$$Q = P$$

**People-Service-Profit**

... when a company establishes a culture that is respectful and rewarding for employees, they will deliver exceptional service to customers. Delighted customers, in turn, will reward a company with their business and loyalty, creating a profitable enterprise that can provide job satisfaction and job security for its people...

## Identification Badges - *PEOPLE 8-30*

The Human Resources Division issues you an identification badge. Your badge, must be worn at all times while on Federal Express property, and must be displayed on the outermost garment in the upper torso of the body. You are subject to fines by the FAA if you are in sensitive areas such as aircraft ramps without your identification badge. There is no cost to replace worn badges, however there is a cost for replacing lost badges. Contact your manager for information regarding a replacement.

## Personal Appearance and Uniforms - *PEOPLE 2-80*

Employee appearance is a major element of the FedEx Express image. We must project that we are the most professional, productive, thorough, and reliable providers of service in our markets. Good grooming and hygiene is expected of everyone.



Whether you meet customers, vendors, or "clients" from other FedEx Express departments, you project the reputation of the Company. Part of the impression you make on others depends on your choice of dress, personal hygiene and courteous behavior. Hair should be clean, well groomed, and in a reasonable style. Mustaches, beards and sideburns must be kept neat and trimmed to a moderate length. Your division or department may have more specific appearance guidelines.

If you are issued a Company uniform, it is your responsibility to wear it properly and in its entirety. Uniform garments may not be mixed and matched with personal garments and they may not be customized with unauthorized insignia or patches. The uniform should be clean, pressed, and well maintained. Replacements should be ordered when garments begin to show wear. Shoes should be in good condition and polished or brushed clean,

25

## Workplace Practices

Identification Badges . . . . . . . . . . . . . . . . . . . . . . . 25

Personal Appearance and Uniforms . . . . . . . . . . . 25

Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Telephone Courtesy . . . . . . . . . . . . . . . . . . . . . . . . 27

Housekeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Attendance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Work Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Work Assignments . . . . . . . . . . . . . . . . . . . . . . . . . 29

Time Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Meals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Smoking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Moonlighting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Workplace Violence . . . . . . . . . . . . . . . . . . . . . . . 31

Firearms and Weapons . . . . . . . . . . . . . . . . . . . . . 31

Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Solicitation and Distributions . . . . . . . . . . . . . . . . 33

Bulletin Boards . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Verification of Employment . . . . . . . . . . . . . . . . . . 34

24

property damage incidents must be reported to your manager immediately. Failure to do so results in disciplinary actions as outlined in the Acceptable Conduct policy in The PEOPLE Manual. Safety, Department of Transportation, and Company requirements related to vehicle operation are discussed in detail in the Driving Qualification policy (PEOPLE 4-48) and the Vehicle Accident /Occurrences policy (PEOPLE 8-90).

Employee groups who are potentially exposed to toe injuries are required to wear safety shoes. Shoe allocations for each group are outlined in the appropriate divisional guidelines.

## Telephone Courtesy / Cellular Phones / Telecommunications Equipment

Telephone courtesy is essential to maintaining our customer service image and is a direct reflection on the Company and your professionalism. When answering the telephone, always state the name of the department/location and then your name. The same information should be given when making a telephone call.

Safe use of cellular telephones while driving a Company vehicle and equipment and while driving on Company business is critical. All FedEx Express employees whose work involves the use of cellular phones are responsible for complying with applicable state and local laws, ordinances and regulations governing handheld cellular phones.

To keep Company telephone lines open for business calls, you are asked to discourage any unnecessary incoming personal calls.



as appropriate. Uniformed employees must wear shoes in the colors and styles that have been approved by Corporate Identity. Hosiery is required for female service agents wearing skirts or dresses (Knee-high hosiery are acceptable with slacks). Normally rings, bracelets, and neck chains may be worn, but must be simple, in good taste, and pose no safety hazard. Your manager will provide you with any additional dress or grooming requirements for your job.

**Safety - PEOPLE 2-5, 4-48, 4-70, 8-1, 8-85, 8-90 and The Safety Manual**



FedEx Express provides a safe and healthy workplace for its employees. The Company complies with the safety and health standards, regulations, and orders issued under state, federal and local statute.

Managers are responsible for ensuring that risk from potential hazards is minimized. Also, management is responsible for instructing you in the safest way to perform your job and to respond to all emergency situations. It is your duty to report all unsafe conditions or unsafe practices to your manager. You are expected to work safely, wear required safety equipment and apparel, observe all posted safety rules, and keep your work area or vehicle neat and clean.

If you operate Company equipment and vehicles in an unsafe or abusive manner, or fail to observe written or posted safety regulations, you are subject to disciplinary action. All vehicle accidents, work-related injuries or illnesses, and

## Work Assignments - PEOPLE 4-95

You are assigned a specific job at FedEx Express, and your manager can provide you with a copy of your job description. However, because of illness, vacations, or other unusual circumstances, you may be asked to perform duties other than your normal assignment. These assignments are temporary, but because of the nature of our business such changes are necessary to meet our service commitments to our customers.

## Time Cards - PEOPLE 3-92



You may be asked to complete a daily and/or weekly timecard or punch a daily time clock. Your manager will designate a place for your time card and instruct you on how to complete it. Each employee is responsible for performing all time card related activities on his own time card. Remember to:

- Record your time accurately, always record the actual hours worked
- Never complete another employee's time card
- If the time clock fails or is not available, a manager should sign your time card

Your manager must notify you of any time card changes. You must affix your initials indicating awareness to these changes.

*Note: Completion of another employee's time card and/or falsification of your time card, in any manner, are serious offenses and may result in termination.*

## Meals - PEOPLE 10-95

Full-time employees have a non-paid meal period, that normally varies as determined by location or department. Meals are normally at mid-shift, an hour before or after the middle of the shift. Meals for part-time, casual, or temporary employees are scheduled according to state law and work scheduling requirements.

## Housekeeping - PEOPLE 10-95

Customers, prospective customers, members of the press and other individuals often observe our work sites; therefore, we must present a professional appearance at all times. You are responsible for keeping your work area clean. Break rooms are to be enjoyed by all in clean comfort and all employees are responsible for keeping them neat and clean.

## Attendance - PEOPLE 1-20



Attendance is an essential part of your total job performance and is important when determining your eligibility for transfer and promotion. Your manager will provide you with any specific attendance guidelines for your department. If you are unable to report to work, you should call your manager at least one hour before your scheduled work time, but no later than the start of your shift.

If you cannot reach your manager, you should contact another member of management in your work area. Record the time you called and to whom you spoke. If you fail to report to work for two consecutive days without notifying management, you will be considered as having voluntarily resigned your employment. You are responsible for having your manager's name, home, work, and pager numbers at all times.

## Work Schedules

Your manager will explain your work schedule and announce any changes as far in advance as possible. When scheduled, you are expected at your normal workstation prepared for work unless your manager directs otherwise. Because of the nature of our business, the hours, shifts, and days of your workweek must remain flexible. Work requirements and schedules may vary according to location and job duties.

## Smoking - *PEOPLE 10-95*

FedEx Express is committed to providing a healthy work environment for all employees. Employees who wish to smoke or use other tobacco products may do so in designated areas outside FedEx Express buildings, facilities, and vehicles, except in areas that would pose a safety hazard (e.g. aircraft ramp areas). Smoking, or the use of other tobacco products in designated areas, is allowed only during scheduled breaks and the meal period.

## Voting - *PEOPLE 1-70*

If you are unable to vote during non-working hours, you may request time off to vote in local, state, or federal elections. This request should be made at least one (1) week before Election Day, or within one (1) day of the posting of your work schedule, whichever comes first.

## Moonlighting - *PEOPLE 1-60*

FedEx Express expects all full-time employees to regard outside employment as supplemental. Outside employment is not considered an excuse for poor performance, absenteeism, tardiness, or refusal to work overtime (full-time employees only). Both full-time and part-time employees are prohibited from working for our competitors, suppliers, or contractors. If your employment is a conflict, normally you will be given thirty days to provide written verification of termination. Notify your manager if you suspect your employment is a conflict of interest. A competitor is defined as any person or business entity that competes with any facet of FedEx Express. A supplier is any person, or business that provides goods, supplies, or services directly to FedEx Express. A contractor is a person or business entity that provides supplies or services to the Company.

## Workplace Violence - *PEOPLE 8-80, 2-5*

 Violent or threatening behavior is not tolerated in the workplace. All employees are responsible for notifying management, FedEx Express Security, or a Human Resources Representative of potentially violent or threatening situations. If you are unable to contact any of these parties, dial 911 when an immediate danger exists. If there is no immediate danger call 1-800-274-HELP for People Help service. Also call Corporate Security to report the incident. Notify your manager of situations that include, but not limited to:

- Threats directed at you from a family member, co-worker or other individual
- Knowledge of threats directed to another employee by family members, co-workers, or other individuals

Never assume that a threat or suspicious action suggesting a potential for violence will not take place. Use the E-mail bulletin board to report any potentially violent situations. You may access this bulletin board by typing in workplace-violence in the search field.

## Firearms and Weapons - *PEOPLE 8-10, 2-5*

 The unauthorized possession or carrying of firearms or weapons, including but not limited to disabling tear gas dispensers (and similar disabling devices), guns, starting pistols, flare pistols and any pocket or hunting knife with a blade more than 3 inches is prohibited on FedEx Express property, Company aircraft, in Company vehicles, or in Company leased or owned buildings. Unless specifically authorized by the Managing Director of Security the possession of firearms or weapons on Company property is strictly prohibited. Possession or carrying of unauthorized weapons will result in immediate dismissal.

## Solicitation and Distribution - PEOPLE 10-55

FedEx Express supports solicitations by United Way. This offers an opportunity for employees to contribute to many charitable agencies that otherwise would solicit individually. Policy permits activities on behalf of other charities or community organizations. Talk to your manager about restrictions.

FedEx Express prohibits solicitation of employees by non-employees on FedEx Express property. Solicitation is any form of approach whether for membership, subscriptions, money, gifts, or the purchase of merchandise, tickets, or services.

Employees may not distribute during their working time or during the working time of the employee or employees to whom the distribution is directed. Distribution is the disbursement of any literature, merchandise, or thing that is not being distributed in the normal course of the business of the Company.

Employees are prohibited from distributing or circulating in work areas, any non-work related literature, merchandise or materials.

## Bulletin Boards - PEOPLE 5-10

Changes in Company policy, government notices, career opportunities, and other information of concern are posted on bulletin boards mounted at convenient locations throughout the various FedEx Express facilities. Employees may not post business bulletin boards may be provided at local management's discretion. These bulletin boards may be posted in non-work areas only, and are not to contain false, vicious, or malicious statements concerning the Company, any employee, or customer.

Also, the Company allows electronic e-mail bulletin boards for the Company and authorized employee groups and organizations. Employees wishing to establish an e-mail or electronic bulletin board for any purpose or organization should contact the e-mail group.

33

## Security - PEOPLE 8-1, 8-10, 2-5

Security regulations, safety regulations, and other rules of conduct, are matters of good management and common sense. Managers must ensure their employees are familiar with these regulations. Review your departmental bulletin boards regularly for publications forwarded periodically by the Security Department.

Security procedures are to protect you and your property as well as to safeguard the property of the Company and its customers. The inspection of packages, lockers, carrying cases and vehicles may be necessary. Your full cooperation is required in this effort to protect employees, facilities, and packages.

You are urged to report to your manager, and to Security, any improper activity that comes to your attention. You may be subjected to disciplinary measures for failure to comply with security regulations. A person who has committed a crime that affects the Company, its employees, or a customer's property is subject to prosecution to the full extent of the law. Information received by the Company about criminal activity by its employees may be turned over to the law enforcement authorities for appropriate action.



32



*Conduct & Performance*

Four Basic Employee Requirements...

- Perform your job in a professional, productive, and thorough manner
- Be courteous to customers and fellow employees
- Be trustworthy and honest in all business dealings
- Abide by a reasonable number of rules and a standard of conduct required by the business

— Manager's Guide, USA

## Verification of Employment to Outside Agencies – PEOPLE 10-90

The release of information in your personnel file is closely guarded and controlled to protect your privacy. Management may release information about you to others outside the company under the circumstances outlined below:

| If you... | And the inquiry is for... | The response is... |
|---|---|---|
| Do not sign the authorization for release | Loan Application/Credit Reference | No information released |
| | Employment Verification | Verify dates of employment |
| Provide written authorization | Loan Application/Credit Reference | Employment and salary verification |
| | Employment Verification | Employment verification/dates of employment |

34

## Conduct and Performance

FedEx Express establishes and maintains conduct standards that are separate from standards that govern job performance. Conduct involves behavioral issues, whereas, performance relates to the execution of the duties and responsibilities of your job. A review of both the conduct and performance standards follow.

### Performance

Standards and requirements for job performance will vary depending on the job. For example, requirements for courier differ from those of handler. Working with your manager, you are expected to attain the highest level of job performance regardless of your work assignment.

### Performance Review - PEOPLE 2-55

A satisfactory level of performance is required of everyone. Recognition for a job well done and suggestions for individual improvement are fundamental at FedEx Express.

In support of this goal, your job performance is reviewed six months from your permanent hire date. In subsequent years, your performance review will be scheduled based on your job classification. Your manager may conduct an additional performance review at any time to notify you of exceptional performance or to help you to improve your job performance.

At the beginning of the review period your manager should discuss performance expectations with you. During your performance discussion, your manager should thoroughly review those expectations given to you at the beginning of the review period and then discuss the specifics of your actual performance. Your manager should provide the necessary help you may need to achieve performance goals. After the review meeting, the review form is completed and signed by both you and your manager, and placed in your permanent PRISM personnel file.

37

# Conduct and Performance

Performance Review . . . . . . . . . . . . . . . . . . . 37

Performance Improvement . . . . . . . . . . . . . . . 38

Acceptable Conduct . . . . . . . . . . . . . . . . . . . 40

Discharge Offenses . . . . . . . . . . . . . . . . . . . 42

Investigative Suspensions . . . . . . . . . . . . . . 42

Discipline for Conduct Violations . . . . . . . . . . 42

Criminal Charges . . . . . . . . . . . . . . . . . . . . . 43

Sexual Harassment . . . . . . . . . . . . . . . . . . . 43

Code of Business Conduct . . . . . . . . . . . . . . . 44

Gifts/Gratuities . . . . . . . . . . . . . . . . . . . . . . 44

Computer Resource Policy . . . . . . . . . . . . . . . 45

Confidentiality . . . . . . . . . . . . . . . . . . . . . . . 46

Personal Financial Responsibility/Garnishments . . . . . . . 46

Alcohol and Drug Free Workplace . . . . . . . . . . 47

Termination . . . . . . . . . . . . . . . . . . . . . . . . . 48

Before your performance review, you will be asked to access the VALIDATE screen in PRISM and to make appropriate changes and corrections. The validate process is to ensure your Corporate personnel file is current and accurate.

In addition to helping to determine your performance level, these evaluations also affect your total compensation (such as salary increases, profit sharing, and other pay programs) and promotional opportunities.

## Performance Improvement - PEOPLE 2-50

 FedEx Express promotes open communications between employees and managers regarding job performance. It is the mutual responsibility of management and employees to achieve and sustain the highest possible performance level.

**It is management's responsibility to:**

- Establish performance expectations and communicate those standards to the employee

- Identify performance deficiencies and determine possible solutions

- Determine systemic and other factors that affect performance

- Provide regular feedback through performance evaluations

- Utilize the performance improvement process, progressive notification, to address performance deficiencies

**It is the employee's responsibility to:**

- Familiarize yourself with the rules, policies, and procedures governing your job

- Attain the highest possible level of job performance

- Develop action plans, in coordination with management, to address any performance deficiencies

- Correct any performance deficiencies you may have, not just for a brief time, but for the duration of your employment

FedEx Express believes that most employees want to improve their job performance. Therefore, the Company adheres to a system of progressive notification. Certain tools are identified as useful in this process. There is no requirement that they be used in any specific order; application depends on the nature and severity of the performance problem. The tools identified are:

- **Verbal Counseling** - This counseling is documented on the employee calendar and the on-line counseling system in PRISM as an open discussion between the employee and manager to identify the performance problem, clarify expectations, determine possible solutions, and establish follow up parameters

- **Written Counseling** - Same as verbal counseling, but issued to the employee in a written document

- **Reminders (with or without Action Plans)** - Written notice is given when there is a severe performance problem or a recurring deficiency. These reminders become a part of the employee's official PRISM personnel file and impact eligibility to apply for job postings

- **Decision Day** - A paid day off granted for the employee to decide if he wants to remain with the Company. Normally this action is warranted when an employee fails to show improvement

- **Personal Performance Agreements** - Prepared by the employee during the Decision Day. The agreement must be acceptable by management and must reflect the employee's commitment to improve performance



# Conduct

🗝 **Acceptable Conduct - PEOPLE 2-5**

FedEx Express expects all employees to demonstrate the highest degree of integrity, responsibility, and professional conduct at all times. Acceptable conduct involves not only sincere respect for the rights and feelings of others but the assurance that personal conduct in both business and personal life avoids any actions that might be harmful to the employee, other employees, the Company, or cause unfavorable reactions to our current or potential customers. You are a representative of FedEx Express both on and off duty. This is particularly important to remember when you are wearing a FedEx Express badge or uniform.

- Violation of Company or departmental rules may constitute misconduct. You may be suspended with pay to investigate possible rule violations. Although not all-inclusive, the specific violations listed below may result in severe disciplinary actions up to and including termination

- Conviction of a crime or a plea of "no contest" involving job-related conduct

- Deliberate falsification of applications or other Company-related documents, including electronic records

- Fraudulent activities

- Theft, including unauthorized possession of Company or customer property or the property of other employees

- Failure to report a vehicle accident or occurrence in, accordance with **8-90 Vehicle Accident Occurrences and 4-48 Driving Qualifications**

- Disruptive conduct while on duty or while on Company property

- Insubordination or refusal to follow instructions or perform assigned work in a timely manner without valid reason

- Threatening, intimidating, coercing, directing abusive language, or displaying blatant or public disrespect toward any employee or customer while on duty, on Company property, at collection sites, or at off-site Company meetings and functions

- Openly making or publishing false, vicious, or malicious statements concerning the Company, any employee, or customer

40

- Fighting while on duty, at Company functions/Company property

- Damage, destruction, interruption of use, or defacement of Company property, facilities, information systems and applications, or equipment as a result of deliberate negligent action

- Unauthorized use of Company facilities, assets, or systems, including, but not limited to:

  – Personal use of COMAIL

  – Use of Company long distance telephone facilities for personal calls

  – Personal or other improper use of the Corporate name, proprietary logo, or various trademarks

- Violation of safety regulations including

  – Failure to wear/use protective equipment/devices when provided and/or required (e.g. seat belts, safety shoes, ear and eye protection)

  – Requiring or allowing subordinates to perform work activities in an unsafe manner or under unsafe and/or unhealthy conditions

  – Failure to ensure subordinates attend required safety training

  – Failure to have the driver-side sliding door closed when the vehicle is in motion

  – Failure to have the passenger-side sliding door closed when the vehicle is moving with a passenger on board

- Violations of guidelines and policy for security regulations

- Violations of employee reduced-rate shipping, non-revenue shipping, interline travel, or jumpseat privileges

- Wearing unauthorized badges, insignias, pins, or other devices while on duty or on Company property

- Solicitation by employees during their working time, or solicitation of other employees during their working time; or distribution in the work areas is a violation of **10-55 Solicitation and Distribution policy.**

- Leadership failure of a member of management

- Any other act obviously and significantly detrimental to the best interest of FedEx Express and/or fellow employees as determined by management

41

## Discharge Offenses

- Unauthorized possession of firearms or other dangerous weapons on Company property as specified in **8-10 Firearms/Weapons**

- Drug and alcohol abuse as specified in **2-10 Alcohol and Drug-Free Workplace**

- Violation of the **Confidentiality** guideline for the SFA as specified in **5-70 Survey/Feedback/Action (SFA) Program**

## Investigative Suspensions

Management may suspend an employee with pay to investigate possible conduct or performance issue violations. Management provides the employee with written notification of the suspension and takes the employee identification badge. Investigations are completed as quickly as possible and normally do not exceed 7 calendar days. Within 7 calendar days of the completion of the investigation the employee is informed of the decision. In some situations, it may be necessary to change the paid investigative suspension to an unpaid disciplinary suspension. The employee should be notified in writing when this occurs. Such suspensions normally may not exceed 365 days.

## Discipline for Conduct Violations

**Warning Letters** - Based on the results of the investigation, management may decide to return the employee to work and issue a Warning Letter.

- Warning Letters are active for a specified time and prevent employees from bidding on internal job postings

- Three notices of discipline within a specified time will result in termination. The infractions do not necessarily have to be related

**Disciplinary Suspension** - Management may determine that the violation is severe enough to warrant an unpaid disciplinary suspension and a Warning Letter. If so, management may change a paid investigative suspension to an unpaid disciplinary suspension.

Employees must understand that recurrent patterns of misconduct will not be tolerated; violations can result in discipline up to and including termination.

**Criminal Charges** - All employees are responsible for notifying their manager no later than the next business day if they have been charged, arrested, or indicted for any criminal (felony or misdemeanor) offense. This includes reporting driving violations and accidents when your position is covered by policies **4-48 Driving Qualifications** and **8-90 Vehicle Accident/Occurrences**. When there is a resulting criminal charge from an accident, all employees must report the charge. "False arrests" must also be reported. Failure to do so may result in disciplinary action, up to and including termination.

## Sexual Harassment - *PEOPLE 5-55*

FedEx strictly prohibits any act in its work environment that creates the potential for sexual harassment. The Company will not tolerate sexual harassment of any employee by another employee or supervisor. This policy is applicable to all FedEx Express personnel and facilities and extends to those with whom we conduct business, internally and externally, including applicants, clients, customers and vendors.

Sexual harassment is unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. The law defines sexual harassment as:

- Conduct that "is so objectively offensive" as to alter the "conditions" of employment

- May be a single incident if conduct is incredibly egregious (e.g. assault)

- Can be a series of harassing acts

- Any unwelcome conduct "based on" or "because of" a person's sex, not just "sexual conduct".

Sexual harassment can take many forms including, but not limited to, sexual innuendoes, suggestive statements, propositions, threats, threatening conduct, or unwanted physical contact.

*All employees should avoid any action or conduct that might be viewed as sexual harassment. Approval of, participation in or acquiescence in conduct constituting sexual harassment will be considered a violation of this policy. Sexual harassment will not be tolerated and may result in discipline up to and including termination.*

## Computer Resources Policy - PEOPLE 10-3



FedEx Express expects all employees using its computer resources, including Internet access, intranet access, e-mail (whether through EMC/TAO or other e-mail programs) software, hardware, etc. to show the utmost respect for FedEx Express employees, systems, and resources.

Violations of this policy may result in disciplinary actions up to and including discharge. Examples of violations are:

- Using Company computer resources to intentionally solicit, print, forward for electronic distribution, or indicate further interest in, publish, or disseminate non business related opinions or statements about race, color, national origin, sex, religion, disability, age, veteran status, or political position. This also includes, but is not limited to any offensive, false, disparaging or defamatory statements

- Using Company/computer resources to send, solicit, indicate further interest in graphic, vulgar, violent, or racially or sexually offensive matters, including, but not limited to, pictures, stories, or jokes

- Using Company computer resources to communicate business related opinions when the individual is not authorized to do so

- Receiving, disclosing, or disseminating any information or records confidential to the Company, including, but not limited to personnel files, business records, customer account information, rate and billing information, customer lists, technical data, and source and objective codes, without the written permission of management and with permission only, if appropriately encrypted as determined by Data Protection



45

---

If you witness or are subjected to sexual harassment at work by anyone, including supervisors, co-workers, vendors or customers, you should immediately report the incident to your manager, Human Resources Representative and/or the Employee Relations Department in Memphis. All sexual harassment complaints will be thoroughly investigated in as confidential a manner as possible and treated in accordance with the Internal EEO process as explained in the Guaranteed Fair Treatment Procedure/EEO Complaint Process policy. You will not be retaliated against for reporting a claim or incident of sexual harassment. FedEx Express will take the necessary corrective action following its investigation depending on the particular circumstances of each case.

## Code of Business Conduct - PEOPLE 2-70

FedEx Express strives to maintain a high standard of business ethics. This involves honesty, integrity and fairness in dealing with customers, suppliers, competitors as well as the Company. The Code of Business Conduct requires that you avoid any activity or interest, which might reflect unfavorably upon the integrity of you or FedEx Express. You may be disciplined, up to and including termination, for failing to report a potential conflict or a relationship, which may lead to a potential conflict. You may also be disciplined for making false reports or improperly using or disclosing proprietary information.

## Gifts / Gratuities - PEOPLE 2-75

Giving or accepting gifts from persons with whom you may conduct business is undesirable and contrary to Company policy. To protect you and FedEx Express, you must understand the implications of accepting business gifts. The solicitation of gifts is prohibited. Nominal gifts valued at $25.00 or less may be accepted, but cash gifts in any amount may never be accepted. Under appropriate circumstances, the acceptance of gifts over the $25.00 limit may be permissible. Contact your manager or your Human Resources Representative if you have questions.

44

## Confidentiality - PEOPLE 10-5

### Information

The release of information contained in a document or package sent through the FedEx Express system could seriously jeopardize the confidence our customers place in our Company. Additionally, the release of this information to any person, except those specifically authorized to participate in its transportation, could expose you to significant personal, civil, and criminal liability, including fines and imprisonment. Therefore, you should not release any information to persons other than those specifically involved in moving the information through the FedEx Express system. If an investigation confirms the release of such information, you may be terminated.

### Documents/Patents and Copyrights

While employed at FedEx Express, you may be exposed to confidential information that involves the design and development of new materials, marketing campaigns, equipment, procedures, or inventions that relate to Company business. All such items and information are the sole property of FedEx Express and may not be used or disclosed by employees except in the ordinary course of performing their duties as FedEx Express employees.

### Personal Financial Responsibility/ Garnishments - PEOPLE 2-85

FedEx Express expects you to handle your financial obligations, including those to the Company, in a responsible and timely manner. Writs of garnishment or other court-ordered wage deductions are costly and should be avoided whenever possible. When the Company is required to be involved in the collection of monies owed to FedEx Express or monies owed to an employee's personal creditor, an administrative service fee may be imposed for each occurrence as permitted by state law.

46

## Alcohol and Drug-Free Workplace - PEOPLE 2-10

FedEx Express is committed to a safe work environment for its employees and the public. The Company supports and complies with the Department of Transportation (DOT) and associated agencies, Federal Aviation Administration (FAA), Federal Highway Administration (FHWA) regulations for drug and alcohol testing as well as all other applicable federal and state laws. FedEx Express reserves the right to test an employee for alcohol and drugs at any time.

FAA and FHWA require FedEx Express to drug and alcohol test covered employees under six different categories: pre-employment (drugs only), random, post accident, reasonable cause, return to duty and follow-up. Non-covered employees may also be required to be drug and/or alcohol tested for pre-employment, post accident, reasonable cause, return to duty, and follow-up.

FedEx Express prohibits the unauthorized possession, sale, manufacture, distribution, known transportation, or non-prescription use of controlled substances (including but not limited to opiates, marijuana, phencyclidine (PCP), amphetamines, cocaine, and other addictive drugs as regulated by DOT). In particular, the Company expressly prohibits unlawful drug usage by its employees at any time, on or off duty. If a drug screen indicates the presence of drugs in your system, you will be terminated.

FedEx Express also prohibits the abuse of legitimately prescribed drugs, while on or off duty. This includes dependency and/or using drugs for reasons other than the purpose of the initial prescription.

The Company also prohibits the unauthorized possession of, use of, or being under the influence of alcohol while on Company property. Also, consumption of alcohol is prohibited during your working hours, including the meal period, breaks, pre-duty/pre-report periods, and standby/on-call hours. Alcohol is defined as any beverage, mixture, or preparation, including medication, prescribed or over-the-counter, intentionally or unintentionally, containing alcohol.

47



"Promoting from within whenever possible…"

—Manager's Guide, USA

Results of an alcohol test (breath or blood), observed behavior, and/or other information substantiating alcohol abuse may result in discipline up to and including termination. An alcohol test result of 0.04 or above will result in termination. An alcohol test below 0.04 may or may not result in termination. Refer to *PEOPLE 2-10 Alcohol and Drug-Free Work* policy for complete details. FedEx Express reserves the right to request you to submit to testing based on observed behavior, other information, or if there is reason to believe you are in violation of the Alcohol and Drug-Free Workplace policy. Failure to submit to testing will result in termination.

If you are required to meet FAA or FHWA qualifications and regulations, you are subject to additional restrictions and drug testing on the use of drugs, including prescription drugs, and alcohol. You are required to report prescription drug use to your manager if the medication has the potential to interfere with safety. Management may request a physician's statement attesting that the prescription drug(s) will not interfere with your ability to perform your normal job duties.

## Termination - *PEOPLE 4-90*

If you expect to terminate your employment with FedEx Express, you should give your manager as much notice as possible. A resignation is considered binding at the time it is tendered to the Company and accepted by management. The termination date is effective at the end of the notification period; however, the Company reserves the right to pay the employee in lieu of a reasonable notice period.

If you terminate your employment with FedEx Express either voluntarily or involuntarily, you must return all Company property and satisfy all outstanding debts. This includes, but is not limited to, the identification badge, Company credit cards, keys, equipment and uniforms. You are advised to review the *Your Employee Benefits book (YEB)* for any questions you may have regarding your employee benefits.

If you are terminated from FedEx Express and believe your termination was unfair, you may use the Guaranteed Fair Treatment Procedure/EEO Complaint Process. This internal resolution procedure is also outlined in the Employee Relations section of this handbook and in the *PEOPLE Manual*. Note that this handbook is not a contract of employment.

48

# Career Opportunities

Career Opportunities Policy . . . . . . . . . . . . . . . . . 51

Job Change Applications . . . . . . . . . . . . . . . . . 51

Candidate Selection . . . . . . . . . . . . . . . . . 52

Personnel Classifications . . . . . . . . . . . . . . . . . 53

Employment of Relatives . . . . . . . . . . . . . . . . . 54

## Career Opportunity - *PEOPLE 4-15*

 Open positions are filled, whenever possible, from qualified candidates from within the existing workforce. Share your career interest with your manager, and he will help you determine your advancement potential and provide suggestions for career development. You are encouraged to use all applicable Company-sponsored training including the Tuition Assistance Program to help you to reach your goals.

FedEx Express requires that all open positions be listed weekly in the Career Opportunity Posting and/or the electronic Job Change Applicant Tracking System (JCATS). The Career Opportunity Postings are listed each Friday on all designated Company bulletin boards including E-mail bulletin board (in search field type Career) and the intranet website (http://home.fedex.com/News/CareerOps/). Each posted open position includes the job title and grade, job requirements, and the name of the hiring manager. You are responsible for monitoring the Career Opportunity Postings and for providing required supporting documentation.

## Job Change Application (JCA) - *PEOPLE 4-15*

To apply for an open position, you must possess the qualifications, skills, education, and required experience. Also, you must have satisfied the required amount of time in your present job or department/location as specified in the *PEOPLE Manual* or the Career Opportunity Posting. If you meet these requirements and the specifications for the job, you may submit either a paper or electronic Job Change Application to your manager for approval. For certain positions your resume and/or additional supporting documentation may be required. The number of active JCAs you may have of any given time is limited as specified in the Career Opportunity policy in the *PEOPLE Manual*. The hiring manager must receive your paper JCA and required attachments no later than 5:00 P.M. on the closing date listed in the Career Opportunity Postings.

## Candidate Selection - *PEOPLE 4-5, 4-10, 4-70*

To qualify for promotion or transfer you must meet the minimum requirements of the position. Once these requirements are met, additional selection criteria for each classification is outlined below:

### Hourly positions

Selections are based on current job classification, length of Company continuous service, performance, conduct, test completion (when required), and ability to perform the job.

### Non-management Salaried Position

Selections are based on qualifications, performance, conduct, ability to perform the job, and length of Company continuous service.

### Management Positions

The ASPIRE Process (Assessing Skills, Performance and Interest Required for Entry to management) is used to select first line managers. The process is designed to help employees decide if they want to pursue a management career and to identify those employees who have the greatest likelihood of succeeding as managers. To be eligible to apply for first-line management positions, employees must first attend a class that provides them with a realistic preview of the manager's job. Following this class, those still interested in management then complete the assessments that have been shown to predict success in the manager job. Additional details regarding this program are available in the *PEOPLE Manual* and from your manager.

## Personnel Classifications

Because of unique scheduling, compensation, and job requirements, employees are classified by category. Your manager will inform you of your classification. The FedEx Express job classifications are as follows:

### Permanent Employees

The permanent employee designation is to classify benefits; it does not confer any special status. To be a permanent employee does not mean you are promised lifetime employment, nor does it mean a promise of certain treatment. Permanent employees are provided a diversified benefit program and regular pay reviews, and may be either classified as full-time or part-time.

- **Permanent Full-time**

  Normally are scheduled no more than 55 hours or paid less than 35 hours per scheduled workweek provided the employee works all scheduled hours

- **Permanent Part-time**

  Normally are scheduled to work no more than 30 hours or paid less than 17.5 hours per scheduled work week provided the employee works all scheduled hours

### Temporary Employees

If a temporary employee is hired later as a permanent FedEx Express employee, the employee's "continuous service" begins on the date the employee becomes permanent. Employee numbers and the time employed as a temporary employee do not affect continuous service. Temporary assignments may not involve confidential information or strategic programs. Additional details regarding temporary employees are available in the *PEOPLE Manual.*

### Casual/On-Call

Casual employees work only when called in by their manager, and their assignments may not involve confidential information. Casual employees are not eligible for FedEx Express benefits.



The total compensation package provided by FedEx Express goes far beyond the cash value of your paycheck. The total compensation package means the combination of pay and benefits programs which provide financial security both today and in the future and many opportunities for you and your family.

**Agency Employees**

May not be assigned to work involving confidential or strategic programs. Agency employees are not eligible for FedEx Express benefits. Additional details regarding agency employees are available in the *PEOPLE Manual*.

**Nonexempt and Exempt Classification**

Employees are also classified as either nonexempt or exempt employees.

**Nonexempt**

Nonexempt employees may be paid on either an hourly or salaried basis. Such positions include hourly-paid operations employees, clerical/administrative positions, and other positions for which output is normally measured in specific tasks completed or hours worked.

**Exempt**

Exempt employees are always salaried and perform managerial, professional, technical, or sales-related job functions. Exempt employees are paid for the successful completion of assignments rather than for actual hours worked.

## Employment of Relatives – PEOPLE 4-50

Individuals who are related by blood or marriage may be hired and permitted to work at the same location if no direct reporting managerial relationships exist. However, special consideration is not given to married couples or relatives for work assignments, vacations, shift scheduled days off, or other business-related decisions.

54

# Compensation and Benefits

Compensation – A Package Deal . . . . . . . . . . . . . . . 57
Your Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
How You are Paid . . . . . . . . . . . . . . . . . . . . . . . . . 58
Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Pay Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Recall/Call-In Pay . . . . . . . . . . . . . . . . . . . . . . . . . 59
Report-In Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Special Recognition Programs . . . . . . . . . . . . . . . 59
Your Benefits–Introduction . . . . . . . . . . . . . . . . . . 60
Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Disability Benefits for full-time Employees –
  Short-Term/Long Term Disability . . . . . . . . . . . . 61
Temporary Return to Work Program . . . . . . . . . . . 61
Life Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
Health and Wellness programs . . . . . . . . . . . . . . . 64
Quality of Life Programs . . . . . . . . . . . . . . . . . . . . 65
Service Awards Programs . . . . . . . . . . . . . . . . . . . 65
Other Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Tuition Assistance Program . . . . . . . . . . . . . . . . . . 66
Discount Shipping . . . . . . . . . . . . . . . . . . . . . . . . . 66
Discount Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
Jumpseat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
Employee Stock Purchase . . . . . . . . . . . . . . . . . . . 69
Toolbox-Coverage . . . . . . . . . . . . . . . . . . . . . . . . . 70
Workers' Compensation . . . . . . . . . . . . . . . . . . . . . 70
Federal Express Credit Association . . . . . . . . . . . . 70
Unemployment Insurance . . . . . . . . . . . . . . . . . . . 70

## Compensation—A Package Deal

At FedEx Express, TOTAL COMPENSATION means the combination of pay programs, benefit plans, and quality of work/life programs offered to you. Almost half of every dollar FedEx Express spends goes to provide pay and benefits. The total compensation package provided by FedEx Express goes far beyond the cash value of your paycheck. From health care to retirement to life insurance—including some unique benefits like discount travel, and extensive voluntary benefits programs— the FedEx Express total compensation package means the combination of pay and benefit programs which provide financial security both today and in the future.

## Your Pay

The Company's pay program is progressive and designed to maintain a competitive position by bringing wages and salaries in line with local and national economic conditions. On a quarterly basis, senior management reviews extensive market data and decides on adjustments and modifications to the wage and salary programs. These decisions are based on:

- the relative competitive position of our pay program in the labor market
- national and local economic conditions
- Company's financial ability to provide such pay increases.

Your actual salary or wage is a confidential matter between you and your manager. If is based on your position, job knowledge, qualifications, and performance. Feel free to discuss questions about the compensation program with your manager or your Human Resources Representative.

# How You are Paid

## Our Pay Objective

The Company's objective is to maintain competitive pay levels for jobs which require similar skills, effort, and responsibility as those in leading local or national companies that compete with FedEx Express for employees. To achieve this objective, your pay may include several components in addition to your base salary or wage such as geographic pay differentials, special licenses, overtime, etc.

- **Nonexempt Hourly Employees** (couriers, handlers, mechanics, etc) are paid weekly. Overtime premium payments are based on hours worked during a week.

- **Nonexempt Salaried Employees** (secretaries/administrative assistants, etc.) are paid semi-monthly. The compensation program provides for merit increase eligibility based on individual performance levels and current salary within an established range. Nonexempt salaried employees are eligible to be paid overtime.

- **Exempt Employees** (managerial and professional jobs) are paid semi-monthly and principally for the successful completion of a project function unrelated to specific work hours. Standard workweeks generally consist of 40 hours (or greater). Exempt employees are provided merit increases based on job performance and location within the respective salary range.

## Overtime

Business conditions may require you to work overtime. Your manager will try to maintain agreeable work schedules while meeting service-level commitments, and will make every effort to notify you as far in advance as possible when you are needed to work overtime. You are expected to comply with and work all assigned overtime. Overtime work is distributed as equitably as possible. Ask your manager about the distribution of overtime in your work area.

Overtime premium payments are based on hours worked during a scheduled workweek. Exempt employees do not receive overtime premiums.

58

## Pay Premiums

Pay premiums are added to base pay for specific reasons and are not normally a part of your base pay when calculating overtime, holidays, or vacation pay, etc. Premiums may be paid for items such as licenses required to perform your job duties. Permanent employees assigned to second or third shift may be eligible for a shift pay premium.

## Recall/Call-In Pay

Permanent employees may be eligible for recall/call-in pay when called to work on a nonscheduled day (call-in) or if required to return to work because of an emergency (recall).

## Report-In Pay

Permanent full-time non-exempt employees are paid a maximum of four hours at the applicable rate if they report to work for their regularly scheduled shift and no work is available. Permanent part-time employees receive a maximum of two hours pay. Report-in pay may not be paid for conditions beyond the control of the Company (e.g. fire, power outages, or civil or Company emergencies).

## Special Recognition Programs

FedEx Express provides special programs to recognize employees for outstanding service to our customers or to the community, for example:

The Bravo Zulu Program recognizes excellence, teamwork, and cooperation above and beyond normal job responsibilities. The Bravo Zulu symbol is used in the U.S. Naval Services and means job well done!

## Golden Falcon/Humanitarian Awards Program

The Golden Falcon is awarded to permanent employees who demonstrate exceptional performance that enhances customer service that is truly above and beyond the call of duty.

59

## Disability Benefits for Full-Time Employees (Short and Long Term)

FedEx Express offers short and long-term disability benefits to permanent full-time employees who have completed 180 days of cumulative full-time active employment. You are eligible to receive a percentage of your base salary if you are disabled longer than the period during which you receive medical absence pay. Part-time employees are not covered under the disability plan unless required by state law. Refer to the **Medical Absence Pay Policy 1-5, 1-7, and Leave of Absence (Medical) Policy 1-6, 1-8** policies in the *PEOPLE Manual* and the *YEB* for more information.

**The Temporary Return to Work Program (TRW)** *PEOPLE 1-68* – provides temporary placement of permanent employees who are temporarily unable to perform the full range of their regular job duties but who have been released by their physicians to return to work in a limited capacity. The program helps the employee recover faster and contributes to corporate productivity. Employees continue to receive disability benefits when eligible.



61

## Your Benefits

The following highlights your FedEx Express benefits. Refer to the *Your Employee Benefits book (YEB)* for more detailed information. You may obtain a copy through your manager.

Employee benefits are a part of your total compensation package. A broad range of programs are provided and designed to give you major economic protection against loss of income or to improve your quality of life. Retirement and savings plans are also provided for your financial security in the future. FedEx Express provides a comprehensive benefit program which includes – Health, Disability, Life Insurance, and Retirement Plans, and other quality of life programs.

### Health

The FedEx Express Group Health Plan provides a comprehensive medical, prescription drugs, dental, and vision benefits program to all permanent employees. Health coverage may be provided for your eligible dependents at an additional cost to you through payroll deductions. If you are a permanent full-time employee, your coverage begins on your first date of employment. Dependent coverage is effective on the first day of active work if you enroll in "Employee and Dependent (s)" health coverage within 31 days following your coverage date.

If you are a permanent part-time employee, your coverage begins on the 91st day of permanent continuous service, not counting days missed for a leave of absence. Dependent coverage is effective on the date of your coverage if you enroll in "Employee and Dependent(s)" health coverage within 31 days of your coverage date.

Depending on where you live, you may have health options. Newly hired or newly eligible employees receive a packet of information describing these options and the details for enrollment. Also, each fall an annual health enrollment is held by the FedEx Express Employee Benefits Department. Employees are mailed a packet of information with details about their health plan options and may change their option for the next calendar year.

## LIFE INSURANCE

### Basic Life Insurance

Participation is automatic and FedEx Express pays the full cost of this coverage. Permanent full-time employees are eligible on their first day of active work and are insured for an amount based on their annual salary. Permanent part-time employees are eligible on the 91st date of permanent continuous active work and are insured for a set amount.

### Optional Life Insurance

Permanent full-time employees may purchase Optional Life Insurance for themselves and their eligible dependents. Permanent part-time employees may purchase Optional Life Insurance for themselves only. Coverage must be requested within 31 days of their eligibility date, or proof of good health is required. The cost of Optional Life insurance is automatically deducted from your paycheck.

### Basic Accidental Death and Dismemberment (AD&D Insurance)

Participation is automatic, and FedEx Express pays the full cost of Accidental Death and Dismemberment for permanent employees. Enrollment is automatic on the first day of active work for full-time employees and on the 91st day of permanent continuous active work for part-time employees.

### Optional Accidental Death and Dismemberment (AD&D) Insurance

Permanent full-time employees may purchase Optional Life Insurance for themselves and their eligible dependents. Coverage begins on the first day of the month following the application date. Coverage can be requested in increments. The cost of Optional AD&D Insurance is automatically deducted from your paycheck.

### Business Travel Accident Insurance

Participation is automatic and FedEx Express pays the full cost. All permanent employees are covered on their first day of active work.

### Survivor's Income Benefits (SIB)

If you are a permanent full time employee, SIB are paid to your spouse and eligible children if you should die while employed at FedEx Express.

## Retirement

Retirement benefits at FedEx Express are designed to provide eligible employees with a solid foundation toward financial security at retirement by sponsoring a Pension Plan and a Profit Sharing Plan. In addition to these programs, FedEx Express contributes an equal portion to Social Security on your behalf.

**The Federal Express Corporation Employees' Pension Plan** FedEx Express provides you with a monthly retirement benefit based on a specific defined formula using Federal Express career earnings and service. The Pension benefit is payable in addition to Social Security retirement benefits, any Profit Sharing Plan account balance, and any income from your personal retirement savings accounts.

**The Federal Express Corporation Profit Sharing Plan (PSP)** The PSP enables the Company to share profits with employees. Company contributions to PSP may be made at the discretion of the Board of Directors. In addition, PSP allows employees to save toward their retirement income with the following features:

- **Retirement Savings Plan (RSP)** a 401(k) feature allows you to contribute on a pre-tax basis through payroll deductions. Each plan year, the Company will match your contributions up to a specified maximum

- **Optional Savings Plan (OSP)** account allows you to contribute with after tax dollars; however, the earnings on these savings are tax deferred

## Quality of Life Programs

FedEx Express provides a variety of activities and programs aimed at enhancing the quality of life of employees and their families.

**People Help Employee Assistance Program**
Confidential prepaid professional counseling and support services are provided for you and your household members at no cost. People Help also coordinates with our mental health and substance abuse benefit.

**Lifeworks Work/Life Program**
A resource and referral program intended to give employees the support and tools needed to manage work, family, and personal life is provided at no cost.

**Federal Express Employee Association (FEEA)**
Social, cultural, and recreational activities are funded by FedEx Express and planned and administered by the FEEA.

**Service Award Program**
FedEx Express recognizes you for continuous permanent service on your first anniversary. Recognition takes place on your first year of service, again on your 5th anniversary, and every 5 years thereafter.

**FedEx Express Retiree Club**
Provides an opportunity for retired employees to participate in social, recreational, and cultural events.



## Health and Wellness Programs

The FedEx Express Health & Wellness Department promotes health education and healthy lifestyles for employees and their family members. Registered nurses and health fitness specialists coordinate all of the wellness and fitness programs.

**Wellness Centers and Fitness Network**
The Health & Wellness Department manages all Wellness Centers on Federal Express property and the International Fitness Club Network.

**Smoking Cessation Program**
FedEx Express provides reimbursement for approved smoking cessation programs up to a set amount.

**The Health & Wellness Department also coordinates the following programs:**

- Health Screenings
- Chronic Disease Intervention Programs
- Medical Support for the Human Capital Management Program
- Maternity Program
- Blood Drives
- Benefits and Health Fairs

FedEx WELLNESS CENTER

WELLNESS CENTER

# VOLUNTARY PROGRAMS

FedEx Express offers employee-paid voluntary programs. Employees save because of special group rates. Payroll deduction is available.

These include programs such as:

- **METPAY Personal Property Insurance**
  Provides automobile, renters', homeowners, and other personal property insurance which may be purchased in most states for those who qualify

- **Long - term Care Insurance**
  Assists with the cost of long-term care provided by a professional home care agency or a nursing home when the covered individual can no longer care for him/herself

- **Group Legal Services Program**
  Provides a wide range of legal services at an affordable price. Examples include purchase, sale or refinancing of primary residence, wills and estate planning, and defense of civil lawsuits

# OTHER BENEFITS PROGRAMS

## Personal Shipping Discounts - *PEOPLE 7-35, 2-5*

FedEx Express offers discount shipping to eligible employees, their spouses, and dependent children.
Employees must ensure that such shipments result in a direct and personal benefit, rather than a commercial benefit for the employee. Excessive or non-personal use of this privilege is a violation of the Acceptable Conduct Policy

## Tuition Assistance Program

Designed to encourage you to get additional education and training to enhance your career development. For participation in this program, first consult your manager and refer to the current YEB book/supplement for specific guidelines and eligibility requirements. Do not enroll in or commit to any course or program of study without first determining that you meet all guidelines and requirements

## Discount Travel - *PEOPLE 7-27, 2-5*

The interline travel privilege is one of our most attractive benefits. Business and personal travel discounts are negotiated with air carriers to meet the travel needs of FedEx Express and its employees.

The Corporate Travel Services Department provides business travel arrangements for FedEx Express personnel regardless of their geographical location or air carrier. Corporate Travel must book reservations for hotels that are not listed in the "E" mail hotel directory (CORPT:AV-DOM-HOTELS). Discounted airline tickets are not eligible for frequent flyer or mileage credits.

All permanent employees may take advantage of interline discounts for personal travel. However, a minimum of 6 months of continuous permanent service is required. Some carriers require longer service for eligibility. A complete listing of all travel information is in E-mail/CORPTRAV, including eligibility requirements, participating airlines and types of discount, ticketing, and baggage procedures. Employees on leaves of absence are not eligible for interline travel except as outlined in the People Manual. Interline discounts are confidential and should not be discussed outside of the Company. It is your responsibility to familiarize yourself with the airline discount directory.

A dress and conduct code brochure is provided for each ticket or authorization letter issued by Corporate Travel. The dress and conduct code is more specifically defined on the e-mail bulletin board CORPTRAV-INFO. You must read the E-mail dress/conduct code bulletin board for the most current information. Abuse of interline privileges jeopardizes the interline agreement and can result in disciplinary actions, including dismissal.

## Company-Paid Training

Internal and external Company-paid training is available. Talk to your manager about your specific training interests.

## FedEx Express Logo Merchandise

The Company sells a variety of useful and decorative merchandise emblazoned with the FedEx Express logo.

## Recognition of Significant Family Events - PEOPLE 6-70

FedEx Express may provide gifts or flowers as appropriate to employees and immediate families in the event of marriage, birth of a child or adoption, hospitalization, or death specified in the PEOPLE Manual.

## Employee Stock Purchase

Permanent employees, who have completed at least three (3) consecutive months of employment with the Company, may buy FDX stock through payroll deductions through the Employee Stock Purchase Plan. You may authorize payroll deductions of 1% to 10% of your gross salary.

These deductions accumulate until the end of each month, at which time FDX purchases shares of stock for all participants. FDX pays all brokerage fees on the purchase of stock through this plan.

If you decide to join the plan, you may make changes in the amount of your payroll deductions at any time. The enrollment, change, or withdrawals take effect immediately.

Once the stock is purchased, it is held in your name by a brokerage firm. You pay the commission for the sale of stock. If you would like more information, contact the FDX Treasury Department.

69

## Jumpseat Travel Privileges - PEOPLE 7-47

Permanent full-time and part-time employees are eligible to jumpseat on FedEx Express aircraft for personal or business travel. You must make your own jumpseat reservations through the on-line FREEBIRD system, the FedEx intranet (in keyword field type in the word [jumpseat]), or by calling the Jumpseat Reservations Office in Memphis. Employees are subject to the following provisions. This list is not inclusive. Before you jumpseat, refer to the PEOPLE Manual 7-47 and the Jumpseat Certification Guide for a complete list of provisions.

- You must successfully complete the jumpseat certification test every 6 months using the computerized FREEBIRD system or the jumpseat website. Refer to the Jumpseat Certification Guide for more details

- Your valid FedEx Express identification badge is required to jumpseat

- Baggage must be kept to a minimum

- You are required to report well in advance of your jumpseat flight or you may not be allowed to fly. Refer to the Jumpseat Certification Guide for specific information on showtimes.

- You may not consume any intoxicating substances within 8 hours of scheduled departure time. If you are under the influence of alcohol or drugs while on FedEx Express aircraft you will be terminated

- You are not eligible for jumpseat while on a Leave of Absence except as outlined in the Jumpseat policy in the PEOPLE Manual

Jumpseat is a privilege, as such; courtesy must be displayed at all times. Inappropriate conduct may result in discipline and permanent forfeiture of your jumpseat privileges.

Jumpseaters remain under the captain's authority at all times. The captain has absolute authority in operation of the aircraft and seat assignments. The captain may exclude, deboard, or relocate anyone who presents potential danger to the safety of the flight or for any other reasons he deems necessary.

Be courteous and polite at all times; thank your crewmembers for the flight. Remember, jumpseating is a privilege, not a benefit or right.

68



FedEx Express provides paid time off to maintain the health, morale, and efficiency of employees.

## Tool Box Coverage

If you are required to use personal hand tools as a regular part of your job, FedEx Express provides protection against the direct loss of your complete toolbox or its contents. Refer to the handbook/SOP for your workgroup, or your manager for details.

## Unemployment Insurance – PEOPLE 3-95

FedEx Express pays unemployment insurance for your benefit in accordance with state laws. Affected persons may apply for unemployment insurance benefits through their local unemployment office.

## Workers' Compensation

If you are unable to work because of job-related injury, you are eligible for income and medical benefits as prescribed by your state's workers' compensation laws. Workers' Compensation income benefits are coordinated with the FedEx Express disability and medical absence pay programs.

If you sustain a job-related injury, report it to your manager immediately. Failure to report the injury immediately may delay benefits and could cause denial of your claim.

## Federal Express Credit Association

The Federal Express Credit Association pays a competitive rate of interest on savings and checking accounts. Loans are available at interest rates generally lower than those charged by most lending institutions. Your spouse, children, stepchildren, parents, stepparents, brothers, sisters, grandparents and grandchildren are also eligible for membership.

# Vacations, Holidays, and Other Paid Absences

Introduction-Paid Time Off . . . . . . . . . . . . . . . . 73

Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Floating Holidays . . . . . . . . . . . . . . . . . . . . . . 73

Personal Days . . . . . . . . . . . . . . . . . . . . . . . . 74

Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Jury Duty . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Funeral (Bereavement) Pay . . . . . . . . . . . . . . . . 76

Medical Absence Pay . . . . . . . . . . . . . . . . . . . . 76

Medical Absence Pay/Leave of Absence (Medical) . . . . 76

Leaves of Absence . . . . . . . . . . . . . . . . . . . . . 77

Leave of Absence (Personal) . . . . . . . . . . . . . . . . 77

Leave of Absence (Military) . . . . . . . . . . . . . . . . 78

Leave of Absence (Family) . . . . . . . . . . . . . . . . . 78

## Paid Time Off

FedEx Express provides pay for vacations, holidays, and other authorized absences for all permanent employees. For detailed information regarding pay calculations refer to the applicable policy in the *PEOPLE Manual*.

## Holiday Pay - *PEOPLE 1-25*

The Company observes six paid holidays. These holidays are:

- New Year's Day (January 1)
- Memorial Day (last Monday in May)
- Independence Day (July 4)
- Labor Day; (first Monday in September)
- Thanksgiving Day (fourth Thursday in November)
- Christmas Day (December 25);

Permanent full-time employees are eligible for eight (8) hours holiday pay and permanent part-time employees are eligible for four (4) hours of holiday pay at their regular pay rate.

To receive holiday pay you must work your full scheduled shift the day before and after the holiday unless approved by your manager.

If a holiday falls within your vacation the holiday is not counted as a vacation day. It is not deducted from your vacation hours.

If you are on a leave of absence you are not eligible for holiday pay.

Nonexempt employees who work on a corporate holiday are paid holiday pay and holiday pay premium at 1½ times their normal pay rate.

Exempt employees are granted compensatory time at 1½ times the hours worked in addition to regular holiday pay.

## Floating Holidays

Floating Holidays must be scheduled through your manager and may be used in conjunction with vacation or personal days. Floating holiday hours do not accrue and you are not paid for unused hours if you terminate your employment. The number of hours awarded is based on your status on the date the time is taken. See Table 1.

### Table 1

#### Eligibility for Floating Holidays and Personal Days





## Personal Days - PEOPLE 1-10

FedEx Express allows paid time away from work to conduct personal business. Permanent employees are eligible for Personal Days as outlined in Table 1.

### Personal Time

• Must be taken in one (1) hour minimum increments, however, departmental management may specify four (4) hour minimum whenever there is a business need

• Hourly employees must request personal time off at least two (2) business days in advance except in emergency situations

• Personal time may be used in conjunction with vacation and floating holidays with management approval

• Unused personal time cannot be carried over to the next fiscal year. Employees are not reimbursed for unused personal time at the time of termination

## Vacation - PEOPLE 1-15, 1-16

In the interest of health, morale, and efficiency, FedEx Express wants you to take full advantage of vacation time. Permanent employees are eligible to be paid vacation time. Your manager can provide you with the specific vacation guidelines for your particular division.

Vacation buyback is currently an option for hourly employees when approved in accordance with the Vacation Policy 1-15. Vacation pay is based on the current rate at the time the vacation is taken or buyback occurs. The total number of vacation hours paid in any pay week may not exceed 40 hours.

### Vacation Scheduling

You are encouraged to schedule your vacation in a minimum of one-week increments. Vacation scheduling is always subject to the business needs of the Company.

## Medical Leaves of Absence - PEOPLE 1-6, 1-8

If you are unable to return to work after your medical absence pay is exhausted, your manager will change your status from active to Medical Leave of Absence. This change is effective the day following the end of your medical absence pay.

- Permanent employees who have completed 180 calendar days of cumulative full-time employment may be eligible for disability income (STD/LTD). Part-time employees are eligible only if governed by state law. It is important that you refer to *Your Employee Benefits book (YEB)* for more information on short and long-term disability coverage (STD/LTD).

# Authorized Non-Paid Time Off

## Personal Leaves of Absence - PEOPLE 1-55

Permanent employees may be granted a non-paid Personal Leave of Absence. You must request such leaves in writing and receive approval of all levels of management through your managing director. Personal Leaves are granted based on the impact on the Company's business operations and the reasons for the request. Most benefits continue for 90 days as if you were an active employee, however, you are responsible for any optional coverage such as dependent coverage and optional life insurance. If your Leave extends beyond 90 days you must pay for coverage directly to Employee Benefits/Enrollments Department.

There are two types of personal leave:

- **Short Term**
  15-to 90 days in duration
  You will return to your regular position within the prescribed time limits

- **Long Term**
  91-days up to 1 year in duration
  You are eligible to apply for any posted position for which you may be eligible during the last 90 days of the leave.

## Unused Vacation/Termination

Vacation time not used is forfeited (except in states where forfeiture is prohibited), unless you get written approval from your managing director or above authorizing a 90-day maximum extension.

If you terminate your employment with FedEx Express, you are paid for all unused vacation time accrued to date.

## Jury Duty - PEOPLE 3-60

Time off is given to permanent employees who are subpoenaed to serve as jurors. Contact your manager as soon as you receive notice. FedEx Express offsets the pay you receive from jury duty. When you return from jury duty, present proof of fee payment to your manager.

## Funeral (Bereavement) Pay - PEOPLE 3-46

Permanent employees may be excused from work with pay for up to three days for the death of an immediate family member.

## Medical Absence Pay/Medical Leaves of Absence



**Medical Absence Pay - PEOPLE 1-5, 1-7**
Permanent employees are eligible for Medical Absence Pay. This salary assurance program provides income during unavoidable short-term or occasional absences due to illness or injury.

- Your manager can provide you with specific guidelines for your division regarding medical absence pay and medical documentation. A doctor's statement may be required before you can receive medical absence pay

- Unsatisfactory attendance is considered a performance deficiency

- Your status will change to Medical Leave of Absence if the length of your illness exceeds your Medical Absence Pay coverage. Eligible employees may also be covered under the Disability Programs

## Military Leave of Absence–*PEOPLE 1-50*

Civilian FedEx Express employees who perform non-career service in the military may be granted a Military Leave for up to 24 months. If your military service extends beyond 24 months, you may have re-employment rights in compliance with federal regulations.

Military Leave may be granted if you are reporting for active duty, training, inactive duty training, reserve and National Guard duty, an examination to determine fitness for duty, or if you volunteer for military duty. Military orders or other proof calling you to active duty should be submitted to your manager as far in advance of departure as possible.

## Family Medical Leave–*PEOPLE 1-45*



FedEx Express recognizes employees need to balance the demands of work and family. Under certain circumstances, the Company provides leave without pay under the federal Family Medical Leave Act, or applicable state Family Leave Acts.

During your leave health benefits continue as though you are an active employee. You are required to pay your normal payroll deductions for any optional coverage you may have (dependent coverage, optional life insurance). See the *Your Employee Benefits Book*, or contact Employee Benefits or Group Health Administration for benefit continuation information.

## Family Medical Leave Act Rights

**Employee Eligibility**

To be eligible for FMLA benefits, an employee must have:

*   Worked for the Company for a total of at least 12 months; and
*   Worked at least 1,250 hours over the previous 12 months.

### Leave Entitlement

The Company must grant an eligible employee up to a total of 12 work weeks of unpaid leave during a rolling year period for one or more of the following reasons:

*   To care for the employee's child after birth or placement for adoption or foster care
*   To care for an immediate family member (spouse, child, or parent ) because of a serious health condition
*   To take leave when the employee is unable to work because of a serious health condition

When both spouses are employed by the Company, they are jointly entitled to a combined total of 12 work weeks of family leave for the birth or placement of a child for adoption or foster care, and to care for a parent (but not a parent-in-law) who has a serious health condition.

Leave for birth or placement for adoption or foster care must conclude within 12 months of the birth or placement and cannot be taken intermittently.

Employees may take FMLA intermittently (i.e., taking leave in blocks of time or by reducing their normal weekly or daily work schedule) when it is medically necessary to care for a family member with a serious health condition or when the employee's own serious health condition makes it medically necessary for intermittent leave.

Also, under certain conditions, employees may choose to use accrued paid leaves, such as vacation, to cover some or all of the FMLA leave.

A serious health condition is any illness, injury, impairment, or physical or mental condition that involves:

*   Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility;
*   A period of incapacity of more than three (3) calendar days from work, school, or other regular daily activities that also involves continuing treatment by, or supervision of, a health care provider;



Communications is the most fundamental process the Company relies upon to organize the people into a highly unified and committed team that shares a common set of values and its focused on achieving common goals...

- Any period of incapacity due to pregnancy or for prenatal care; or
- Continuing treatment by or under the supervision of a health care provider or a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than 3 calendar days.

**Note:** Ordinarily, unless complications arise, the common cold, the flu, earaches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definitions of a serious health condition and do not qualify for FMLA leave.

**Job Restoration**
Employees returning from FMLA leave of 12 weeks or less within a rolling 12-month period will be returned to the same or equivalent position.

In addition, an employee's use of FMLA leave cannot result in the loss of any employment benefit that the employee earned or was entitled to before using FMLA leave.

**Notice and Certification**
Employees who wish to use FMLA leave may be required to provide:

- 30-day advance notice of the need to take FMLA leave when the need is foreseeable.
- Medical certification that supports the need for leave due to a serious health condition that affects the employee or an immediate family member
- Periodic reports during the FMLA leave about their status and intent to return to work

When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is for planned medical treatment, the employee must try to schedule the treatment so that the Company's operation is not unduly disrupted.

# Communications and Employee Relations

Communications . . . . . . . . . . . . . . . . . . . . . . 83

Employee Relations . . . . . . . . . . . . . . . . . . . 83

Open Door . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Guaranteed Fair Treatment Procedure . . . . . . . . . . 84

EEO Complaint Process . . . . . . . . . . . . . . . . . . 88

SFA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

## Communications

FedEx Express has one of the most advanced Corporate communications systems in the industry. Current information about FedEx Express is provided through several means of communications, including bulletin board notices, internal Company publications, video presentations, daily live television broadcasts (FXTV) and the FedEx Express Intranet. Members of senior management also distribute special reports on the Company's progress to you and your family.

Open face to face management/employee communication is at the very cornerstone of our daily FedEx Express operations. Upward employee communications are encouraged through frequent one on one management / employee interface as well as through planned organized meetings. Employees are encouraged to express their concerns, suggestions and ideas with management.

## Employee Relations

FedEx Express is committed to developing and maintaining a positive work environment by communicating directly with you rather than through third parties such as government agencies, labor unions, and special interest groups. If you have any concerns consult your manager or your Human Resources Representative.

There are several channels for addressing any questions or concerns you may have. Among these channels are the Open Door Policy, the Guaranteed Fair Treatment Procedure/EEO Complaint Process, and the Survey Feedback Action (SFA) Program.

## Open Door - PEOPLE 5-40



The Company has a formal Open Door Process, which encourages employees to communicate their ideas and concerns directly to management. The process is available for employees to use for concerns or ideas that are general in nature and may affect other employees.

Examples of issues suitable for the Open Door Process are:

- Explain how geographic pay differentials or market level changes are made
- I believe our policy regarding personal appearance should be changed for the following reasons

First you must discuss your concerns or ideas with your immediate manager or your Human Resources Representative. Often times they can address your issues. If you do not receive a satisfactory response, you may formally enter into the Open Door process by submitting your concerns via the Open Door inquiry form found on the Open Door website. To locate the website, type in open door in the keyword field from the FedEx intranet homepage. You may also complete the Open Door inquiry form found in e-mail bulletin board.

## Guaranteed Fair Treatment Procedure/EEO Complaint Process - PEOPLE 5-5



The cornerstone of the FedEx Express PEOPLE philosophy is the Guaranteed Fair Treatment Procedure/Equal Employment Opportunity Process (GFTP/EEO). Because FedEx Express believes in a team effort and insists on an open atmosphere, the Company developed the GFTP/EEO process for handling complaints. Though the outcome may not be assured in your favor, your right to participate within the guidelines of the procedure is guaranteed.

You may use the GFTP/EEO to resolve work-related complaints that arise during your employment or termination of your employment. All employees who receive discipline, including termination, or treatment they believe to be unfair are eligible to participate in the GFTP/EEO process. This procedure guarantees an employee the right to appeal any eligible issue through a process of systematic review by progressively higher levels of management.

If you wish to initiate a complaint under the Guaranteed Fair Treatment Procedure to resolve a concern, you must hold an open and frank discussion with your immediate manager as soon as possible. If you believe the response you received is unsatisfactory or if management fails to respond, you may proceed to the next step of the GFTP/EEO process.

**Eligible GFTP Issues Include:**

- Disciplinary actions, including termination*
- Selection
- Application of benefits and compensation policies
- Performance reviews
- All allegations of discriminatory employment practices based on an employee's race, color, sex, religion, national origin, age, physical or mental handicap/disability, or veteran status including all allegations of sexual harassment

**Ineligible GFTP Issues:**

- Hours of employment
- Compensation rates and grade levels
- Content of benefit policies
- Content of Corporate policies and procedures
- Decision to suspend with pay pending investigation
- Denial of request for case review by the Accident Appeals Board
- Discipline initiated by the Appeals Board
- Documented counseling
- Other issues defined as appropriate by the Appeals Board

*Discipline or termination resulting from an EEO investigation may be appealed to Step 2 of the GFTP only.

# OVERVIEW OF THE GFT PROCESS

## Guaranteed Fair Treatment Procedure Process (Non-discrimination issues)

Note: An employee who wishes to initiate a GFTP complaint must hold an open and frank discussion with a member of management in their division before filing a formal complaint.



| Required Action within Time Frame | Decision |
|---|---|
| | Management's decision is documented and communicated to the employee. |
| **Step 2: Officer Review.** Within 10 calendar days the reviewing Officer reviews and considers all pertinent information and either upholds, modifies, or overturns the Step 1 decision. Officer Review and communicated to the employee within 10 calendar days of receipt of Step 2 Appeal. | Management upholds, modifies, or overturns the Step 1 decision. |
| **Step 3: Executive Review / Appeals Board.** Within 5 calendar days of the decision, the employee appeals the Step 3 decision. The Appeals Board reviews and considers all information and upholds their and submits recommendations. | Employee Relations Department makes a decision within 10 calendar days of receipt of Step 3 appeal. |
| | Appeals Board reviews and makes a decision and communicates decision to employee within 10 calendar days of Board's review. |

## Survey Feedback Action (SFA) Program

The Survey Action (SFA) Program is designed so that all employees can help improve the workplace. The Corporate goal is not only to continuously improve customer service, but also to continuously improve your working conditions. The components of the SFA process are:

### Survey

A standard, anonymous questionnaire is given each year to every active permanent employee. Questions are designed to allow employees to provide input on management, pay, benefits, communications, rules and procedures, and other areas that affect their jobs.

### Feedback

Results of the survey for each work group are summarized and returned to each manager. To understand the meaning of the survey results, each manager holds a feedback meeting with his employees. During the feedback meeting, the employees and their manager identify specific concerns or problems and develop action plans to correct these problems.

### Action

The most challenging part of the process is the design and follow-through of corrective actions. The outcome of the feedback meeting should be the SFA Action Plan—a list of clear, concise actions that will be taken to address employee concerns and lead to improvements in the workplace.

The SFA process also works at the corporate level. Managing directors, vice presidents, and senior vice presidents receive reports that indicate the concern of employees in their areas. As a result of feedback from employees, changes have been made in corporate programs and policies such as pay and benefit programs, recognition programs, and policies and procedures.

89

## EEO Complaint Process

All allegations of discrimination based on race, color, sex, religion, national origin, age, physical or mental handicap/disability, veteran status, or sexual harassment are eligible for the EEO process.

If you wish to initiate an employment discrimination complaint or access the EEO complaint Process, you should discuss your concerns with a member of management, Human Resources Representative, or HR Compliance as soon as possible. You will then receive an Employee Information Statement form to complete and return. All complaints will be promptly and thoroughly investigated in as confidential a manner as possible. The EEO complaint procedure is described in detail in **Table 2** of *PEOPLE Policy 5-5.*

At FedEx Express, where we have a "people-first" philosophy, you have a right to discuss your complaints with your manager without fear of retaliation. You also have the right to participate in the Guaranteed Fair Treatment Procedure or Equal Employment Opportunity Process without fear of retaliation for utilizing these processes.



88





90

**A**

acceptable conduct . . . . . . . . . . . . . . . . . . . . . . 27, 40-41, 66
accidental death and dismemberment . . . . . . . . . . . . . . 62
ad&d insurance . . . . . . . . . . . . . . . . . . . . . . . . 62
advancement opportunities . . . . . . . . . . . . . . . . . . 49-54
alcohol & drug free workplace . . . . . . . . . . . . . . . . 47-48
appearance, personal . . . . . . . . . . . . . . . . . . . . 25-26
assignments, work . . . . . . . . . . . . . . . . . . . . . . 29,54
attendance . . . . . . . . . . . . . . . . . . . . . . . . 11, 28, 76

**B**

badges (company id) . . . . . . . . . . . . . . . . . . . . . . 25
basic life insurance . . . . . . . . . . . . . . . . . . . . . . 62
benefit programs, other . . . . . . . . . . . . . . . . . . . 66-70
benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 60-70
bereavement pay . . . . . . . . . . . . . . . . . . . . . . . 59
bravo July voucher program . . . . . . . . . . . . . . . . . 11, 31, 32, 33, 51, 67, 83, 84
bulletin boards . . . . . . . . . . . . . . . . . . . . . . . 34-48
business conduct . . . . . . . . . . . . . . . . . . . . . . . 34-48
business travel accident insurance . . . . . . . . . . . . . . 62

**C**

career opportunity posting . . . . . . . . . . . . . . . . . 51, 52,55
cellular phone usage . . . . . . . . . . . . . . . . . . . . . 27
code of business conduct . . . . . . . . . . . . . . . . . . . 44
communications . . . . . . . . . . . . . . . . . . . . . . 15, 38, 83-91
community activities . . . . . . . . . . . . . . . . . . . . . 20
community relations . . . . . . . . . . . . . . . . . . . . . 20
company history . . . . . . . . . . . . . . . . . . . . . . 16-20
company store . . . . . . . . . . . . . . . . . . . . . . . . 69
compensation . . . . . . . . . . . . . . . 3, 4, 38, 53, 55-59, 60, 70, 87
computer usage . . . . . . . . . . . . . . . . . . . . . . . 45
confidential information . . . . . . . . . . . . . . . . . . 10, 56
confidentiality of documents . . . . . . . . . . . . . . . . 42, 46
continuous service . . . . . . . . . . . . . . . . . . . 52, 53, 60, 65, 67
copyrights . . . . . . . . . . . . . . . . . . . . . . . . . . 46
corporate contributions . . . . . . . . . . . . . . . . . . . 20
credit association . . . . . . . . . . . . . . . . . . . . . . 70
criminal charges . . . . . . . . . . . . . . . . . . . . . . . 43

**D**

disability benefits . . . . . . . . . . . . . . . . . . . . 60, 61, 77
discount shipping . . . . . . . . . . . . . . . . . . . . . . 66
discount travel . . . . . . . . . . . . . . . . . . . . . . . 57, 67
distribution . . . . . . . . . . . . . . . . . . . . 18, 33, 41, 45, 47, 58
drug-free workplace . . . . . . . . . . . . . . . . . . . . 42, 47-48

**E**

eeo complaint process . . . . . . . . . . . . . 2, 3, 19, 43, 48, 84, 85-87, 90
employee communications . . . . . . . . . . . . . . . . . . 81-89
employee relations . . . . . . . . . . . . . . 11, 15, 43, 48, 83, 87, 88
employee stock purchase plan . . . . . . . . . . . . . . . . 69
employment of relatives . . . . . . . . . . . . . . . . . . . 54
employment verification . . . . . . . . . . . . . . . . . . . 34

**F**

family leave absence .................................. 78-80
federal express credit association ...................... 70
fedex express employee association (feea) .............. 65
firearms ............................................. 31, 42
floating holiday ....................................... 73, 74
fmla ............................................... 78-80
flower program ....................................... 69
funeral (bereavement) ................................. 76

**G**

garnishments ......................................... 46
gftp/eeo complaint process ......... 2, 3, 19, 43, 48, 84, 85-87, 90
golden falcon award .................................. 59
guaranteed fair treatment procedure/eeo
    complaint process ............ 2, 3, 19, 43, 48, 84, 85-87, 90

**H**

harassment, sexual ................................ 43, 85, 88
health and wellness program ......................... 64
history of fedex express ............................ 16-20
holiday pay .......................................... 73
housekeeping ........................................ 28
humanitarian award ................................... 59
human resources information systems ......... 10, 38, 39, 87

**I**

identification badges ................................. 25
insurance, life .......................... 57, 60, 62, 77, 78

**J**

jca, job change application ............................ 51
job posting (career opportunity posting) ...... 51, 52-55
job security ......................................... 19
job training ..................................... 66, 69
jumpseat travel .................................. 41, 68
jury duty ............................................ 76

**L**

leave of absence, family ......................... 78-80
leave of absence, medical .................... 61, 76-77
leave of absence, military ......................... 78
leave of absence, personal ................... 76
life insurance .................... 57, 60, 62, 77, 78
long-term disability benefits ............... 61, 66

**M**

management/employee communications ............... 83
manager, your ...................... 2, 4, 9, 10, 11, 25, 26,
    27, 28, 29, 30, 31, 32, 33, 37,
    38, 43, 44, 48, 51, 52, 53, 55, 58,
    60, 66, 69, 70, 72, 73, 74, 75, 76, 77, 78, 83
manuals, people ..................... 2, 4, 11, 27, 48, 51, 52, 53,
    54, 61, 67, 68, 69, 72, 85
meals ............................................. 29

**M** (right column continued below)

medical absence/leave of absence (medical) ......... 61, 75-76
medical absence pay .......................... 61, 70, 75-76
military leave of absence ............................ 77
moonlighting ........................................ 30

**O**

open door policy ................................ 2, 83, 84
opportunity for advancement ................... 52-55
optional savings plan ............................... 63
orientation .......................................... 12
oap ................................................. 63
outside employment .................................. 30
overtime ..................................... 30, 58, 59

**P**

paid holidays ........................................ 72
paid time off .................................... 72-76
patents ............................................. 46
pay .................. 38, 40, 42, 57-59, 61, 72, 74, 75,
    76, 77, 84, 85, 89
pay premiums ......................................... 59
paycheck and deductions ............ 46, 60, 62, 69, 77
People manual .......... 2, 4, 11, 27, 48, 51, 52, 53,
    54, 61, 67, 68, 69, 72, 84, 85
people manual and
    work group handbooks ......... 2, 4, 11, 26, 27, 48, 51, 52, 53,
    54, 61, 67, 68, 69, 72, 84, 85
performance improvement ......................... 38-39
performance review ......................... 37-38, 39, 85
personal appearance ............................. 25-26
personal days ................................... 74, 75
personal financial responsibility ................... 46
personal leave of absence .......................... 76
personal tools ...................................... 70
personnel classification definitions ............. 53-54
personnel record .................................... 10
profit .................. 4, 5, 11, 15, 19, 21, 38, 63
profit sharing plan (psp) ...................... 48, 63

**Q**

quality improvement process
    quality-productivity (q-sp) ................... 21, 22

**R**

relatives, employment of ............................ 54
report-in pay ....................................... 59
retirement benefits ................................. 63
retirement savings plan (rsp) ....................... 63
return to work program .............................. 61
rsp ................................................. 63

**S**

safety .................. 11, 19, 26-27, 30, 32, 41, 48, 68
security ............... 11, 19, 31, 32, 41, 57, 60, 63

service ............................................. 4, 5, 11, 15, 16, 17, 18, 19, 20, 21,
                                                     22, 25, 26, 27, 29, 30, 31, 33, 46, 52,
                                                     53, 58, 59, 60, 63, 65, 67, 77, 89
service awards .................................................... 65
service quality indicator (sqi) .................................. 22
sexual harassment ........................................... 43, 85, 88
sfa ............................................................. 42, 83, 89
shipping discounts ................................................ 66
short-term disability benefits .................................... 61
sib ............................................................... 62
smoking ........................................................... 30, 64
social security ................................................... 63
solicitation and distribution .................................... 41
sqi ............................................................... 22
stock purchase plan ............................................... 69
survey feedback action (sfa) ............................... 42, 83, 89
survivor's income benefits (sib) .................................. 62

T

telecommunications equipment ...................................... 27
telephone courtesy ................................................ 27
temporary return to work .......................................... 61
termination .................................... 3, 29, 30, 39, 71, 42, 43, 44,
                                               48, 75, 76, 84, 85
time cards ........................................................ 29
time off, paid .................................................... 72-76
toolbox coverage .................................................. 70
travel discounts .................................................. 57, 67
tuition assistance program ...................................... 51, 66

U

unemployment insurance ............................................ 70
uniforms ....................................................... 25, 48

V

vacations ................................ 29, 54, 59, 73, 75-76, 79
verification of employment to outside agencies .................. 34
violence, workplace
voting ............................................................ 31

W

weapons ....................................................... 31, 42
wellness programs ................................................. 64
work assignments ............................................. 29, 54
work group handbooks ................................ 2, 4, 11, 26, 27, 48, 51, 52, 53,
                                                   54, 61, 67, 68, 69, 72, 84, 85
work hours ........................................................ 58
workplace violence ................................................ 31

XYZ

Service: **Get by LEXSEE®**
Citation: **1993 u.s. dist lexis 16425**

*1993 U.S. Dist. LEXIS 16425, ***

FLORENCE HICKS ALEXANDER, Plaintiff, v. ANGELA EVANS-AFFLICK, STERLING AFFLICK, SYLVIA EDWARDS, and METROPOLITAN AREA CONTRACTORS, INC., Defendants.

C.A. 92-2834 (TFH)(PJA)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

1993 U.S. Dist. LEXIS 16425

November 18, 1993, Decided
November 18, 1993, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employer brought an action against defendants, her former employees, for tortious interference with contracts and advantageous business relationships, breach of contract, conversion of property, libel, and slander. The employees filed a motion to dismiss the complaint.

**OVERVIEW:** The employer alleged that the employees violate a confidentiality agreement in which the employees promised that they would not reveal information obtained from working for the employer. The court concluded that the employer's failure to allege resultant damage in her claim for tortious interference with business relationships precluded the making of a prima facie case. Dismissal of the contract claim was inappropriate because a fact issue existed as to whether the contracts applied to the employees, and prior litigation did not bar the claim under the doctrine of res judicata. Dismissal of the tortious conversion of property claim was inappropriate because the employees failed to dispute the alleged conversion. Dismissal of the defamation claims was proper as to statements made in pleadings and in letters to the Department of Employment Services because such statements were absolutely privileged. Statements made to a case investigator for the Department of Human Rights & Minority Business Development could be similarly privileged but dismissal was not recommended because the privilege for quasi-judicial proceedings had not been explored in this context.

**OUTCOME:** The court recommended that the employees' motion to dismiss the complaint be granted as to the employer's claim for tortious interference and the defamation claims based on statements made in pleadings and to the Department of Employment Services but denied as to the remaining defamation claim, the breach of contract claim, and the conversion claim.

**CORE TERMS:** absolutely privileged, recommended, unemployment compensation, tortious interference, prima facie case, quasi-judicial, breach of contract, collected, undersigned, interfere, defamation claim, defamatory, statements contained, privileged, libel, intentional interference, expectancy, information obtained, inappropriate, confidential, termination, defamation, terminated, offending, recommends, courtesy, slander, mailed, motion to dismiss, matter of law

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 16425     Page 2 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 2 of 36

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims 📁

*HN1* ⚓ Dismissal for failure to state a claim is warranted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his/her claim which would entitle him/her to relief. The question is whether in the light most favorable to the plaintiff and with every doubt resolved in the plaintiff's behalf, the complaint states any valid claim for relief.   More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

Torts > Business Torts > Commercial Interference > Business Relationships > Elements 📁

Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview 📁

*HN2* ⚓ With respect to a claim for tortious interference with business relationships, dismissal would be an inappropriate resolution if it appears that the Plaintiff could prove the following prima facie elements of the tort: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.   More Like This Headnote

Civil Procedure > Dismissals > Voluntary Dismissals > General Overview 📁

Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata 

*HN3* ⚓ The second time a plaintiff seeks to assert a claim against the same party, the claim is barred by res judicata if in the prior suit, such claim was decided on the merits. Voluntary dismissal by a plaintiff does not constitute a decision on the merits. Fed. R. Civ. P. 41(a)(1).   More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 📁

Torts > Intentional Torts > Conversion > General Overview 

*HN4* ⚓ Fed. R. Civ. P. 12(b)(6) dismissal of a claim for tortious conversion of property is inappropriate if it appears that there are facts to support a finding that the Plaintiff owns or holds title to the converted property, and that the Defendants unlawfully exercised ownership, dominion, and control over that property.   More Like This Headnote

Torts > Intentional Torts > Defamation > Defenses > Privileges > General Overview 

Torts > Intentional Torts > Defamation > Procedure 📁

*HN5* ⚓ To make out a prima facie case for defamation (libel or slander) a Plaintiff must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. A necessary element to a legally sufficient claim is the absence of a privilege. Privilege is a complete defense to defamation, the existence of which would compel the Court

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 16425    Page 3 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 3 of 36

to grant the Defendants' motion to dismiss the defamation claim. Whether or not a communication is privileged is a question of law for the Court. More Like This Headnote | *Shepardize: Restrict By Headnote*

Torts > Intentional Torts > Defamation > Defenses > Privileges > Absolute Privileges

HN6 Statements in pleadings are absolutely privileged provided they are relevant to the case in which they are filed. More Like This Headnote

Torts > Intentional Torts > Defamation > Defenses > Privileges > Absolute Privileges

Torts > Intentional Torts > Defamation > Elements > Libel

HN7 Reports to the unemployment compensation board (a.k.a. Department of Employment Services) concerning the termination of an employee are absolutely privileged and cannot support a claim for libel. More Like This Headnote

Torts > Intentional Torts > Defamation > Defenses > Privileges > Absolute Privileges

HN8 Statements made in connection with judicial and quasi-judicial proceedings are absolutely privileged. More Like This Headnote

**COUNSEL:** For Plaintiff: Janet M. Cook-Love, Sterling, VA.

Angela Evans Afflick & Sterling Affick, Pro Se, Germantown, MD.

Sylvia Edwards, Pro Se, Washington, D.C.

**JUDGES:** [*1] ATTRIDGE

**OPINION BY:** PATRICK J. ATTRIDGE

**OPINION:** REPORT AND RECOMMENDATION

This matter was referred for full case management, including a report and recommendation on Defendant's Motion to Dismiss the Amended Complaint [52]. The undersigned recommends that the motion be granted in part and denied in part according to the following report.

I. Background

Plaintiff Florence Hicks Alexander is the sole owner of Ebon Research Systems, hereinafter "Ebon." Ebon contracts with the Federal Government to create data bases for the maintenance of "extremely sensitive law enforcement matters." (Amended Complaint at P 3.) Ebon also supplies employees to organizations such as the DEA, the United States Attorney's Office, the United States Marshals Service, the INS, and the FBI (Id..)

Defendants Angela Evans Afflick, Sylvia Edwards, and Sterling Afflick are all former employees of Ebon who, as Ebon employees, worked with the Department of Justice (DOJ). Specifically, Ms. Evans Afflick served as the Plaintiff's General Counsel and as Project Director of the Ebon-DOJ contract; Ms. Edwards served as Plaintiff's Assistant General Counsel, Employee Labor Relations Specialist, Director of Personnel Management, and [*2] Field Operations Project Manager on the DOJ contract, and Mr. Afflick was the Director of Training for Ebon, and managed employees working under the DOJ contract (Amended Complaint at

PP 4-6.)

Defendant Angela Evans Afflick's employment was terminated by the Plaintiff in March 1992 for alleged theft and forgery. (Defendants' Answer to Complaint and Counterclaim at P 3.a.) Defendant Sylvia Edwards' employment was terminated in May 1992, allegedly after she refused to swear to false information concerning Defendant Evans Afflick (Id. at 3.z.) Defendant Sterling Afflick's employment ended in January 1991, however the reason for his termination is not clear from the record (Amended Complaint at P 5.)

Defendants Mr. Afflick, Ms. Evans Afflick, and Ms. Edwards are now incorporated as the Metropolitan Area Contractors, Inc., or "MAC" (See Plaintiff's Motion to Amend and Supplement Complaint, hereinafter Motion to Amend, Exhibit A.) n1 MAC was incorporated on May 19, 1992, for the stated purpose of rendering business services including, *inter alia,* consulting and advising on business contracts and preparing and managing business contracts for clients (Id..) MAC solicits Federal **[*3]** Government contracts in direct competition with the Plaintiff, (Amended Complaint at P 7), allegedly with the help of information which the Defendants gleaned from their employment with Ebon (Id. at P 19.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 Mr. Afflick serves as the President of MAC, and both Ms. Evans Afflick and Ms. Edwards serve as Vice Presidents of MAC (Defendants' Motion to Dismiss Amended Complaint, hereinafter Motion to Dismiss, at 17.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Plaintiff alleges that by so using information obtained during their employment with the Plaintiff, the Defendants violate a confidentiality agreement which they signed, in which the Defendants promised Ebon that they would not "reveal . . . publicize . . . or disseminate any oral or written information obtained as a result of their work on the Ebon-Department of Justice contract(s)." (Amended Complaint at PP 10-13, 18; see Exhibits A & B, attached to initial Complaint.)

II. Analysis

Ms. Alexander charges the Defendants with tortious interference with contracts and advantageous business relationships **[*4]** (Amended Complaint, count I); breach of contract by Defendants Evans Afflick and Edwards (counts II & III); conversion of property (count IV), and libel and slander (count V.)

*HN1* Dismissal for failure to state a claim is warranted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his/her claim which would entitle him/her to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The question is whether in the light most favorable to the plaintiff, ( Jenkins v. McKeithen, 395 U.S. 411, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969)), and with every doubt resolved in the plaintiff's behalf, ( De Arellano v. Weinberger, 240 U.S. App. D.C. 363, 745 F.2d 1500 (D.C. Cir. 1984), *vacated on other grounds,* 471 U.S. 1113 (1985)), the complaint states any valid claim for relief. It is within this context that the Court analyzes the Plaintiff's claims.

First *HN2* with respect to the Plaintiff's claim for tortious interference with business relationships, dismissal would be an inappropriate resolution if it appears that the Plaintiff could prove the following *prima facie* elements of the tort:

**[\*5]** (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.

Okusami v. Psychiatric Institute of Washington, Inc., 295 U.S. App. D.C. 58, 959 F.2d 1062, 1069 (D.C. Cir. 1992) (Sentelle, J., dissenting); see also Genetic Systems Corp. v. Abbott Laboratories, 691 F. Supp. 407, 422 (D.D.C. 1988), and authorities collected therein.

Because the Plaintiff has failed utterly to offer proof of resultant damage, she has failed to state a claim upon which relief could be granted, and the undersigned therefore recommends that this claim be dismissed. Nonetheless the Plaintiff's case for tortious interference is fully discussed below.

The Plaintiff complains that the Defendants have interfered with the orderly progress of her work with DOJ by trying to persuade her employees to quit, file claims against the Plaintiff, and/or disclose confidential information gleaned from their employment with the Plaintiff (Amended Complaint at PP 9, 27.) **[\*6]** She further alleges that the Defendants have "disseminated negative innuendoes and demeaning remarks" regarding the Plaintiff, "with the specific intent to harm or destroy the Plaintiff's business interests" (Id. at P 9.)

The Plaintiff also claims that in an attempt to discredit her and interfere with her business relationships, Defendant Evans Afflick filed claims or complaints with the Office of Federal Contract Compliance Programs (OFCCP), the DOJ Inspector General's Office and the DOJ Contracting Officer, the EEOC, and the D.C. Department of Human Rights and Minority Business Development (Amended Complaint at PP 20-24.)

The Plaintiff also alleges that the Defendants mailed "courtesy copies" of their Answer and Counterclaim in this case to three of the Plaintiff's Regional Directors, (Amended Complaint at P 29), and sent "courtesy copies" of the Defendants' pleadings filed against the Plaintiff in other cases to the Plaintiff's employees at their work addresses (Id. at P 25.) Presumably, the Defendants were aware that mail received by the Plaintiff's employees at the DEA building and at the DOJ Criminal Division would be opened and read by the Federal officials with whom **[\*7]** the Plaintiff works, before being forwarded to the addressees (See id..) n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The Defendants' bizarre response to this conduct is that they were attempting service under Fed. R. Civ. P. 4(b) (See Motion to Dismiss at 14.) Rule 4(b) is entirely inapplicable to this situation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, the Plaintiff alleges that the Defendants use information concerning Ebon's business procedures, "secrets," and client lists, which they gained during their employment with Ebon, to interfere with the Plaintiff's contracts and business relationships and to acquire the Plaintiff's contracts (Amended Complaint at P 19.)

The Plaintiff claims that as a result of the above acts she has suffered a business loss greater

than $ 500,000 and may lose her contract with the Justice Department, allegedly worth 100 million dollars (Amended Complaint at P 30.)

Though she alleges that the Defendants attempted to interfere with the Plaintiff's business relationships with her own employees, there is no offer of proof that any employee has as a **[*8]** result of the Defendants' efforts, quit working for the Plaintiff. Nor is there any allegation that the Department of Justice or any other of the Plaintiff's clients has in fact terminated a contract with the Plaintiff as a result of the Defendants' conduct. Rather, there is a conclusory statement that the Plaintiff has suffered over $ 500,000 worth of damage and may lose her contract with the DOJ.

The Plaintiff must point to damages resulting from any alleged tortious interference for an award of relief to be appropriate. See Genetic Systems Corp., 691 F. Supp. at 423, and authorities collected therein. With respect to this requirement of the *prima facie* case, the Plaintiff offers no facts other than a bare allegation that she has suffered $ 500,000 damages, and "may" lose her contract with the Justice Department (Amended Complaint at P 29.)

Even assuming arguendo that the Plaintiff had sufficiently stated a claim in all other respects, her failure to make out a *prima facie* case for relief renders the tort claim appropriate for dismissal under Fed. R. Civ. P. 12(b)(6). Furthermore, it is not the Court's opinion that the Plaintiff has stated **[*9]** a claim in all other respects: Other weaknesses in the Plaintiff's case indicate the recommended resolution.

For instance, to make out a *prima facie* case for relief, there must be facts to support a finding of intentional interference with a relationship / contract by the Defendant. See Okusami, 959 F.2d at 1069 (emphasis added). In setting forth the elements of a *prima facie* case for tortious interference with prospective economic advantage, Judge Joyce Hens Green described the requirement for a showing of intent as follows:

> 'motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case . . . and a strong showing of intent is required to establish liability.' A general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability.

Genetic Systems Corp., 691 F. Supp. at 423 *(quoting e.g.,* Rickards v. Canine Eye Registration Foundation, Inc., 704 F.2d 1449, 1456 (9th. Cir.), cert. denied, 464 U.S. 994, 78 L. Ed. 2d 683, 104 S. Ct. 488 (1983)).

The Plaintiff's **[*10]** factual proffer of the Defendants' intent does not approach that high standard. The Plaintiff makes only conclusory allegations of specific intent, (see Amended Complaint at P 9), which are not supported by facts tending to prove intent. The Court is not inclined to accept legal conclusions as true in considering this motion to dismiss. See 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d (1990) at § 1357, pp. 311, 315, and authorities collected therein; see also Okusami v. Psychiatric Institute of Washington, 959 F.2d at 1069 (Sentelle, J., dissenting).

The conduct Ms. Alexander complains of, e.g., that the Defendants have disseminated negative and demeaning remarks, (Amended Complaint at P 9), equally support a finding that the Defendants had reason to disparage the Plaintiff, as they support any finding of

malice on the part of the Defendants. Likewise, it is as likely that the Defendants filed claims or complaints against Ms. Alexander because they had grievances against her, as it is likely that the Defendants filed such claims in order to interfere with the Plaintiff's business relationships.

The undersigned does not accept **[*11]** the Plaintiff's unwarranted inferences and unsupported conclusions as true. See 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d (1990) at § 1357, p. 315-18, and authorities collected therein. Thus the Plaintiff's claim also fails for want of a sufficient allegation of intent, e.g., intentional interference.

Turning to the Plaintiff's breach of contract claim; Ms. Alexander alleges that as a condition of their employment with Ebon, Defendants Evans Afflick and Edwards were required to sign confidentiality agreements in which they agreed not to disclose any oral or written information obtained during their involvement with the Ebon-DOJ contract (Amended Complaint at PP 10-13, 34-37; 43-46. ) Pursuant to these agreements the Defendants were required to "guard and protect the Plaintiff's confidential and proprietary information." (Id. at PP 33-34, 43-46.) The Plaintiff alleges that by accepting employment, the Defendants agreed to guard and protect such information, and that the Plaintiff has detrimentally relied on these promises (Id. at PP 34, 43.)

Ms. Alexander claims that Defendants Evans Afflick and Edwards breached these agreements by disclosing to Defendants **[*12]** Sterling Afflick and MAC, Inc. information concerning the Plaintiff's trade secrets, proposals, manuals, and client lists, and information about the Federal Government which the Defendants learned as a result of their employment with Ebon (Amended Complaint at P 38; 47.)

The Plaintiff considers the above information to be her own confidential, secret, and privileged property (Id. at PP 32-33; 42.) She asserts that unless restrained, the Defendants will continue to use her trade secrets and confidential information to compete with the Plaintiff in the future and to obtain contracts currently held by the Plaintiff (Id. at P 39; 47.)

As a result of this alleged contract breach, the Plaintiff claims to have suffered damages (Id. at P 40.) She seeks relief in the form of, among other things, a monetary award and permanent injunction (Id. at PP 40(a)-(f).)

The Defendants argue that the information which they allegedly disclosed is the property of the Federal Government (See Memorandum of Points of [sic] Authorities and Motion to Dismiss Amended Complaint, hereinafter Motion to Dismiss, at 15.) Apparently the Defendants' argument is that their contracts protected the **[*13]** Federal Government, not the Plaintiff, from the Defendants' disclosure of information such that the Plaintiff can not base her claim for breach of contract on the Defendants' actions (See Motion to Dismiss at 15.)

Notwithstanding the Defendants' argument, the Plaintiff has pointed to specific contracts between herself and Defendants Evans Afflick and Edwards, and has alleged that the Defendants breached those contracts. The Defendants' apparent contention that the contracts do not apply to these parties is a factual dispute inappropriate for resolution by Rule 12(b)(6) dismissal.

Neither is there any merit to the Defendants' charge that the breach of contract claim is barred by res judicata (See Motion to Dismiss at 15.) **HN3** The second time a plaintiff seeks to assert a claim against the same party, the claim is barred by res judicata if in the prior suit, such claim was decided on the merits. See, e.g., Hughes v. United States, 71 U.S. 232, 237, 18 L. Ed. 303 (1866) (judgment constitutes a bar to a second suit if rendered in a proceeding between the same parties or their privies; on the same point of controversy;

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 16425

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 8 of 36    Page 8 of 12

which controversy must have been decided on **[\*14]** its merits.) Voluntary dismissal by a plaintiff does not constitute a decision on the merits. Fed. R. Civ. P. 41(a)(1).

So far, in this court alone, Ms. Alexander or her corporation (Ebon) have brought at least the following suits concerning the issues involved in the case at bar: Alexander v. Evans-Afflick, C.A. 92-1481 (Oberdorfer, J.) (dismissed without prejudice on Plaintiff's oral motion, Nov. 9, 1992); Ebon Research System v. Department of Justice, C.A. 93-393 (Harris, J.) (dismissed on Plaintiff's motion over the objection of intervenor-defendant, July 21, 1993). n3 Though the history of litigation between these parties may be characterized as wasteful and certainly frustrating to the many separate forums forced to participate in the disputes, the prior litigation does not yet preclude the Plaintiff's breach of contract claim in this litigation. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Ms. Alexander is by no means alone in her litigiousness. Ms. Evans Afflick has filed at least one suit based on these same facts against Ms. Alexander, C.A. 92-1235 (Oberdorfer. J.) (dismissed without prejudice on plaintiff's motion Nov. 24, 1992). **[\*15]**

n4 However, the next time the Plaintiff files for voluntary dismissal, such dismissal will serve as an adjudication upon the merits. See Fed. R. Civ. P. 41(a)(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Turning next to the Plaintiff's claim for tortious conversion of property, *HN4* Rule 12(b)(6) dismissal is inappropriate if it appears that there are facts to support a finding that the Plaintiff owns or holds title to the converted property, and that the Defendants unlawfully exercised ownership, dominion, and control over that property. See R.A. Weaver & Assoc., Inc. v. Haas & Haynie Corp., 213 U.S. App. D.C. 404, 663 F.2d 168, 173 & n.43 (D.C. Cir. 1980), and authorities collected therein.

The Plaintiff alleges that as a result of their employment with her, Defendants Evans Afflick and Edwards obtained the Plaintiff's client lists, policy manuals, procedures, business operation information, and other confidential documents (Amended Complaint at P 50.) All such materials are asserted to be the property of the Plaintiff (Id. at PP 32-33.) The Defendants allegedly converted such business information, knowingly, for their own **[\*16]** use and financial gain to assist in the operations of Defendant MAC and to compete with the Plaintiff (Id. at P 51.) Despite alleged numerous requests for the return of such materials, the Defendants maintain wrongful possession thereof (Id. at P 49.)

The Defendants move to dismiss this claim on the grounds that they have advanced degrees, "are consummate Proposal Writers," and "have no need whatsoever to obtain or rely on the Plaintiff's illegal business practices" (Motion to Dismiss at 16-17.)

Be that as it may, the Defendants have not disputed that they took the Plaintiff's business materials. The Defendants offer nothing in rebuttal of the Plaintiff's allegation that they have converted her property. Consequently, there are no grounds upon which to grant the Defendant's Motion to Dismiss the claim for conversion.

Finally, *HN5* to make out a *prima facie* case for defamation (libel or slander) a Plaintiff must show:

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant "published" the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; **[*17]** and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

Prins v. International Telephone & Telegraph Corp., 757 F. Supp. 87, 90 (D.D.C. 1991) (citing Restatement (second) of Torts § 558 (1977)).

A necessary element to the Plaintiff's legally sufficient claim is the absence of a privilege. Privilege is a complete defense to defamation, the existence of which would compel the Court to grant the Defendants' motion to dismiss the defamation claim. 53 C.J.S. Libel and Slander § 56 & n.65 (citing, e.g., Schiavone Constr . Co. v. Time, Inc., 735 F.2d 94, 96 (N.J. 1984)); see also Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan, 374 A.2d 284, 288 (D.C. 1977). Whether or not a communication is privileged is a question of law for the Court. Mosrie v. Trussell, 467 A.2d 475, 477 (D.C. 1983); Manbeck v. Ostrowski, 128 U.S. App. D.C. 1, 384 F.2d 970, 974 n.20 (D.C. Cir.), cert. denied, 390 U.S. 966, 19 L. Ed. 2d 1170, 88 S. Ct. 1077 (1967).

Although it is **[*18]** very difficult to tell from the poorly plead complaint, n5 the defamatory statements which are the subject of this claim are: (1) statements made by Sterling and Angela Evans Afflick in a responsive pleading in C.A. 92-1235 (see *supra* note 4), "courtesy copies" of which the Defendants mailed to the Plaintiff's employees (exhibits E & F, attached to initial Complaint); (2) statements contained in letters written by Defendants Evans Afflick and Edwards to a Hearing Examiner in the Department of Employment Services in connection with the Defendants' claims for unemployment compensation (exhibits G, H, I, K, L, M, & N, attached to initial Complaint); (3) statements made by Defendant Evans Afflick in a letter to a Case Investigator for the Department of Human Rights & Minority Business Development, (exhibit J, attached to initial Complaint), and (4) statements and counter-claims made by the Defendants (Counter-Plaintiffs) in answer to the Plaintiff's complaint in this case -- C.A. 92-2834 -- which the Defendants mailed to the Plaintiff's employees (see exhibits O & P, attached to Amended Complaint.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The court must know the identity of the recipient/listener of libel or slander in order to determine whether the offending communications are privileged. Yet the Amended Complaint does not specify to whom the allegedly libelous and defamatory statements were made other than to refer the reader to "statements contained in Exhibits E through Q, and other documents" (Amended Complaint at PP 58, 59.) Dismissal might have been recommended on the basis of the Plaintiff's failure to make clear this element of her *prima facie* case alone.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*19]**

*HN6* Statements in pleadings are absolutely privileged provided they are relevant to the case in which they are filed. Brown v. Shimabukuro, 73 App. D.C. 194, 118 F.2d 17, 18 (D.C. Cir. 1941) (affirming dismissal of a complaint charging libel where the offending statements were

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 16425    Page 10 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 10 of 56

made in an affidavit filed in support of a motion). As Judge Sporkin put it:

> . . . It is clear in this jurisdiction and most others that comments contained in court related documents are privileged and cannot form the basis for a defamation action. As this Circuit recognized several years ago, 'statements in pleadings and affidavits are absolutely privileged if they have enough appearance of connection with the case in which they are filed so that a reasonable man might think them relevant.'

International City Management Association Retirement Corp. v. Watkins, 726 F. Supp. 1, 3 (D.D.C. 1989) *(quoting* Brown v. Shimabukuro, 118 F.2d at 18).

Due to this absolute privilege, the undersigned recommends that the Plaintiff's defamation claim be dismissed with respect to the statements described in subsections (1) and (4) above.

Next **[*20]** the Plaintiff challenges as defamatory statements contained in the Defendants' letters to the Department of Employment Services (the statements described in subsection (2) above). Specifically, the Plaintiff challenges the Defendants' statement that the Plaintiff had asked Defendant Evans Afflick to participate in fraud and forgery of audited documents and that as a result of her refusal to participate in such activities the Defendant was fired (Amended Complaint at P 56.) The Defendants also reported to the Department of Employment Services that the Plaintiff forged documents relating to the Defendants' unemployment compensation hearing; that the Plaintiff encouraged her employees to lie, and that the Plaintiff herself was likely to lie to the Hearing Examiner regarding the Defendants' unemployment compensation claims (Amended Complaint at PP 56-57; see exhibits G, H, I, K, L, M, & N, attached to initial Complaint.)

*HN7* Reports to the unemployment compensation board (a.k.a. Department of Employment Services) concerning the termination of an employee are absolutely privileged and cannot support a claim for libel. Goggins v. Hoddes, 265 A.2d 302, 303 (D.C. 1970); **[*21]** Holland v. Marriott Corp., 34 Fair Empl. Prac. Cas. (BNA) 1763 (D.D.C. 1984).

Consequently, it is recommended that the defamation allegation be dismissed with respect to the statements made in the context of the unemployment compensation proceedings.

Finally, the Plaintiff challenges as defamatory statements made by Defendant Evans Afflick in a letter to a Case Investigator for the Department of Human Rights & Minority Business Development. The challenged statements are apparently those in which Defendant Evans Afflick promised the Investigator proof that the Plaintiff had procured false affidavits from her employees by threatening them with the loss of their jobs, and that the Plaintiff "left a paper trial of deceit, corruption, and racketeering," and "practiced abuse and discrimination against people with disabilities" (Amended Complaint at P 58; see exhibit J, attached to Plaintiff's initial complaint.)

*HN8* Statements made in connection with judicial and quasi-judicial proceedings are absolutely privileged. E.g., Bouchet v. National Urban League, Inc., 235 U.S. App. D.C. 37, 730 F.2d 799, 806-07 (D.C. Cir. 1984). n6 It may well be that the **[*22]** privilege exonerating statements made in quasi-judicial proceedings extends to letters to the Department of Human Rights and Minority Business Development (See *infra* note 6.)

However, because the privilege has not been explored in this context, the undersigned is unable to say as a matter of law that the Plaintiff has not stated a claim for relief based on the offending statements contained in the Defendant's letter to the DHRMB. It is therefore recommended that this claim not be dismissed.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The privilege described in Goggins and Holland, *supra,* covers relevant statements made in the context of unemployment compensation hearings because such hearings are considered quasi-judicial. See, e.g., Hawthorne v. WMATA, 702 F. Supp. 285, 288 (D.D.C. 1988) (statements made by employees before D.C.'s Office of Unemployment Compensation held absolutely privileged because made during the course of quasi-judicial proceedings); Mazanderan v. McGranery, 490 A.2d 180 (D.C. 1984) (letter written by aggrieved taxi passenger to Public Vehicles Division as result of which Hacker's License Appeal Board conducted a hearing into driver's conduct held absolutely privileged because written in connection with quasi-judicial proceeding); Lewis v. Elliott, 628 F. Supp. 512 (D.D.C. 1986) (arbitration proceedings and hearings before Hacker's License Appeal Board are examples of quasi judicial proceedings, and statements made in connection with such proceedings are absolutely privileged); Jeffers v. Convoy Co., 650 F. Supp. 315 (D. Minn. 1986) (unemployment compensation hearing is quasi-judicial proceeding at which allegedly defamatory statements are absolutely privileged).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*23]**

Conclusion

Upon consideration of the Defendant's Motion to Dismiss, the response thereto, and the applicable law, it is recommended for the foregoing reasons that the Defendant's Motion to Dismiss the Amended Complaint be granted with respect to the tortious interference claim and the breach of contract claim. It is further recommended that the motion be granted in part and denied in part with respect to the Plaintiff's defamation claim, as described above. It is further recommended that the Defendants' Motion to Dismiss be denied with respect to the Plaintiff's claim for conversion and denied with respect to the defamation claim based on statements made in the Defendants' letter to the DHRMB.

November 18, 1993
DATE

PATRICK J. ATTRIDGE

UNITED STATES MAGISTRATE JUDGE

Service: **Get by LEXSEE®**
Citation: **1993 u.s. dist lexis 16425**
View: Full
Date/Time: Thursday, April 5, 2007 - 5:25 PM EDT

* Signal Legend:
⬤ - Warning: Negative treatment is indicated
▣ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 16425     Page 12 of 12

Case 1:07-cv-00569-JDB     Document 5-6     Filed 04/05/2007     Page 12 of 36

 - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

LexisNexis®

About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: 1987 U.S. Dist. LEXIS 16893

*1987 U.S. Dist. LEXIS 16893, \**

GMO RICE, Plaintiff, v. HILTON HOTEL CORPORATION t/a CAPITAL HILTON HOTEL, Defendant.

Civil Action No. 85-1470

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

1987 U.S. Dist. LEXIS 16893

August 31, 1987, Decided
September 1, 1987, Filed

**DISPOSITION: [\*1]** Defendant's motion for summary judgment granted; and plaintiff's amended complaint dismissed.

**CORE TERMS:** summary judgment, defamatory, hearsay, hotel, notice, conversation, declarant, limiting instruction, admissible evidence, defamation, admissible, privileged, recipients, defamatory statement, personal knowledge, discharged, deposition, persuasive, defaming, purpose of establishing, allegedly defamatory, independent evidence, hearsay testimony, own testimony, manager, banquet, dollars, posted, stolen, marred

**COUNSEL:** For GMO RICE, PLAINTIFF: Randall C. Smith, Washington, DC.

For HILTON HOTEL CORPORATION, DEFENDANT: Peter , [ILLEGIBLE WORDS], Washington, D. C.

**JUDGES:** HAROLD H. GREENE, United States District Judge.

**OPINION BY:** HAROLD H. GREENE

**OPINION:** MEMORANDUM

On May 6, 1986, plaintiff filed an amended complaint alleging that Hilton Hotel Corporation ("Hilton") had, through its employees and agents, made more than a dozen defamatory statements regarding plaintiff from June 1984 through May 1985. Defendant has now moved for summary judgment on all claims, arguing alternatively that no defamatory statements were made, that they were privileged, and that they were substantially true.

With regard to most of the alleged statements, there is no admissible evidence to support a finding that these statements were in fact made. As to the remaining few, the record shows that the statements were either privileged or were not defamatory. Accordingly, defendant's motion for summary judgment will be granted.

I

Plaintiff was banquet manager at the Capital Hilton Hotel in Washington, D.C. from 1972 **[\*2]** to May 1984. As banquet manager, he was responsible for scheduling waiters and supervising the preparation of wage sheets.

On May 3, 1984, plaintiff was fired for, among other things, improperly distributing gratuities

to himself and his friends. After his termination, plaintiff sought employment elsewhere. His resume listed the Capital Hilton as his prior employer and Frederick Kleisner, the hotel's General Manager, as a reference. In October of 1984, plaintiff was hired by the Westin Hotel in Detroit, Michigan, where he worked until his discharge in February 1985.

Plaintiff filed this action in May 1985, alleging that various people at Hilton had told his prospective employers that plaintiff was a "crook" and had "stolen thousands of dollars" from the Hotel, and words to similar effect. n1 Plaintiff sues for defamation, and demands $ 6 million in compensatory and punitive damages.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Plaintiff's amended complaint lists fifteen allegedly defamatory statements. See Amended Complaint PP 5-13, 15-17; see also Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 6-7.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*3]**

II

According to plaintiff, he learned of the defamatory statements from the persons to whom the Hilton agents spoke. As defendant notes, however:

> the alleged declarants and alleged recipients of all but one of the alleged defamatory statements categorically deny that the statements were made. Because the alleged declarants and recipients were the only parties to the alleged conversations, Plaintiff cannot possibly adduce admissible evidence at trial that the alleged statements were made.

Memorandum at 5.

In response, plaintiff argues that his own testimony of what he was told by a party to the conversation would be admissible at trial to prove that the defamatory statements were made and therefore may be considered in opposition to defendant's motion for summary judgment. Plaintiff reasons that "his testimony that the recipients told him of the defamatory statements made to them by the declarants would not be hearsay since it would be offered not to prove the truth of the matter asserted, but that the words were said." Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 24. Plaintiff also argues **[*4]** that he has independent evidence establishing various subsidiary facts -- e.g., the time and place that conversations about plaintiff took place.

That response is not persuasive. Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this instance, plaintiff seeks to testify that one person ("B") told the plaintiff that another person ("A") made a statement defaming plaintiff. Plaintiff offers this testimony in an effort to show that "A" did, in fact, make the defamatory statement. This is inadmissible hearsay; plaintiff has no personal knowledge as to whether the defamatory statement was made and he cannot be cross-examined with respect thereto.

In Sires v. Luke, 544 F. Supp. 1155 (S.D. Ga. 1982), Luke brought a counterclaim against Sires for slander. As proof of the statement, Luke sought to testify that a Mr. Johnson told him of the slanderous remarks. In his deposition, however, Johnson denied that Sires had slandered Luke. The court granted Sires' motion for summary judgment, explaining: **[*5]**

> This Court may consider [in ruling on a motion for summary judgment] only that evidence that would be admissible at trial . . . The use of depositions under Rule 56 is limited to those statements made "on personal knowledge" [that] would be admissible in evidence. Testimony as to what a nonparty witness may have told Luke is hearsay and inadmissible.

544 F. Supp. at 1160.

Similarly, in Goudarzi v. Washington Hilton Corp., C.A. No. 85-0285 (D.D.C. March 20, 1986), the court granted summary judgment to the defendant on a defamation claim. Plaintiff based his claim on his own testimony that he had been told that one of defendant's employees had posted a notice on a bulletin board defaming plaintiff. The defendant submitted an affidavit from the person who allegedly told plaintiff about the notice, and from the employee who allegedly posted the notice, denying plaintiff's allegations. On these facts, the court granted summary judgment, stating:

> Plaintiff's opposition on the issue of publication offers only his own hearsay testimony that another employee, Tekola Taye, reported having seen and read the alleged notice. Taye, however, avers in **[*6]** a sworn affidavit that he did not see or read such a notice, and did not tell plaintiff he had done so. Absent some admissible evidence sufficient to place in issue the fact of publication, summary judgment in defendant's favor is appropriate on this claim.

Id. at 11. See also Leo Winter Associates v. Department of Health and Human Services, 497 F. Supp. 429, 432 (D.D.C. 1980); Barnes v. Avis Rent A Car, 466 F. Supp. 907, 910 (D.D.C. 1979); White v. Cudahy Co., 130 Ga. App. 64, 202 S.E.2d 233, 235 (Ga. 1973). These decisions are directly on point, and they are also persuasive. n2

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In opposition, plaintiff cites Luster v. Retail Credit Co., 575 F.2d 609 (8th Cir. 1978). In Luster, the defendant in a libel action claimed that the trial court had committed error by admitting hearsay testimony. "Over the defendant's objection the court allowed Davidson to testify that Newell, who is now deceased, told Davidson that a Bowes and Company representative had told Newell that the defendant's report suggested arson and that he assumed it referred to the plaintiff." 575 F.2d at 615. The court rejected the challenge that this testimony was hearsay on the ground that the testimony "was not admitted to prove the truth of the matter asserted. It was admitted solely to prove the fact that the words were said. A proper limiting instruction was given the jury at the time of the disputed testimony." 575 F.2d at 615.

The language of this opinion is far from clear, and it is impossible to determine the purpose for which Davidson's testimony was admitted. If the testimony was admitted solely for the purpose of establishing what Newell had said to Davidson, then the court was correct that the testimony was not hearsay. The fact that a limiting instruction was given by the trial court, and relied upon the Court of Appeals, suggests that both courts were sensitive to the hearsay potential of Davidson's testimony, and it further suggests that the limiting instruction limited the jury's consideration of this testimony to its proper non-hearsay uses.

If the opinion is read more broadly, as plaintiff here would read it, that is, to sanction the use of Davidson's testimony for the purpose of establishing that a Bowes and Company representative had in fact made certain statements to Newell, or to establish that Newell did in fact assume that the Bowes and Company report referred to the plaintiff, then that testimony was hearsay, and this Court declines to follow that holding.

The other authorities cited by plaintiff are inapposite.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*7]**

Because plaintiff's proffered testimony is hearsay, and there is no independent evidence to establish that the statements alleged in paragraphs 5-9, 11-13, and 15-17 were made, defendant's motion for summary judgment must be granted as to those claims.

III

Paragraph 10 of the amended complaint remains to be considered. That paragraph alleges that Vivian Grant told Ivy Short, of the D.C. Office of Unemployment Compensation, that plaintiff was discharged for "redistributing hotel resources for [his] personal use." Assuming that this statement was made, and that it is defamatory, it is nevertheless absolutely privileged under District of Columbia law. See Holland v. Marriott Corp., 1984 U.S. Dist. LEXIS 16102, 34 Fair Empl. Prac. Cas. (BNA) 1763, 1766-67 (D.D.C. 1984); Goggins v. Hoddes, 265 A.2d 302 (D.C. 1970). Accordingly, that claim must also be dismissed.

Finally, there remain to be considered two allegedly defamatory statements which are not alleged in the complaint but which have been put at issue in the pleadings. William Rice, plaintiff's son, stated that he spoke with Shinji Tanaka, director of the hotel's food and beverage department, **[*8]** in June of 1984, and that Tanaka "told [him] . . . that in all probabality Gmo probably won't be able to work on the East coast again and that he should either check out Chicago or Los Angeles if he wanted to find employment, 'cause he felt that his record had been marred -- by, you know, there was a lot of talk going around in the area . . . ." William Rice also testified that Tanaka mentioned that "talk [was] going around" about his father and "basically [about] the incident, how that had marred him . . . ." Memorandum in Opposition at 26-27.

Even if the complaint had properly alleged a claim based on this testimony, the testimony would not be sufficient to sustain an action for defamation. Tanaka's vague references to an "incident" and advice that plaintiff look elsewhere for a job are not defamatory.

Finally, in paragraph 12 of the amended complaint, plaintiff alleges that Tanaka telephoned Marty Lang, director of catering of the Westin Hotel in Detroit, Michigan, and stated to him that plaintiff was a "crook" and had "stolen thousands of dollars" from the hotel. As with almost all of the other allegations, there is no evidence that these statements were ever made. However, **[*9]** during his conversation with Lang, Tanaka did confirm that plaintiff had been fired. Furthermore, Tanaka told Lang that if he called the hotel's personnel department, he would be told that plaintiff was discharged for violating the Hilton Code of Conduct. Lang asked Tanaka for further details, but Tanaka refused to elaborate. According

to plaintiff, these statements alone constitute actionable defamation.

Apart from other problems with this claim, these statements were at least qualifiedly privileged as a communication by a former employer to a prospective or current employer concerning plaintiff's prior employment performance. See Edwards v. James Stewart & Co., 82 U.S. App. D.C. 123, 160 F.2d 935, 936 & n.1 (D.C. Cir. 1947); Zuschek v. Whitmoyer Laboratories, Inc., 430 F. Supp. 1163, 1165 (E.D. Pa. 1977). And despite plaintiff's allegations of malice, there are no facts to support the allegation, and the statement on its face is not malicious. Accordingly, had this claim been stated in the complaint, it could not stand.

In view of the foregoing, it is this 31st day of August, 1987

ORDERED that defendant's motion for summary judgment be and it [*10] is hereby granted; and it is further

ORDERED that plaintiff's amended complaint be and it is hereby dismissed; and it is further

ORDERED that a status conference shall be held at 9:45 a.m., September 16, 1987, in Courtroom No. 1, for the purpose of determining what issues remain to be resolved.

HAROLD H. GREENE

United States District Judge

Service: **Get by LEXSEE®**
Citation: **1987 U.S. Dist. LEXIS 16893**
View: Full
Date/Time: Thursday, April 5, 2007 - 5:26 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
▣ - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis  | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1985 U.S. Dist. LEXIS 18787**

*1985 U.S. Dist. LEXIS 18787, \**

CECILY COLEMAN, Plaintiff, v. AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.

Civil Action No. 84-1594

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

1985 U.S. Dist. LEXIS 18787

June 18, 1985, Decided
June 18, 1985, FILED

**CORE TERMS:** summary judgment, intentional infliction of emotional distress, attorney-client, defamation, sexual harassment, common law tort, retaliation, motion to dismiss, battery, personal jurisdiction, inappropriate, tortious, in-house, assault, employment discrimination, lawsuit, cause of action, legal advice, et seq, misconduct, discovery, sufficient evidence, prima facie, defamatory, disputed, common law, countersuit, termination, privileged, sexual

**JUDGES:** **[\*1]** Barrington D. Parker, United States District Judge

**OPINION BY:** Barrington D. Parker

**OPINION: MEMORANDUM ORDER**

**(Supplementing Bench Rulings of June 5, 6, and 7, 1985 and Ruling from Hearing of June 12, 1985)**

On May 22, 1984, plaintiff Cecily Coleman filed a complaint charging acts of sexual harassment by James Abernathy, an officer of her employer, the American Broadcasting Companies, Inc. ("ABC"). Ms. Coleman further alleged that after she reported the Abernathy harassment incidents to another ABC official, the defendant ABC engaged in a retaliatory course of conduct which resulted in an involuntary termination of her employment on May 1, 1984.

From March 28, 1983 to May 1, 1984, Ms. Coleman served first as the Staff Director of the Harvard/ABC Symposium on American Voter Participation and later as the Executive Director of the Advisory Committee on Voter Education. She contends that her immediate supervisor, James Abernathy, ABC's Vice-President of Corporate Affairs, made unsolicited and improper sexual advances on numerous occasions throughout her employment tenure.

In her original complaint, Ms. Coleman named as defendants, the corporation ABC and three individuals -- James **[\*2]** Abernathy, Edward Fuohy, n1 and Jeffrey S. Rosen, Esq., a Senior General Attorney, Employment Practices, Corporate Legal Affairs at ABC. In early April 1985, the Court permitted the plaintiff to file an amended complaint. Ms. Coleman added several factual allegations and paragraphs to her amended complaint. She also named two additional individual defendants, Everett M. Erlick, Executive Vice-President and General Counsel of ABC, and Peter Cusack, Vice-President, Human Resources, at ABC.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

Get a Document - by Citation - 1985 U.S. Dist. LEXIS 18787                    Page 2 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 19 of 36

n1 Mr. Fuohy was a Vice-President and Bureau Chief of the Washington News Bureau of ABC. He was voluntarily dismissed by the plaintiff from the complaint on October 12, 1984.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ms. Coleman's original and amended complaints are based on diversity jurisdiction. She alleges violations of the District of Columbia Human Rights Act, D.C. Code § 1-2501 et seq. (1981), together with several common law torts: assault, battery, intentional infliction of emotional distress and defamation.

Before the Court at this time for disposition **[*3]** are three motions filed by the defendants: motion to dismiss amended portions of the complaint (filed April 5, 1985); motion to dismiss amended portions of complaint or, in the alternative, for summary judgment (filed April 15, 1985); and a motion for summary judgment (filed May 15, 1985). On June 5, 6, and 7, 1985, the Court heard oral argument on the three motions and announced ruling from the bench. On June 12, 1985, the Court heard further argument on the defendants' motions and took the matter under advisement. This Memorandum Order supplies the reasons for all earlier rulings and the ruling on the matters considered on June 12, 1985.

## I. JURISDICTION OVER ERLICK AND CUSACK

In her amended complaint of April 2, 1985, the plaintiff added Everett M. Erlick and Peter Cusack as individual defendants. Erlick is described as "Executive Vice-President and General Counsel of...ABC" and as a "senior management officer and member of...ABC's Executive Committee [and] chief legal officer." Amended Complaint, P 4. Cusack is named as "Vice-President, Human Resources of...ABC" and as "senior personnel officer...[of] all personnel functions and policies of the entire company." **[*4]** Amended Complaint, P 6.

The defendants have moved to dismiss, or, in the alternative, seek summary judgment as to paragraphs 4 and 6 of the amended complaint. Erlick and Cusack are alleged throughout the complaint to have committed various acts in their official capacity as corporate officers. See, e.g., PP 4, 6. The complaint also alleges and plaintiff's counsel argue that the two defendants, as ABC officials, oversaw and directed retaliatory acts against Ms. Coleman. Id. See also April 1, 1985 Hearing Tr. at 11. There is no allegation in the amended pleading nor have the discovery efforts of the plaintiff revealed that either acted personally or in any way for independent personal gain.

Erlick and Cusack are not citizens or residents of the District of Columbia. At the motions hearing, plaintiff's counsel conceded that there was nothing uncovered by way of discovery or otherwise showing that Cusack ever had a presence in the District of Columbia. Id. at 20. As to Erlick, it was conceded that he appeared in the District as ABC's general counsel and as chief government relations officer of the corporation for purposes of business before the Federal Communications Commission **[*5]** and lobbying on communications issues. Id. at 36, 37. However, little, if any, reference was made to the record or to the fruits of discovery, as to anything done by Erlick in the District of Columbia relative to plaintiff's case.

Plaintiff's counsel seek to invoke personal jurisdiction over these defendants under the District of Columbia long-arm statute, D.C. Code § 13-423 (1981). Relying solely on section (a)(3) of the statute, they claim that jurisdiction is conferred over those defendants for acts "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." n2 Plaintiff's counsel concede that they have found no evidence that either engaged in any tortious activities relating to Ms. Coleman while in the District of Columbia. They do assert, however, that the individuals who performed the allegedly tortious acts were

agents of Erlick and Cusack. They then contend that because they acted in that capacity, this Court has personal jurisdiction over them. Rose v. Silver, 394 A.2d 1368 (D.C. App. 1978). But the plaintiff's reliance on that decision is completely misplaced. There is no showing that any of ABC's employees in Washington, [*6] D. C. were agents of Erlick and Cusack, rather, than agents of the corporate entity, ABC. Although ABC employees located in the District of Columbia may have received some instructions from either Erlick or Cusack, they were not agents of those two officials. If anything, they were receiving directions as agents of ABC -- the corporation. Their activities in the District were in response to instructions given by ABC as a corporation, not by Erlick and Cusack personally. Since none of the alleged tortious acts involve charges of personal gain or profit to either Erlick or Cusack, the ABC employees located here cannot be considered as their personal agents. Therefore, the long-arm statute does not give this Court personal jurisdiction over either Erlick or Cusack because activities undertaken by individuals in the District of Columbia who are agents of a corporation but who are not "agents" of corporate agents is sufficient as a basis for jurisdiction only over the corporation, not over the corporate representatives who are being sued in their individual capacity.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n2 Although plaintiff does not rely on D.C. Code § 13-423(a)(4) as a basis for personal jurisdiction over Erlick and Cusack, it appears to the Court that that provision might have been applicable to Mr. Erlick who defendants admitted regularly travels into the District of Columbia for business purposes. April 1, 1985 Tr. at 37. However, the fiduciary shield doctrine would prevent this Court from obtaining jurisdiction over Erlick in his individual capacity when his only contacts with the District were business contacts. See, e.g., Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902-03 (2d Cir. 1981). Moreover, the plaintiff has not demonstrated that either Erlick or Cusack ever came into the District of Columbia on any business related to Ms. Coleman's complaint. Thus, personal jurisdiction is inappropriate. Cf. Davenport v. Warren, Gorham & Lamont, Inc., No. 85-0002, cMem. at 10-11 (D.D.C. May 3, 1985).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*7]**

Accordingly, the Court rules that Erlick and Cusack should be dismissed as defendants; paragraphs 4 and 6 of the amended complaint, likewise, are **dismissed** with prejudice.

## II. THE EXCLUSIVITY OF D.C. HUMAN RIGHTS ACT

The defendants assert that the D.C. Human Rights Act, D.C. Code § 1-2501 et seq. (1981), provides the exclusive remedy for a plaintiff's claims and, therefore, Ms. Coleman should not be allowed to pursue relief under her several asserted tort claims. Ms. Coleman alleges assault, battery, intentional infliction of emotional distress, and defamation.

The Act itself states that a plaintiff must elect whether to proceed either administratively or directly to the court. D.C. Code § 1-2556(a). The cause of action in court may be "for damages and such other remedies as may be appropriate." Id. "The Court may grant such relief as it deems appropriate, including but not limited to, such relief as is provided in § 1-2553(a)." § 1-2556(b). The statute does not explicitly limit the remedies available to the plaintiff to those provided under the D.C. Human Rights Act, nor does the Court find that the statute should be so limited.

Although there [*8] is no decision dealing with the D.C. statute directly on point, the local appeals court in Howard University v. Best, 484 A.2d 958 (D.C. App. 1984), accepted and approved the practice of pursuing a common law tort claim along with an action alleging

Get a Document - by Citation - 1985 U.S. Dist. LEXIS 18787    Page 4 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 21 of 36

violations of the D.C. Human Rights Act. "While acts constituting sexual harassment may also give rise to a claim for intentional infliction of emotional distress...we do not believe that the broad purposes of the D.C. Human Rights Act to eradicate all forms of employment discrimination, D.C. Code § 1-2501, would be served by requiring this same high standard for actions alleged to be sexual harassment." Id. at 980 n.26 (emphasis added).

Nor are the common law tort claims that Ms. Coleman asserts of such nature that it can be said the "plaintiff appears to be attempting impermissibly to pyramid her possible recovery." Clark v. World Airways, 24 Fair Empl. Prac. Cas. (BNA) 305, 307 n.6 (D.D.C. 1980). Rather, plaintiff is seeking through her tort claims, redress for the physical and emotional injuries that she suffered as a result of alleged sexual harassment. Those claims and injuries are distinct from the employment [*9] discrimination issues redressable under the D.C. Human Rights Act.

The analysis and practice which permits common law tort claims to be filed when other claims are brought under the D.C. statutory remedy is particularly appropriate where an individual has brought a claim for sexual harassment as a form of sex discrimination because the common law torts will allow the claimant to address injuries above and beyond employment discrimination. Cf. Bouchet v. Nat'l Urban League, Inc., 235 U.S. App. D.C. 37, 730 F.2d 799, 804-05 (D.C. Cir. 1984) (defamation was a proper separate claim in a case brought under Title VII); Howard University, 484 A.2d at 985 (intentional infliction of emotional distress considered with statutory claim); West v. Technical Aid Corp., 111 Misc. 2d 23, 443 N.Y.S.2d 318 (N.Y. Sup. Ct. 1981) (sexual assault and battery claims brought in a case filed under the New York Human Rights Law which, like the D.C. statute, provides for an election between administrative or judicial procedures).

The Maryland authorities cited by the defendants are not persuasive. Initially, the Maryland statute does not appear to permit election of remedies. Md. Ann. Code [*10] art. 49B § 9 (1957). Further, the common law tort claims asserted in many of the cases cited by the defendants duplicate a cause of action for employment discrimination. See, e.g., Dillon v. Great Atlantic & Pacific Tea Co., Inc., 43 Md. App. 161, 403 A.2d 406 (Md. Ct. Spec. App. 1979) (tort claim for negligent failure to hire is not recognized in common law).

Accordingly, the Court rules that the D.C. Human Rights Act is not exclusive and does not preempt the plaintiff's common law tort claims. The defendants' motion for summary judgment as to those claims is denied.

## III. D.C. WORKERS' COMPENSATION ACT AND RECOVERY IN TORT

The defendants' contention that the D.C. Workers' Compensation Act, D.C. Code § 36-301 et seq. (1981), precludes common law tort recovery and that such claims are within the exclusive coverage of the Act is misplaced. A decision by the local court of appeals, Mason v. District of Columbia, 395 A.2d 399, 403 (D.C. App. 1978), completely blunts and disposes of such argument. n3 In Mason, the plaintiff filed a suit for assault, battery, false arrest and false imprisonment and the Court held those claims were not covered [*11] by the Act. Likewise, Ms. Coleman's allegations of assault, battery, defamation and intentional infliction of emotional distress, all resulting from alleged sexual harassment, are not the sort of claims covered by the D. C. Workers' Compensation Act.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Mason interpreted the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq., which is the workers' compensation act for federal employees.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Since Ms. Coleman's common law tort claims are so inextricably linked to her sexual harassment claim, a cause of action not covered by the Act, plaintiff's right to recovery for such torts should not be confined exclusively to the Workers' Compensation Act. Cf. Tredway v. District of Columbia, 403 A.2d 732, 735 (D.C. App. 1979), cert. denied, 444 U.S. 867, 62 L. Ed. 2d 92, 100 S. Ct. 141 (1979) ("Mason involved injuries which we held were not covered by FECA, namely false arrest and false imprisonment") (emphasis in original). But see Belanoff v. Grayson, 98 A.D.2d 353, **[*12]** 471 N.Y.S.2d 91, 94 (N.Y. App. 1984) (New York workers' compensation law bars recovery for claim of intentional infliction of emotional distress).

Finally, there is no evidence that Ms. Coleman was disabled within the meaning of the Act. D.C. Code § 36-301(8). Plaintiff contends that her inability to work resulted from ABC's termination of her employment and that she was prepared to work had she been afforded the opportunity.

The Court rules that the D.C. Workers' Compensation Act does not preclude the plaintiff's recovery for her common law tort claims. The defendants' motion for summary judgment as to those claims is **denied.**

### IV. THE DEFENDANT JEFFREY ROSEN

Jeffrey Rosen was ABC's Senior General Counsel and served as in-house counselor for the company. In that capacity he conducted an investigation of the plaintiff's charges, represented ABC in conferences and negotiations with the plaintiff and her counsel, rendered advice to and served the interests of his client, and otherwise acted as an attorney for ABC within the scope of his duties. The defendants contend that because Rosen's participation and contact with Ms. Coleman's case was in his role as in-house **[*13]** counsel for and in furtherance of ABC's interests and because he did not act from personal motive or beyond the scope of his official duties, he should be granted summary judgment and dismissed from this proceeding. On the other hand, plaintiff's counsel contend that Rosen retaliated and discriminated against their client and otherwise participated in wrongful tortious activity as to her.

However, the fact that Rosen was acting as an attorney and therefore is protected by the attorney-client privilege will preclude him from being sued in the circumstances presented in this case. The Magistrate has concluded, and this Court has affirmed, that there has not been a sufficient showing of fraud or misconduct to defeat the attorney-client privilege. See Orders of May 1, 1985, May 17, 1985 and May 24, 1985. The magistrate pursued the inquiry into plaintiff's motion to compel on the basis of attorney-client privilege carefully, considered counsel's argument, reviewed the relevant transcripts of testimony and otherwise conducted a complete hearing. The findings set out in his May 17, 1985 Memorandum Opinion are instructive:

In her motion to compel, plaintiff has contended that defendants **[*14]** have sought to evade discovery, i.e. to avoid answering interrogatories and deposition questions and furnishing documents and records pursuant to requests for production of documents, on the basis that the disclosure would reveal communications subject to the attorney-client privilege. According to plaintiff, the information sought is not protected by the attorney-client privilege on three grounds: 1) the communications related to business matters and not the giving of legal advice, 2) the communications fell within an exception to the attorney-client privilege since they were made in furtherance of illegal conduct, and 3)

Get a Document - by Citation - 1985 U.S. Dist. LEXIS 18787    Page 6 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 23 of 56

even if privileged, the attorney-client privilege was waived with regard to some of these communications. Defendants have maintained that they have adequately established in the record in this case that the communications concerned the giving of legal and not business advice, and thus were properly attorney-client matters, that no exception to the attorney-client privilege is applicable and that there has been no waiver of the privilege.

Id. at 2.

* * *

The mere fact that business considerations are weighed in the rendering of legal advice does not **[*15]** vitiate the attorney-client privilege. In the present case, there has been an ample showing that the communications between the management officials of ABC, Inc. and their in-house counsel related to the giving of legal advice independent of whether business ramifications might have been involved. n4 Therefore, the Magistrate concludes that the communications are within the protection of the attorney-client privilege as involving the giving of legal advice and are not disclosable as communications involving business discussions and the exercise of business judgment.

Id. at 5-6.

* * *

To invoke the "crime-fraud" or other misconduct exception to the attorney-client privilege, the party alleging misconduct must make a prima facie or probable cause showing that such misconduct occurred. After full consideration of both the written submissions of plaintiff's counsel and their oral representations and arguments at the hearing before the Court, the Magistrate concludes that plaintiff in this case has failed to proffer sufficient evidence to rise to the level of a prima facie showing. Further, the Magistrate is of the view that plaintiff has failed even to put forward **[*16]** enough factual information to require the Magistrate to conduct an in camera examination of the "confidential" documents themselves in an effort to determine whether these documents might raise the level of proof to a prima facie showing. See, In Re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 815 (D.C. Cir. 1982). It is important to reemphasize here that mere allegations of wrongdoing or simply naming attorneys as defendants in litigation is not enough to vitiate the attorney-client privilege.

Id. at 12.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 See, e.g., Ornes depo., September 14, 1984, pg. 40, lines 6-19; pg. 57, lines 18-22; pg. 58, lines 1-15; pg. 148, lines 18-21; Rosen depo., November 26, 1984 (Volume I), pg. 7, lines 5-22; pg. 8, lines 1-22; pg. 9, lines 1-6; pg. 10, lines 9-22; pg. 12, lines 12-16; pg. 39,

Get a Document - by Citation - 1985 U.S. Dist. LEXIS 18787    Page 7 of 12

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 24 of 36

lines 2-22; pg. 40, lines 1-6; pg. 45, lines 18-22; pg. 46, lines 1-2; and Cusack depo., November 2, 1984, pg. 10, lines 24-25; pp. 11-13; pg. 14, lines 2-3; pg. 44, lines 5-25; pg. 45, 1-14, pg. 88, lines 8-25; pg. 89, lines 2-23.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*17]**

In light of the above, the Court rules that plaintiff has failed to point to or provide any evidence that Jeffrey Rosen acted other than as an in-house counsel. This finding would, of course, not preclude an action against an individual who is an attorney but who is not acting in his role as a legal counselor to another individual or entity. This conclusion is limited to the circumstances and showings made in this case in which there is no evidence that Rosen acted beyond the scope of a corporate attorney-investigator. The communications in that role are protected by the attorney-client privilege. Upjohn Co. v. United States, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). Cf. Whittlesey v. Union Carbide Corp., 742 F.2d 724, 726-27 (2d Cir. 1984) (corporate counsel not exempt from protection of Age Discrimination Act when his activities involved legal work and only a small amount of policymaking).

Accordingly, summary judgment is **granted** and the complaint and amended complaint are **dismissed** with prejudice as to defendant Rosen.

## V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Count V of the amended complaint, incorrectly designated **[*18]** as Count IV, presents Ms. Coleman's claim for intentional infliction of emotional distress. The specific claims are set out in paragraphs 42, 43, 44, 45.

### A.

Paragraph 42 charges the defendant Abernathy with acts of sexual harassment, including sexual advances, verbal comments, sexual solicitations on various occasions. The allegations of the paragraph are sufficient to support the plaintiff's claim. Howard University v. Best, 484 A.2d 958, 986 (D.C. App. 1984). See also Rogers v. Loews L'Enfant Plaza Hotel, 526 F. Supp. 523, 530-531 (D.D.C. 1981). Acts of sexual harassment may rise to a level supporting a claim of intentional infliction of emotional distress; whether it does in this case is a question for the jury.

The defendants' motion for summary judgment as to paragraph 42 of the amended complaint is **denied.**

### B.

Paragraph 43 charges ABC and its officers and employees with a number of acts including acts of retaliation and reprisal, discharge of plaintiff without notice, ransacking her office in a manner so as to create wrongful impressions of her conduct, barring plaintiff from ABC and spreading and causing unwarranted rumors to be **[*19]** spread. Plaintiff's claim is more than a mere employer-employee dispute which cannot amount to intentional infliction of emotional distress. See, e.g., Howard University, 484 A.2d at 986; Shewmaker v. Minchew, 504 F. Supp. 156, 163 (D.D.C. 1980), aff'd, 215 U.S. App. D.C. 53, 666 F.2d 616 (D.C. Cir. 1981); Beidler v. W.R. Grace, Inc., 461 F. Supp. 1013, 1016 (E.D. Pa. 1978), aff'd, 609 F.2d 500 (3rd Cir. 1979). Rather, the alleged retaliation is a direct outgrowth of sexual harassment and as such the employer's response to an individual's claim of such harassment may present a claim of intentional infliction of emotional distress. Rogers v. Loews L'Enfant Plaza Hotel, 526 F. Supp. at 1031.

The defendants' motion for summary judgment as to paragraph 43 of the amended complaint

is **denied.**

**C.**

The allegations in paragraph 44 regarding a fundraiser and the activities of defendants' attorneys are insufficient as a matter of law to support a claim of intentional infliction of emotional distress. As inappropriate as defense counsel's attendance was on the occasion described in the amended complaint, that behavior is not sufficiently outrageous **[*20]** to constitute intentional infliction of emotional distress. Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. App. 1982), cert. denied, 459 U.S. 912, 74 L. Ed. 2d 176, 103 S. Ct. 221 (1982); Waldon v. Covington, 415 A.2d 1070, 1076-78 (D.C. App. 1980).

Further, the memorandum referred to in the amended complaint is subject to the attorney-client privilege. Plaintiff has never demonstrated that her receipt of the memorandum was facilitated by an individual at ABC who had the authority to waive the privilege for the corporation. Judicial compulsion to present the document at a hearing held in this matter on a separate motion does not constitute voluntary waiver. Chubb Integrated Systems, Ltd. v. Nat'l Bank of Washington, 103 F.R.D. 52, 63 & n.2 (D.D.C. 1984).

**D.**

Finally, the claims in paragraph 45 regarding representations made by defendants' counsel in the District of Columbia unemployment compensation proceedings must be excluded. Opposing a claimant's request for unemployment compensation, even through alleged misrepresentation and ex parte contact, does not constitute outrageous behavior. Sere, 443 A.2d at 37; Waldon, **[*21]** 415 A.2d at 1076-78. Moreover, it is settled law that proceedings before that Board are absolutely confidential and privileged. Certainly, no representations made during the course of the hearing may become the subject of a lawsuit. See D.C. Code § 46-114(f); Goggins v. Hoddes, 265 A.2d 302 (D.C. App. 1970). However, plaintiff also alleges as a cause of action that an unethical ex parte communication was made to the Board by ABC's attorneys which was extrinsic to and outside that which took place at the hearing itself. That communication, if made by ABC, is similarly privileged as information obtained from any employing unit. D.C. Code § 46-114(f). Cf. Holland v. Marriott Corp., 34 Fair Empl. Prac. Cas. (BNA) 1763, 1767 (D.D.C. 1984).

The defendants' motion for summary judgment as to paragraphs 44 and 45 of the amended complaint is **granted.** Paragraphs 44 and 45 are **dismissed.**

## VI. ABC'S LIABILITY FOR INTENTIONAL TORTS

Defendants argue that ABC cannot be held liable for the intentional torts (assault, battery, intentional infliction of emotional distress, and defamation) of its employees and thus summary judgment should be granted **[*22]** in its favor on the common law tort counts. The law has evolved such that an employer may be liable for an employee's intentional tort if the tort was committed in the scope of employment or to further an employer's business. See Prosser and Keeton, § 70 The Law of Torts at 505-07 (5th ed. 1984).

Our Circuit Court of Appeals has reaffirmed that whether a tort was committed in the scope of employment is generally a question of fact which should be submitted to the trier of fact. Jordan v. Medley, 228 U.S. App. D.C. 425, 711 F.2d 211, 215 (D.C. Cir. 1983); Lyon v. Carey, 174 U.S. App. D.C. 422, 533 F.2d 649, 651 (D.C. Cir. 1976).

Thus, summary judgment is inappropriate with respect to ABC's liability for intentional torts and the defendants' motion is denied.

## VII. RETALIATION CLAIMS, RATIFICATION CLAIMS AND INTENTIONAL INFLICTION

## OF EMOTIONAL DISTRESS AND DEFAMATION CLAIMS AGAINST DEFENDANT ABERNATHY

**A.**

Defendants have moved for summary judgment on the retaliation claims against all defendants claiming that there is sufficient evidence in the record that ABC had a legitimate reason for discharging the plaintiff. Amended Complaint, **[*23]** Count II -- Retaliation. The defendants claim that the discharge was appropriate because Ms. Coleman made non-negotiable demands on ABC which could not be met. Plaintiff has disputed that contention in her deposition testimony. Because there are disputed material facts on this issue, summary judgment is clearly not appropriate and the defendants' motion is **denied.** See, e.g., Alexander v. Pan American World Airways, 244 U.S. App. D.C. 287, 757 F.2d 362, 363 (D.C. Cir. 1985).

Defendants have also moved for summary judgment in favor of Mr. Abernathy on the retaliation and defamation claims. The Court further finds that there are disputed questions of fact on this question such as Mr. Abernathy's input into Mr. Coleman's job assignment after she complained of his behavior and alleged statements he made to other employees about Ms. Coleman. Therefore, summary judgment is inappropriate and the defendants' motion is **denied.** Alexander, 757 F.2d at 363.

**B.**

Similarly, the Court rules that the defendants' motion to dismiss as to claims that ABC ratified Abernathy's conduct, namely, sexual harassment, retaliation and intentional infliction of emotional distress, **[*24]** because ABC took no action, although previously informed of sexual harassment incidents by male employees, cannot be granted at this time. (Amended Complaint, PP 16, 27, 46). The plaintiff alleges that she has other such evidence to introduce. Within reasonable boundaries, evidence of other incidents of sexual harassment is relevant to plaintiff's claim. Vinson v. Taylor, 243 U.S. App. D.C. 323, 753 F.2d 141, 146 (D.C. Cir. 1985). Should the plaintiff has such evidence to proffer, it would be inappropriate for the Court to prevent her from so doing at this stage of the litigation.

The defendants' motion to dismiss is **denied.**

## VIII. DEFAMATION

Through interrogatory answers and her complaint, the plaintiff has charged in Count VI of the amended complaint five areas and instances of defamation. n5 Discovery initiated by the defendants has focused on the specific claims. n6 The Court will discuss each allegation in turn.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 This count was incorrectly labeled Count V in the amended complaint.

n6 Interrogatory answers 18 and 27 filed April 18, 1985.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*25]**

**A.**

Initially, plaintiff contends that a statement released to the press by ABC stating that "Miss Coleman's claims have been fully reviewed and we have concluded there is no merit to them" was defamatory. See Amended Complaint, P 51. The Court finds that the statement is opinion protected by the first amendment under the doctrine of Ollman v. Evans, 242 U.S. App. D.C. 301, 750 F.2d 970 (D.C. Cir. 1984) (en banc), cert. denied, 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 Mem. No. 84-1524 (May 28, 1985).

Ollman sets out several factors for the court to utilize when making a determination that a statement is fact or opinion. Common usage of the terms, suggests that ABC's statement is opinion. Id. at 979-81. A statement that after a review of charges the conclusion is reached that they have no merit is often a standard response by a defendant engaged in active litigation and cannot be commonly understood to mean that the charges, in reality, have no basis. A second factor, the verifiability of the statement, id. at 981-82, weighs in favor of considering the statement as opinion. The merits of Ms. Coleman's claims will be decided by a jury; **[*26]** that jury, however, will make no finding as to ABC's conclusion after the company investigated her charges. Another factor to be considered is the context of the statement. Id. at 982-83. The context of ABC's statement, as a response to a lawsuit which had been filed against it, indicates that the statement represents an opinion as to pending litigation.

More importantly, the broader context of the statement, id. at 983-84, sets the press statement apart as protected opinion. ABC issued a one-line press statement prompted by the plaintiff's lawsuit. What is contained in the statement is no more than what would be contained in an answer to the complaint. To prohibit ABC from issuing the type of statement that it did at the risk of liability for defamation would be tantamount to imposing a restraint on its ability to issue any comment on the litigation unless and until it received a favorable jury verdict.

Thus, defendants' motion to dismiss the defamation count on the ABC press statement is **granted.**

**B.**

Ms. Coleman claims that she was defamed by a statement that Rosen made to Huntington Williams, a colleague of Ms. Coleman's at ABC. Williams reported that **[*27]** Rosen said "that in his view Cecily was opening herself to a countersuit, and that as far as he saw it, the facts made    were more in support of a countersuit to defamation against her than for her complaint." Williams dep. at 148.

This statement is protected opinion under Ollman, supra. The two factors cited in that case which would lead to that conclusion are the immediate and broad context of the statement. 750 F.2d at 982-84. The statement was allegedly made by Rosen during the course of an investigation of Ms. Coleman's charges. Rosen was expressing his belief as to what he believed the investigation revealed. His representations regarding a countersuit for defamation were in the nature of legal opinion that he, as in-house counsel was making. Although there is reference to facts in the statement, the context of the statement is such that Rosen is clearly putting Williams on notice as to his views. The cautionary language used in the statement, while not conclusive, id. at 983, is persuasive.

The defendants' motion for summary judgment is **granted** as to Rosen's statement to Huntington Williams.

**C.**

Plaintiff next alleges defamation through the **[*28]** method by which the defendant packed and removed documents from her office following her termination and responsed to co-

workers' inquiries into the process and basis for those actions by saying that "they didn't want to know" and essentially to mind their own business.

The Court agrees that the plaintiff has pointed to specific instances in the record which support the conclusion that those actions conveyed a defamatory meaning to her co-employees. This evidence of defamatory meaning is sufficient to withstand summary judgment. See McBride v. Merrell Dow and Pharmaceuticals, Inc., 230 U.S. App. D.C. 403, 717 F.2d 1460, 1465 (D.C. Cir. 1983) (motion to dismiss).

Although the actions taken by ABC and statements made to co-employees regarding the documents are arguably protected by the qualified employer privilege, Holland v. Marriott Corp., 34 Fair Empl. Prac. Cas. (BNA) 1763, 1767 (D.D.C. 1984), the plaintiff has plead actual malice which may defeat the privilege. Id. See Amended Complaint, P 54. The plaintiff has raised sufficient question as to the way in which ABC proceeded with the documents contained in her office such that her charge of actual malice cannot **[*29]** be said to be based solely on mere "speculation." Id. at 1768. "While the existence of the privilege is a question of law for the court, whether it was abused by the defendant, is a question of fact for the jury." Mosrie v. Trussell, 467 A.2d 475, 477 (D.C. App. 1983).

The defendants motion for summary judgment is **denied** with respect to the removal of documents from plaintiff's office.

**D.**

The fourth claim of alleged defamation relates to alleged statements made by Mr. Abernathy regarding plaintiff's emotional and mental health. Such statements, if made, are defamatory. There is sufficient evidence in the record, Amended Complaint, Exhibit C, Abernathy dep. at 166, Nov. 2, 1984 Cusack dep. at 20, to indicate that Abernathy may have made statements to others at ABC concerning Ms. Coleman's mental health.

Summary judgment is thus not appropriate and the defendants' motion is **denied** as to Abernathy's statements.

**E.**

Finally, plaintiff's allegations regarding statements made by ABC to a political campaign cannot be considered defamatory. The only citations to the record which the plaintiff can point to are statements by Ms. Coleman repeating **[*30]** what a Mondale-Ferraro official told her. Such evidence is inadmissible hearsay. The record does indicate that an ABC official, Sharon Young, told campaign representatives "Are you aware that Cecily Coleman is involved in a lawsuit against my employer? And given that, I do hope that everything will be conducted in a professional and equal manner." Young dep. at 23. Plaintiff can point to nothing which is false in that statement. Truth is an absolute defense to defamation. Prosser and Keeton, § 116 The Law of Torts at 839-40 (5th ed. 1984). There is no factual dispute as to the truth of the statement. Ms. Young's statement, which may or may not have had detrimental effects on Ms. Coleman's career, is not a basis for a defamation action.

Summary judgment with respect to the statements made to a political campaign therefore is **granted.**

**Entered: June 18, 1985**

**Barrington D. Parker**

United States District Judge

Get a Document - by Citation - 1985 U.S. Dist. LEXIS 18787          Page 12 of 12

Case 1:07-cv-00569-JDB     Document 5-6     Filed 04/05/2007     Page 29 of 36

Service: **Get by LEXSEE®**
Citation: **1985 U.S. Dist. LEXIS 18787**
View: Full
Date/Time: Thursday, April 5, 2007 - 5:26 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis®**

About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 16872                    Page 1 of 2

Case 1:07-cv-00569-JDB     Document 5-6     Filed 04/05/2007     Page 30 of 36

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 16872**

*2002 U.S. Dist. LEXIS 16872, \**

JUSTINA GREEN, et al., Plaintiffs, v. BOWNE OF NEW YORK LLC, Defendant.

Civil Action No. 02-1263 (GK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2002 U.S. Dist. LEXIS 16872

September 5, 2002, Decided
September 5, 2002, Filed

**DISPOSITION: [\*1]** Defendant's partial motion to dismiss granted in part and denied in part.

**COUNSEL:** For JUSTINA GREEN, QUEEN TAYLOR, NICOLE TAYLOR, SONYA NICHOLSON, MEAGAN FRAME, plaintiffs: Theodore Scot Allison, Washington, DC.

For BOWNE OF NEW YORK, LLC, defendant: Christopher Schwartz, HOLLAND & KNIGHT, L.L.P., Washington, DC.

**JUDGES:** Gladys Kessler, United States District Court Judge.

**OPINION BY:** Gladys Kessler

**OPINION: MEMORANDUM OPINION**

Upon consideration of Defendant's Partial Motion to Dismiss, the Opposition, and the Reply, the Court concludes that the Motion should be **granted in part** and **denied in part** for the following reasons.

1. Defendant argues that Plaintiff's fourth claim for breach of contract must be dismissed for failure to state a claim. "It is well-settled District of Columbia law that, in the absence of clearly expressed contrary intent ... the parties have in mind merely the ordinary business contract for continuing employment, terminable at the will of either party." Minihan v. Am. Pharm. Ass'n., 259 U.S. App. D.C. 10, 812 F.2d 726, 727 (D.C. Cir. 1987); **[\*2]** Willoughby v. Potomac Elec. Power Co., 100 F.2d 999, 1001 (D.C. Cir. 1996). In short, there is a longstanding presumption in the District of Columbia that, unless a contrary contractual intent is clearly expressed, all employment is at-will. Sullivan v. Heritage Found., 399 A.2d 856, 860 (D.C. 1978).

In this case, there is no question that the understanding between the parties was clear. Defendant's employee handbook states: "this booklet ... is not intended to be, nor is it a contract or guarantee of employment of working conditions." Accordingly, the Plaintiffs' have failed to state a claim for breach of contract.

2. Defendant argues that Plaintiffs' fifth claim for intentional infliction of emotional distress should be dismissed for failure to state a claim. In particular, Defendant argues that Plaintiffs have failed to allege, as a matter of law, facts which would fall within the requirements of Sere v. Group Hospitalization Inc., 442 A.2d 33 (D.C. 1982). That seminal case requires that, in order to state a claim for intentional infliction of emotional distress, a plaintiff must show

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 16872     Page 2 of 2

Case 1:07-cv-00569-JDB   Document 5-6   Filed 04/05/2007   Page 31 of 36

"(1) extreme and outrageous conduct on the **[\*3]** part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Id. at 37.

This is an employment discharge case. The courts have long held that "mere discharge of an employee is not 'conduct that goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community.'" Elliot v. Health Care Corp., 629 A.2d 6, 9 (D.C. 1992). There are no facts alleged by Plaintiffs that could possibly fit within this standard. Moreover, Plaintiffs will have an opportunity to recover for emotional distress as part of their compensatory damages for discriminatory treatment based on race, ethnic origin, gender and age, if they prevail on these claims.

3. Defendant also argues that Plaintiffs have failed to state a claim for common law fraud and defamation. After considering the arguments of counsel presented in their briefs, the Court concludes that Plaintiffs have in fact stated such claims and that the Motion to Dismiss these claims should be denied.

Sept 5, 2002
Date

Gladys Kessler

United States District Court Judge

**ORDER**

Upon consideration **[\*4]** of Defendant's Partial Motion to Dismiss, the Opposition, Reply, and the appropriate case law, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that as to Count 4, Defendant's Partial Motion to Dismiss is **granted;** and it is further

ORDERED that as to Count 5, Defendant's Partial Motion to Dismiss is **granted;** and it is further

ORDERED that Defendant's Motion to Dismiss is **denied** as to Counts 6 and 7.

**SO ORDERED** this 5th day of September, 2002.

Gladys Kessler

United States District Court Judge

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 16872**
View: Full
Date/Time: Thursday, April 5, 2007 - 5:27 PM EDT



About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 29541                Page 1 of 5

Case 1:07-cv-00569-JDB     Document 5-6     Filed 04/05/2007     Page 32 of 36

Service: Get by LEXSEE®
Citation: 2004 U.S. Dist. LEXIS 29541

*2004 U.S. Dist. LEXIS 29541, \**

DAVID SPYCHALSKI, Plaintiff, v. THE UNIVERSITY CLUB, et al., Defendants.

Civil Action No. 03-2127 (PLF)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2004 U.S. Dist. LEXIS 29541

June 9, 2004, Decided
June 9, 2004, Filed

**CORE TERMS:** summary judgment, intentional interference, wrongful termination, contractual, at-will, partial, public policy, third person, declaration, terminated, catering, genuine issue, sole reason, furtherance, regulation, careful consideration, motion to dismiss, general manager, memorandum, handbook, sexually, staff

**COUNSEL:** **[\*1]** For DAVID SPYCHALSKI, Plaintiff: Frederic M. Brandes, Timonium, MD; James R. Klimaski, KLIMASKI & ASSOCIATES, PC, Washington, DC; John P. Racin, LAW OFFICE OF JOHN P. RACIN, Washington, DC.

For THE UNIVERSITY CLUB, ALBERT ARMSTRONG, BRAD ELMORE, Defendants: Raymond Charles Baldwin, SEYFARTH SHAW, Washington, DC.

**JUDGES:** PAUL L. FRIEDMAN, United States District Judge.

**OPINION BY:** PAUL L. FRIEDMAN

**OPINION:** MEMORANDUM OPINION

This matter is before the Court on Defendants' Partial Motion to Dismiss or, in the Alternative, for Summary Judgment. Upon careful consideration of the parties' briefs, the Court concludes that it will grant defendants' motion for partial summary judgment.

I. BACKGROUND

In his complaint plaintiff makes the following allegations: Plaintiff was employed as the executive chef of The University Club, and during plaintiff's tenure, defendant Brad Elmore was the club's house manager. See id. PP 3, 5. On two occasions in March 2000, Mr. Elmore displayed sexually explicit photographs to plaintiff despite plaintiff's express request against such actions. Shortly after these incidents, Mr. Elmore began circulating rumors about plaintiff, which plaintiff discussed with defendant **[\*2]** Albert Armstrong, the general manager of The University Club. See id. P 11. In November 2001, Mr. Elmore gave to the catering sales staff manager a copy a highly critical memorandum concerning the catering sales staff that plaintiff had written to Mr. Armstrong, which action was unusual and "must have had the concurrence of both Elmore and Mr. Armstrong." Id. P 12. As a result of the memorandum, the catering sales manager filed an internal grievance against plaintiff. See id. P 13.

In February 2002, while plaintiff was in Mr. Elmore's office Mr. Elmore spoke with someone on the phone within plaintiff's hearing and made several sexually graphic comments. See

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 29541

Case 1:07-cv-00569-JDB   Document 5-6   Filed 04/05/2007   Page 33 of 36

Page 2 of 5

Compl. P 15. The sexual comments continued after this incident, and plaintiff filed an EEOC charge in March 2002. In October 2002, plaintiff was advised that he was under investigation for "raising a voice at work," the same day on which Mr. Elmore informed plaintiff that Elmore had been "written up" for showing plaintiff pornography. Id. P 18. It is unclear from the complaint when plaintiff was terminated, but a termination letter attached to defendants' motion indicates that Mr. Armstrong terminated plaintiff **[*3]** on October 24, 2002. Defendants' Partial Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mot."), Ex. 4, October 25, 2002 letter from A. Armstrong to D. Spychalski.

In his complaint plaintiff raises four claims: (1) sexual harassment; (2) intentional interference with contractual relations (against defendant Armstrong only); (3) negligent supervision; and (4) wrongful termination. Defendants filed a partial motion to dismiss or, in the alternative, for summary judgment on Counts II and IV. Upon careful consideration of the parties' positions, the Court will grant defendants' partial motion for summary judgment as to both counts.

## II. DISCUSSION

### A. *Standard of Review*

Defendants filed a motion to dismiss or, in the alternative for summary judgment. Because the Court will consider materials outside of the pleadings, the Court will treat defendants' motion as a motion for summary judgment. See FED. R. CIV. P. 12(b). Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine **[*4]** issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When considering a summary judgment motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. See also Washington Post Co. v. United States Dep't of Health and Human Services, 275 U.S. App. D.C. 101, 865 F.2d 320, 325 (D.C. Cir. 1989).

Plaintiff's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. See FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Plaintiff is "required to provide evidence that would permit a reasonable jury to find" in his favor. Laningham v. United States Navy, 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242 (D.C. Cir. 1987). **[*5]** If plaintiff's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. To defeat summary judgment, plaintiff must have more than "a scintilla of evidence to support his claims." Freedman v. MCI Telecommunications Corp., 347 U.S. App. D.C. 112, 255 F.3d 840, 845 (D.C. Cir. 2001).

### B. *Intentional Interference with a Contract*

Defendants first argue that they should be granted judgment with respect to Count II (Intentional Interference with a Contract) because an employment contract did not exist due to plaintiff's status as an "at-will" employee. See Memorandum of Points and Authorities in Support of Partial Motion to Dismiss or, in the Alternative for Summary Judgment ("Defs.' Mem.") at 4. In the District of Columbia, the law on intentional interference with contractual relations provides that:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary **[*6]** loss resulting to the other from the failure of the third person to perform the contract.

Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., 565 A.2d 285, 290 (D.C. 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 766 (1979)).

To recover in tort for intentional interference with contractual relations, a plaintiff must first establish the requisite elements of a *prima facie* case: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of its breach; and (4) damages resulting from the breach. See Curaflex Health Services, Inc. v. Bruni, 899 F. Supp. 689, 694 (D.D.C. 1995); see also Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., 565 A.2d at 289 (citing Alfred A. Altimont. Inc. v. Chatelain, Samperton, and Nolan, 374 A.2d 284, 288 (D.C. 1977)); Nickens v. Labor Agency of Metropolitan Washington, 600 A.2d 813, 819 (D.C. 1991). It is well-established, however, that an at-will employee cannot meet the *prima facie* standard because he "[does] not have a contractual employment relationship **[*7]** [he can] use as the basis for a suit for tortious interference with a contractual relationship." McManus v. MCI Communications Corp., 748 A.2d 949, 957 (D.C. 2000). See also Gross v. Davis, Civil Action No. 01-1486, 2003 U.S. Dist. LEXIS 3427, at *5-6 (D.D.C. Mar. 3, 2003); Riggs v. Home Builders Institute, 203 F. Supp. 2d 1, 23 (D.D.C. 2002).

In support of their motion defendants attached to their brief an excerpt from "The University Club Employee Handbook," which expressly states in a section entitled "Employment-At-Will" that club employees "are not employed for a definite or set period of time but rather at [the employee's] and at the Club's will," and that the employee "or the Club may terminate [the employee's] employment at any time for any reason." Defs.' Mot., Ex. 1, The University Club Employee Handbook at 1. Defendants also attached plaintiff's signed "Acknowledgment of Receipt" of the handbook, which explicitly states that "this handbook is not an express or implied contract of employment." Defs.' Mot., Ex. 2, Acknowledgment of Receipt. Finally, defendants provide the declaration of Paula V. Thompson, Human Resources **[*8]** Manager at the University Club, in which Ms. Thompson states that "all employees at the Club, with the exception of the General Manager, are at-will employees and do not have employment contracts or employment agreements of any kind." See Defs.' Mot., Ex. 3, Declaration of Paula V. Thompson P 5.

In response to defendants' argument, plaintiff has not put forth any evidence that the employment was contractual. Instead, plaintiff argues that "employment at-will is not a denial of contract status, but rather an open ended contract," although plaintiff offers no legal support for this assertion. Opposition to Partial Motion to Dismiss or in the Alternative for Summary Judgment ("Pl.'s Opp.") at 1. Plaintiff's argument clearly misstates established law and does not save his claim. Accordingly, the Court will grant defendants summary judgment on Count II (Intentional Interference with a Contract).

C. *Wrongful Termination*

Defendants also argue that they should be granted judgment with respect to Count IV (Wrongful Termination). See Def.'s Mem. at 7. District of Columbia law presumptively bars wrongful termination claims brought by at-will employees. See Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991). **[*9]** In Adams v. George W. Cochran & Co., the District of Columbia Court of Appeals recognized a narrow policy exception to this rule,

however, if the plaintiff demonstrates that "the sole reason for [the employee's] discharge is the employee's refusal to violate the law, as expressed in a statute or a municipal regulation." Id. at 34. In Carl v. Children's Hospital, 702 A.2d 159 (D.C. 1997), the court expanded this exception slightly, concluding that circumstances other than an employee's outright refusal to violate a law may constitute grounds for a public policy exception if the employee acted in furtherance of a public policy "solidly based on a statute or regulation that reflects the particular public policy to be applied or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct." Id. at 163. See also Liberatore v. Melville Corp., 335 U.S. App. D.C. 26, 168 F.3d 1326, 1331 (D.C. Cir. 1999); Riggs v. Home Builders Institute, 203 F. Supp. 2d at 7-8.

Here, plaintiff has not demonstrated that the sole reason for his discharge was his refusal to violate any law or that the actions **[*10]** for which he was terminated were in furtherance of a clearly articulated public policy based directly on a statute, a regulation or the United States Constitution. Instead, plaintiff argues that "the Constitution of the United States gives him the right to practice his own sexuality without having his employer force homosexuality upon him as a term and condition of his employment." Pl.'s Opp. at 1. This argument simply is non-responsive. Upon the foregoing, the Court will grant defendants' summary judgment on Count IV (Wrongful Termination). An Order and Partial Judgment consistent with this Memorandum Opinion shall issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN

United States District Judge

DATE: June 9, 2004

ORDER AND PARTIAL JUDGMENT

This matter is before the Court on Defendants' Partial Motion to Dismiss or, in the Alternative, for Summary Judgment. For the reasons state by separate Memorandum Opinion issued this same day, the Court concludes that it will grant defendants' motion for partial summary judgment. Accordingly, it is hereby

ORDERED that Defendants' Partial Motion to Dismiss or, in the Alternative, For Summary Judgment [4-1] is GRANTED; and it is

FURTHER **[*11]** ORDERED that JUDGMENT is entered for defendants on Count II and Count IV of the complaint.

SO ORDERED.

PAUL L. FRIEDMAN

United States District Judge

DATE: June 9, 2004

Service: **Get by LEXSEE®**
Citation: **2004 U.S. Dist. LEXIS 29541**
View: Full
Date/Time: Thursday, April 5, 2007 - 5:27 PM EDT

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 29541                    Page 5 of 5

Case 1:07-cv-00569-JDB    Document 5-6    Filed 04/05/2007    Page 36 of 36

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- ▣ - Questioned: Validity questioned by citing refs
- △ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ❶ - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis®**

About LexisNexis  | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.